**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**UMAR HASSAN BURLEY**                             *
1722 Aberdeen Road, Apt. 2
Baltimore, MD 21234                                *

**BRENT ANDREW MATTHEWS**                          *
700 N. Woodington Road
Baltimore, MD 21229                                *

       Plaintiffs,            *       Civil No. _____

v.                                                *       **JURY DEMAND**

**BALTIMORE CITY POLICE**                          *
**DEPARTMENT**
                                                   *

    <u>Serve on</u>:
    Interim Commissioner Gary Tuggle        *
    601 E. Fayette Street
    Baltimore, MD 21201                     *

**STATE OF MARYLAND**                              *

    <u>Serve on</u>:                          *
    Nancy K. Kopp, Treasurer
    80 Calvert Street, Rm. 109              *
    Louis L. Goldstein Treasury Building
    Annapolis, MD 21401                     *

**WAYNE JENKINS**                                  *
Individually and in his Official Capacity as a
Detective of the Baltimore City Police            *
Department
601 E. Fayette Street                             *
Baltimore, MD 21201
                                                   *

**RYAN GUINN**                                     *
Individually and in his Official Capacity as a
Detective of the Baltimore City Police            *
Department
601 E. Fayette Street                             *
Baltimore, MD 21201
                                                   *

**KEITH GLADSTONE**
Individually and in his Official Capacity as a     *
Sergeant of the Baltimore City Police
Department                                         *
601 E. Fayette Street
Baltimore, MD 21201                                *

**THE ESTATE OF SEAN MATTHEW**                      *
**SUITER**
                                                    *

    <u>Serve on</u>:
    Nicole Rochelle Suiter                          *
    Personal Representative
    90 Hunter Creek Drive                           *
    York, PA 17406
                                                    *
        Defendants.
                                                    *
_____

## COMPLAINT

    Plaintiffs Umar Hassan Burley and Brent Andre Matthews, by their undersigned attorneys Silverman|Thompson|Slutkin|White, LLC, file this Complaint against the Baltimore City Police Department, the State of Maryland, Wayne Jenkins, Ryan Guinn, Keith Gladstone, and the Estate of Sean Matthew Suiter ("Defendants"). In support, Plaintiffs state as follows:

## INTRODUCTION

    1.    Plaintiffs Umar Hassan Burley and Brent Andre Matthews lost years of their lives in prison solely because of the unconstitutional practices and policies of the Baltimore City Police Department ("BPD").

    2.    On April 28, 2010, plainclothes BPD officers ("Officers") and members of the elite Gun Trace Task Force ("GTTF"), while wearing masks, with guns drawn, and acting without reasonable suspicion, illegally stopped Plaintiffs. Because the Officers drove unmarked vehicles and did not identify themselves as police, Plaintiffs believed they were about to be

robbed and fled in Mr. Burley's car, an action that led to the death of an innocent third party during the ensuing chase.

3. Ultimately, the Officers arrested Plaintiffs and illegally searched Mr. Burley's car, consistent with their practice of seeking contraband and then selling or using the same to frame innocent people – as they did here.

4. Finding nothing in Mr. Burley's car, the Officers planted heroin inside it. This heroin had been taken from a stash of drugs that these Officers carried with them for the purpose of framing innocent persons to cover up the Officers' illegal behavior.

5. The Officers then falsified a statement of probable cause and other police reports relating to what transpired.

6. Relying on the planted evidence and falsified statements, state and federal prosecutors pursued the harshest punishments available against Messrs. Burley and Matthews. Faced with threats of long federal sentences unless they pled guilty to all charges against them, and with no good way of proving that the Officers had, in fact, manufactured the entire criminal case against them, Messrs. Burley and Matthews pled guilty to crimes they did not commit.

7. These guilty pleas dramatically reduced the amount of prison time Plaintiffs would have faced compared to convictions after a trial. Indeed, these circumstances reflected a real-life Hobson's choice between a long prison sentence and a lifetime of incarceration.

8. Years after serving some or all of their sentences, a federal investigation uncovered unconstitutional practices and policies that pervaded the GTTF and BPD. Specifically, the federal investigation revealed that Defendants had in fact planted the drug evidence in Mr. Burley's car and used this planted evidence in a false and malicious prosecution.

9. With this new information, Plaintiffs could finally prove their innocence.

10.     Accordingly, the United States Attorney's Office's petitioned the United States District Court for the District of Maryland to vacate both of their drug convictions, which was granted on December 18, 2017.

11.     Likewise, the State of Maryland and Mr. Burley filed a joint motion to withdraw his guilty plea for the vehicular manslaughter conviction arising from the same illegal stop, which was granted by the Circuit Court for Baltimore City on April 9, 2018.

12.     The unconstitutional conduct at issue was part of a pattern or practice of deficient training, supervision, and discipline by the BPD, beginning long before Defendants' illegal stop of Plaintiffs, which was sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge. Indeed, the illegal stop, search and seizure of Plaintiffs were themselves part of a pattern or practice sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge. The BPD either intended that these "customs or usages" continue or condoned such behavior by demonstrating deliberate indifference to stopping or correcting them.

13.     This lawsuit seeks redress for Messrs. Burley and Matthews' injuries resulting from the Officers' misconduct that was in accord with BPD policies or procedures and of which the BPD knew or should have known.

## JURISDICTION AND VENUE

14.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

16.     Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this

complaint occurred in this judicial district.

17.    On October 12, 2017, Plaintiffs sent Nancy K. Kopp, Treasurer of the State of Maryland, notice of Plaintiffs' claims.  A copy of this letter is attached hereto as **Exhibit A**.

18.    The State did not respond within the 6-month statutory period, thereby denying Plaintiffs' claims pursuant to MD. CODE ANN. STATE GOVERNMENT ART. § 12-107(d)(2).

## THE PARTIES

19.    Plaintiff Umar Hassan Burley is 47 years-old.  He was born and raised in Baltimore, Maryland.

20.    Plaintiff Brent Andre Matthews is 44 years-old.  He was born and raised in Baltimore, Maryland.

21.    At all times relevant hereto, Defendants Jenkins, Guinn, and Gladstone were police officers with the BPD.  All are sued in their official and individual capacities, while acting under color of law and within the scope of their employment.

22.    Defendants Jenkins is a former member of the GTTF; Defendants Guinn and Gladstone worked with him in specialized units.

23.    At all times relevant hereto, Defendant Suiter, who is now deceased, was a police officer with the BPD.  He died of a single gunshot wound to the head from his own service weapon the day before he was scheduled to testify before a federal grand jury in connection with an ongoing investigation and prosecution of several former GTTF members, which included Defendant Jenkins, for RICO-related violations consistent with Defendants' illegal stop of Plaintiffs in this matter.  Nicole Rochelle Suiter, Personal Representative of the Estate of Sean Matthew Suiter, is being sued in her representative capacity for Defendant Suiter's official and individual actions while acting under color of law and within the scope of his employment

during the arrest and subsequent investigation of Messrs. Burley and Matthews.

24. The BPD is a Maryland state agency that employs or has employed each of the Officers. It is a "person" within the context of 42 U.S.C. § 1983.

25. The BPD is an agency of Defendant State of Maryland ("State"). The State is a "person" within the context of 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

I. **DEFENDANTS' ILLEGAL STOP OF PLAINTIFFS IS BUT PART OF A WIDESPREAD BPD PATTERN OR PRACTICE OF ILLEGAL CONDUCT.**

26. The BPD knew or should have known years ago that officers given broad authority as part of "elite" units to combat violence, guns, and drugs often engaged in a pattern or practice of illegal activities like those that occurred here.

27. Unfortunately for Plaintiffs, and many other innocent victims, the BPD turned a blind eye to this pattern and practice of illegal activity, allowing Defendants the opportunity they never should have had to engage in the conduct at issue in this case.

### A. SUBSTANTIALLY-SIMILAR ALLEGATIONS TO THOSE IN THIS COMPLAINT STAINED THE GTTF'S PREDECESSORS.

28. Before the GTTF came into existence, the BPD utilized similar elite units comprised of plainclothes officers driving unmarked vehicles with wide latitude to investigate and arrest persons suspected of dealing drugs and/or gun violations, including the so-called "flex squads" and Special Enforcement Teams ("SETs").

29. With regard to the "flex squads," in January 2006, the Baltimore Sun published an article titled "Questions Raised for Years About City 'Flex Squad.'"

30. That article noted, *inter alia*, that:

- The BPD employed "flex squads" in all its districts which, unlike normal officers,

had enhanced freedom "to chase down suspected criminals in neighborhoods dominated by drug dealing and violence."

- "Defense attorneys, prosecutors and community members say they have heard for years about allegations of misconduct that included planted drugs and troublesome practices about how suspects were treated and charged."

- "In a warrant police used to search the flex squad office last month, investigators noted that previous allegations against [certain officers] 'have been made as to the planting of controlled dangerous substances on citizens in an effort to knowingly make false arrests.'"

- "The inquiry in the Southwest [district flex squad] has prompted concern about flex squads in other districts – each of the nine has at least one. In a statement, the [BPD] said it was examining 'all practices and procedures' of every district's 'flex' and drug enforcement units."

- "A department spokesman said that internal affairs will soon begin conducting annual evaluations of every officer in those units."

31. But years later, with "internal charges [still] pending against some officers involved with the flex squad," the City of Baltimore "did an about-face, agreeing to pay the [Southwest district flex] squad's supervisor a six-figure settlement and issuing a rare public apology."

32. Whatever became of those "internal charges" is not known, but regardless of whatever exoneration certain flex squad officers might have received, the squads themselves were eventually disbanded and BPD was on notice of at least the potential for abuse associated with officers who had the wide latitude to police in a manner similar to that of the flex squad officers.

33. Coincidentally (or perhaps not), at the same time the allegations surfaced regarding the flex squads, the Sun reported on similar allegations leveled at the SETs, whose "officers [were] accused of lying in charging documents, most of which involve drug arrests that result from car stops."

34.     Like the flex squads, SET members normally worked in plainclothes and patrolled the streets in unmarked cars. But whereas the flex squads were managed by each of the nine district commanders, the SETs (there were two – one on the east side and one on the west side of Baltimore) were managed directly by the BPD's Chief of Patrol.

35.     Ultimately, the SETs were disbanded.

36.     Indeed, for many years before the instant matter, the BPD was keenly aware of the illegal acts committed by unsupervised police units and officers, including those of William King and Antonio Murray who received hefty federal sentences for robbing drug dealers, drug trafficking, and gun violations in 2005 – similar to those charges against the GTTF.

37.     In sum, the illegal conduct of the BPD's flex squads and SETs was no secret to BPD or its policymakers. As such, the BPD had sufficient notice of the problems that could (and did) arise with employing elite units of plainclothed officers driving unmarked vehicles who had wide latitude to combat drug and gun-related offenses years before Defendants' illegal stop of Plaintiffs. Indeed, it is a reasonable expectation that given the knowledge that the BPD had prior to the events at issue in the instant Complaint, it would have taken sufficient steps to ensure that those events would not occur. But this it failed to do, thus allowing another elite squad, the GTTF, to do exactly what the flex squads and SETs were accused of and disbanded for.

**B.     BPD KNOWINGLY ALLOWED THE GTTF TO CONTINUE THE FLEX SQUAD AND SETs' PATTERN OF ILLEGAL CONDUCT.**

38.     Like the flex squads and SETs, the GTTF was an elite unit within the BPD with broad authority to roam the city ostensibly looking for drugs and guns.

39.     Although the BPD conducted internal investigations into the former elite units, and thus had ample opportunity to correct the illegal behavior, it failed to provide the necessary

training or oversight, if any, to ensure that the GTTF did not engage in the same pattern of misconduct.

40. Indeed, one need only look at several indictments against GTTF officers since 2017 for evidence of the same.

41. For example, on February 23, 2017, a number of GTTF officers, including Defendant Jenkins, were indicted by the United States Attorney's Office for the District of Maryland ("USAO") for various RICO offenses ("RICO Indictment").

42. The RICO Indictment revealed that the GTTF officers engaged in, among other things, the following overt acts:

- Conducting traffic stops of vehicles and stealing money, property, and narcotics from the vehicle occupants; and

- Preparing false and fraudulent official incident and arrest reports, reports of property seized from arrestees, and charging documents to conceal the fact that the defendants stole money, property, and narcotics from individuals.

43. One of the defendants in that prosecution, Jemell Rayam, pled guilty to a RICO conspiracy charge and cooperated with federal authorities during their investigation. In his plea agreement, he publicly admitted that, among other things, he:

> [r]obbed civilians he detained and in some cases arrested and stole money and drugs from them. RAYAM did this beginning in at least 2009 or 2010 when he joined the GTTF. At times, RAYAM shared the proceeds with co-defendants Momodu GONDO ("GONDO"), Wayne Jenkins ("JENKINS"), Daniel Hersl ("HERSL"), Marcus Taylor ("TAYLOR"), Defendant A and others, and on other occasions, he kept all the proceeds for himself . . . . RAYAM also sold, through associates of his, drugs that JENKINS gave him and split the proceeds of those sales. JENKINS obtained the drugs by robbing detainees and arrestees.

44. Astonishingly, the BPD was well-aware that on July 14, 2010, Rayam lied on a BPD-administered polygraph examination about a vehicle stop that had occurred in 2009, yet he kept his job.

45.     Specifically, he was asked two series of questions about his conduct as well as the

conduct of fellow officers, including:

- "Did you see Detective Giordano remove a bag from the truck of that car [you pulled over on Lafayette Ave on June 8, 2009]?";

- "Did you see Officer Sylvester take possession of a bag that was removed from that car?"; and

- "Did you conspire with Officer Sylvester to take money from anyone on June 8, 2009?"

46.     For each question, Rayam answered, "No."  The polygraph examiner "found the

possibility of deception [by Rayam] to be greater than 99% in both tests."  *See infra*:



# BALTIMORE POLICE DEPARTMENT





Stephanie Rawlings Blake
Mayor

FREDERICK BEALEFELD
Police Commissioner

| | | | |
|---|---|---|---|
| **To:** | Major Nathan Warfield<br>Internal Investigation Division | **Date:** | 07 / 14 / 2010 |
| **From:** | Detective John T. Brown<br>CID -Polygraph Unit | **Case#:** | IID# 2009-1060 |
| **Subject:** | Polygraph Examination of:<br>Detective Rayam, Jemell Lamar | **PF#:** | 2010-123 |
| | B / M / 29   DOB: 7/16/1980 | **Results:** | *Significant Responses Shown* |

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

With reference to the polygraph examination given to the above named subject, herewith is a *confidential brief analysis* of the Polygraph Examiner's report. This information is for *OFFICIAL POLICE USE ONLY* and should not be publicly disseminated.

### Procedures:

On Wednesday, July 14, 2010, Detective Jemell Rayam of the Baltimore Police Department was examined by polygraph. The LX4000 Computerized Polygraph was used. Detective Rayam attorney, Martin E. Cadogan, and Detective Burbra Price were in attendance. The examinee was allowed to confer with his attorney, and review his IID statement. A pre-test interview was conducted and Detective Rayam appeared to be suitable for examination by polygraph. The relevant questions were interspersed with irrelevant and control questions, and placed in a AFMGQT format. Standard polygraph procedures were exercised throughout the examination.

### Summary of case Facts:

Detective Rayam is the focus of an internal investigation and Detective Barbra Price requested that he be given a credibility assessment test (polygraph) to determine the veracity of his statement. During the polygraph pre-test interview, Detective Rayam denied the following: *searching the vehicle, seeing, removing a bag of money, seeing his partner, Detective Giordano search the car, seeing Officer Sylvester take possession of a bag of money, having any knowledge of any plans to steal money, and he denied receiving any of the stolen money.*

c/o 242 W. 29th Street • Baltimore, Maryland 21211

# Test I

### Relevant Questions.

1. (SR) Regarding the car you pulled over on Lafayette Ave on June 8, 2009 for Officer Sylvester, do you intend to answer each question truthfully?
   Answer – "Yes"

2. (R) Did you search the interior or trunk of that car?
   Answer – "No"

3. (R) Did you see a bag of money in that car?
   Answer – "No"

4. (R) Did you see Detective Giordano search the interior or trunk of that car?
   Answer – "No"

5. (R) Did you see Detective Giordano remove a bag from the trunk of that car?
   Answer – "No"

6. (R) Did you see Officer Sylvester take possesion of a bag that was removed from that car?
   Answer – "No"

# Test II

### Relevant Questions:

1. (SR) Regarding the car you pulled over on Lafayette Ave on June 8, 2009 for Officer Sylvester, do you intend to answer each question truthfully?
   Answer – "Yes"

2. (R) Did you make plans to meet with Officer Sylvester on June 8, 2009 before you made the car stop?
   Answer – "No"

3. (R) Did you conspire with Officer Sylvester to take money from anyone on June 8, 2009?
   Answer – "No"

4. (R) Did you receive any money from Officer Sylvester any time after that car stop?
   Answer – "No"

c/o 242 W. 29th Street • Baltimore, Maryland 21211

## Results:

The polygraph examination was given in two parts (Test I and Test II). Six charts containing psycho-physiological data were collected from the examinee. Consistent significant levels of biofeedback from the examinee was shown on the highlighted relevant issue questions in both tests. As requested by Detective Rayam's attorney, no post-test interview was conducted.

The LaFayette computerized polygraph *Polyscore algorithm* found the probability of deception to be greater than 99% in both tests.

It is this examiner's opinion, after conducting a comprehensive pre-test interview and chart analysis, that the responses shown to the above relevant questions are consistent with being untruthful, and or, not giving full disclosure.

## Final Call:

### *Significant Responses Shown*

Examiner:      John T. Brown

Reviewing Examiner:      Jimmy Hampton

47. Although the polygraph examiner found the probability of deception concerning Rayam's denial of misconduct "to be greater than 99%," the BPD did nothing to address, or for that matter, investigate the troubling misconduct.

48. Indeed, that was not the only instance in which the BPD and local authorities were aware of GTTF misconduct and did nothing to stop or correct it.

49. In a 2014 case involving Defendants Jenkins and Gladstone, Assistant City State's Attorney Molly Webb notified defense counsel that video camera footage taken of a search of a car directly contradicted the sworn statement of probable cause submitted by the officers.

50. In response to the troubling footage, ASA Webb dismissed the case and reported the disturbing inconsistency to BPD's Internal Affairs Division.

51. Upon information and belief, after ASA Webb reported the incident, Defendant Jenkins threatened ASA Webb to "stop talking about him," and in a suspicious turn of events, ASA Webb later lost her job.

52. Upon information and belief, no investigation was conducted or disciplinary actions were taken against any of the Officers concerning their alleged misconduct. In fact, Defendant Jenkins, who had already risen through the BPD ranks, was promoted to officer-in-charge of the GTTF in 2016. Likewise, upon information and belief, Defendant Gladstone remains employed by the BPD to this day. Similarly, by 2017, Defendant Guinn was selected to serve as a training instructor for the BPD's police academy and continues to train other BPD officers to this day.

53. Similar allegations attach to other, former GTTF officers. For example, Momodu Gondo admitted to "protecting" a Northeast Baltimore drug crew from arrest and "rogue officers who would rob them" and that he conspired with Rayam to rob other drug dealers of contraband

and money, all under the supervision of Defendant Jenkins.

54.    Gondo ultimately admitted to stealing over $100,000.00 in concert with other GTTF officers.  He further admitted to filing false police reports to cover their tracks.

55.    Speaking of his experience with Defendant Jenkins in the GTTF, Gondo stated:

> Defendant Wayne Jenkins was very reckless, you know. I mean, he was just out of control, putting citizens at risk, you know, driving on the side of the street, going in people bumpers. I just never saw anything like this . . . This dude is out of control. . . . It was crazy. Yeah. His -- his tactics in law enforcement, you know, he was -- you know what I mean? He was -- it was crazy. It was bad. It was bad.

56.    Gondo further admitted that he and Rayam seized two individuals, stole $3,500.00 from them, and detained them in an "off-site facility" in Baltimore City that was maintained by the BPD and used by GTTF.  Defendant Jenkins impersonated the United States Attorney to interrogate the individuals.  Thereafter, GTTF officers committed an armed burglary under color of law of the two detained individuals' residences and, under the guise of a search warrant, stole an additional $20,000.00.

57.    In another incident, Gondo admitted that he, Rayam, and Defendant Jenkins stole and sold a handgun, along with a pound of marijuana they had seized from another victim's home, for which they never filed an incident report.  Gondo and Rayam admitted to committing other armed robberies and sales of contraband with other GTTF officers.

58.    Likewise, on August 24, 2017, a federal grand jury indicted Sergeant Thomas Allers, GTTF's officer-in-charge from July 25, 2013 through June 14, 2016, on RICO and Hobbs Act Robbery/Extortion claims for the same type of misconduct ("Allers Indictment").

59.    The earliest identified overt act in the Allers Indictment occurred on March 11, 2014 when Allers, along with others, was alleged to have stolen approximately $50,000.00 from

a potential defendant in the course of executing a search warrant.

60.     The Allers Indictment is replete with a number of instances of Allers allegedly robbing persons against whom he was executing search and/or seizure warrants and then covering his tracks with false police reports as to what had occurred.

61.     Allers eventually pled guilty to the RICO conspiracy charges and was sentenced to 15 years in prison.

**C.      BPD ENTERED INTO A CONSENT DECREE IN WHICH IT ADMITTED TO A PATTERN OR PRACTICE OF CONDUCT IDENTICAL TO THAT AT ISSUE HERE AND BASED IN PART ON ACTIVITIES THAT OCCURRED IN 2010.**

62.     Following the April 2015 death of Freddie Gray in police custody, Baltimore Mayor Stephanie Rawlings-Blake asked the United States Department of Justice, Civil Rights Division, to conduct a pattern-or-practice investigation of BPD's policies.

63.     The Civil Rights Division issued an investigative report on August 10, 2016. That report presented, in relevant part, the following findings:

- The Civil Rights Division "reviewed hundreds of thousands of pages of documents, including all relevant policies and training manuals used by the [BPD] since 2010; BPD's database of internal affairs files; a random sample of about 800 case files on non-deadly force incidents; files on all deadly force incidents since 2010" and other data;

- The BPD engaged in a pattern or practice of conduct that violates the United States Constitution and federal law, including stops, searches and arrests without the reasonable suspicion or probable cause required under the Fourth Amendment to the United States Constitution;

- The foregoing pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity and resulted in part from BPD's zero tolerance enforcement strategy, dating back to the early 2000s;

- The BPD failed to take action against officers with a long history of misconduct that is well known to the Department. For example, one officer currently employed by the BPD had received approximately 125 complaints from

complainants within the Department and from the community since 2010, and many of these complaints allege serious misconduct. However, the DOJ found that the BPD had sustained only one complaint against the officer for minor misconduct;

- In June 2006, the ACLU of Maryland sued the BPD regarding its illegal arrests of thousands of Baltimore residents. In 2010, that case settled with BPD agreeing to change its policies and procedures and submit to an independent auditor to evaluate its progress toward adopting stop and arrest practices consistent with the United States Constitution;

- The final report of the auditor from 2014 noted that there were no systemic improvements in reporting for those stop and arrest offenses during the monitoring period; and

- Various policies that pre-date the events at issue in the instant complaint demonstrate that BPD failed to adequately equip its officers to police effectively and constitutionally.

64.    On January 12, 2017, the United States filed a complaint in the United States District Court for the District of Maryland against the BPD. That complaint alleged in relevant part that:

- In the late 1990s, BPD adopted zero tolerance policing strategies that prioritized officers making large numbers of stops, searches, and arrests for misdemeanor offenses without ensuring robust oversight to hold officers accountable for misconduct and protect the constitutional rights of Baltimore City residents;

- Based on data from 2010 – 2015, BPD engaged in a pattern or practice of conduct that violated the United States Constitution and federal laws. Those violations included unconstitutional stops, searches, and arrests that run afoul of the rights guaranteed to Baltimore's citizens by the Fourth and Fourteenth Amendments to the United States Constitution; and

- BPD's violations of the Constitution and federal law are driven by BPD's systemic deficiencies in policies, training, supervision, and accountability structures. BPD has been aware of these structural challenges for many years but has not taken adequate steps to comply with the Constitution or federal law.

65.    That same day, the United States and the BPD jointly filed a motion asking the court to approve a 227-page consent decree. That decree provides in relevant part that:

- BPD will provide its officers with training on stops, searches, and seizures;

- BPD will ensure that a supervising officer reviews all documentation relating to stops, searches, seizures, and arrests for completeness and adherence to the law and BPD policy; and

- BPD will audit the aforementioned supervisory reviews.

66.    On April 7, 2017, the court granted that motion, entered a slightly-modified version of the consent decree, and stated that it will retain jurisdiction over the decree until it is terminated. As of the filing of this complaint, the decree remains in place.

### D.    THE POLICIES AND "CUSTOM AND USAGE" OF THE BPD.

67.    BPD policymakers, aware of the potential for abuse among elite units like the GTTF since at least the mid-2000s when the Baltimore Sun reported on flex squad and SET misconduct and having the final authority to establish and implement policies, permitted and condoned the GTTF's unconstitutional conduct alleged herein by, *inter alia*, failing to establish and implement training policies designed to curb the abuses carried out by officers assigned to BPD units like the GTTF.

68.    That unconstitutional conduct was sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

69.    The BPD had actual or constructive knowledge of the same as identified above and either intended that the "custom or usage" or pattern or practice continue or was deliberately indifferent to stopping or correcting the same, which caused Plaintiffs' injuries.

70.    BPD policymakers, aware of specific instances of police misconduct acutely similar to that at issue here since at least 2006 and armed with actual knowledge of GTTF officers' misconduct both before and after the events at issue here took place, failed to adequately supervise and/or discipline their officers, thus allowing for the unconstitutional

conduct described herein to occur.

71.     That conduct was sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

72.     The BPD had actual or constructive knowledge of the same as identified herein and either intended that the "custom or usage" or pattern or practice continue or was deliberately indifferent to stopping or correcting the same, which caused Plaintiffs' injuries.

73.     The stop, search, arrest and seizure of Plaintiffs was part of a pattern or practice of illegal conduct sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

74.     The BPD had actual or constructive knowledge of the same as identified herein and either intended that the "custom or usage" or pattern or practice continue or was deliberately indifferent to stopping or correcting the same, which caused Plaintiffs' injuries.

75.     In sum, since at least 2005, the BPD (and therefore the State) had repeated notice through, *inter alia*, convictions of their police officers, complaints and suits lodged against their police officers, failed polygraph tests, and notifications from state prosecutors, that its officers engaged in a widespread pattern of flagrant unconstitutional violations.  Rather than take any action to stop such conduct, BPD condoned that pattern and practice by ignoring it.

## II.     PLAINTIFFS UNNECESARILY SERVED SUBSTANTIAL PRISON SENTENCES SOLELY BECAUSE OF DEFENDANTS' ILLEGAL POLICIES AND PRACTICES.

76.     As demonstrated below, Defendants' illegal stop of Plaintiffs, and all that followed, fits part and parcel with the illegal custom and usage, pattern and practice and/or policies and practices of the BPD that have existed since long before Defendants illegally stopped Plaintiffs.  Specifically, at all times relevant hereto, BPD officers engaged in warrantless

stops and seizures without probable cause, made false arrests, and covered their tracks with fabricated evidence and false statements like Defendants did here.

## A.    <u>THE UNCONSTITUTIONAL STOP.</u>

77.    On April 28, 2010, Messrs. Burley and Matthews were planning to attend a sentencing hearing in the Circuit Court for Baltimore County for a defendant recently convicted of murdering Mr. Burley's cousin. Specifically, they wanted to attend the sentencing to provide emotional support to loved ones who were delivering victim impact statements.

78.    Mr. Burley was waiting for Mr. Matthews in his car, which was located near an apartment building on the 3800 block of Parkview Avenue, Baltimore, Maryland.

79.    Mr. Matthews exited the building and entered Mr. Burley's vehicle.

80.    As far as Plaintiffs knew, there were no illicit drugs or other illegal contraband inside of Mr. Burley's vehicle. Plaintiffs had no illicit drugs or other illegal contraband on their person.

81.    Although there was no reasonable suspicion of criminal activity, Defendants Jenkins and Guinn, in an unmarked BPD vehicle, suddenly pulled in front of Mr. Burley's vehicle.

82.    A second unmarked BPD vehicle, operated by Defendant Suiter, quickly pulled behind Mr. Burley's vehicle and bumped it so that Mr. Burley was boxed-in and prevented from leaving the area.

83.    The plainclothes Officers jumped out of their vehicles wearing masks and with their guns drawn.

84.    None of them were in police uniform, displayed identification, or verbally identified themselves as police officers.

85.     Prior to this time, Plaintiffs were personally familiar with friends and family who had been robbed and/or kidnapped in this manner.

86.     With only a split second to react and fearing that they were about to be robbed or kidnapped by armed gunmen, Mr. Burley, with Mr. Matthews in the passenger seat, maneuvered his vehicle and narrowly escaped the attempted illegal stop.

87.     The Officers returned to their unmarked BPD vehicles and a high-speed chase ensued.  At no time did the Officers turn on police sirens or lights to indicate that they were, in fact, police officers.

88.     During the course of that chase, Plaintiffs' car reached an intersection with a four-way stop.  A car being driven by Elbert Davis reached the intersection at approximately the same time and proceeded in front of Plaintiffs' car.  Mr. Burley, who was driving the car, sought to speed through the intersection to avoid hitting the other car but, unfortunately, the two cars collided and Mr. Davis ultimately died from his injuries.

89.     Fearing for their lives, Messrs. Burley and Matthews exited the car after the accident (not knowing that Mr. Davis had been injured) and fled on foot to evade the Officers but were ultimately apprehended.

B.      **THE ILLEGAL PLANTING OF HEROIN.**

90.     Once Messrs. Burley and Matthews were detained on the side of the street, Defendant Jenkins instructed one of the Officers to call Defendant Gladstone and ask him to bring the "stuff" or "shit" in his car (referring to the stash of illegal drugs used by the GTTF and BPD to plant on innocent victims).

91.     Upon information and belief, Defendant Gladstone was asked to bring the "stuff" or "shit" because the Officers needed evidence to justify their illegal stop and search and seizure

of Messrs. Burley and Matthews in case they could not find anything in the car that would have justified their stop.

92.     Because there was nothing inside of Mr. Burley's vehicle to justify their illegal acts, Defendant Jenkins took 32 grams of heroin from Defendant Gladstone's vehicle and planted it on the floor of Mr. Burley's vehicle.

93.     Once Defendant Jenkins planted the heroin, he asked Defendant Guinn to instruct Defendant Suiter to search the vehicle.

94.     Defendant Suiter searched Mr. Burley's car and signaled that he "found" something.

95.     Despite knowledge of their illicit acts, the Officers intentionally withheld this information from others and used it to arrest the Plaintiffs.

96.     In sum, and in light of what was revealed in, *inter alia*, the DOJ Report, the RICO Indictment, the Jenkins and Superseding Indictments (*see* discussion *infra*), and the October 25, 2017 testimony of Gondo recounted above, the purpose of the warrantless search and seizure of Messrs. Burley and Matthews was to rob them of any drugs or money they may have possessed, as was the policy and practice of the flex squads, SETs, GTTF, and other BPD officers, all under the supervision of the BPD.

97.     Further, upon information and belief, Defendant Gladstone possessed the planted heroin because he and his co-conspirators had stolen it from other victims, as described in the preceding paragraphs, as was the policy and practice of the flex squads, SETs, GTTF, and other BPD officers, all under the supervision of the BPD. Had the planted heroin been obtained as part of a properly-documented seizure, Defendant Jenkins would not have been able to plant it inside

of Mr. Burley's vehicle without raising chain of custody concerns and potentially implicating the Officers in their illegal activity.

## C.     THE FABRICATED STATEMENT OF PROBABLE CAUSE.

98.     Later that day, Defendant Jenkins authored a fabricated statement of probable cause in which he falsely claimed that "32 individually wrapped pieces of plastic containing a tan powder substance each weighing approximately one gram (all of which was suspected high purity heroin)" was recovered from Mr. Burley's car.

99.     Although Defendant Jenkins knew that he had planted this evidence, he signed the statement affirmatively declaring that his statements were true under the penalties of perjury.

100.     Based solely on Defendant Jenkins' fabricated statement of probable cause, Messrs. Burley and Matthews were charged with two counts: (1) conspiracy to possess with intent to distribute heroin and (2) possession with intent to distribute heroin.

101.     Mr. Burley, individually, was also charged with vehicular manslaughter.

## D.     THE PLEA DEALS.

102.     After they were arrested, Plaintiffs were given the same choice that any criminal defendant faces: take a plea and hope for a reduced sentence or roll the dice and hope a jury acquits because if they do not, the full sentence available for the crime will likely be imposed.

103.     But for Plaintiffs, there was no real choice to make. Both were charged in the federal courts, where convictions typically result in sentences far harsher than those for similar convictions in state court. Additionally, federal prosecutors' success rates with juries eclipses that of state prosecutors by far, particularly when one compares cases tried in the United States District Court, where Plaintiffs ultimately entered guilty pleas, with those of the Circuit Court for Baltimore City ("City Circuit Court"), the only other venue in which they could have been

prosecuted. And a federal jury, which is generally far more predisposed to accepting the testimony of a police officer than a jury empaneled in the City Circuit Court, would have heard the coordinated testimony of multiple, veteran police officers, some of whom were members of the elite GTTF, while Plaintiffs would have had no evidence to contradict the Officers' testimony save to testify themselves.

104.    In sum, armed with falsified statements by Officers of the BPD and the acclaimed GTTF and the tragic death of a third-party, state and federal prosecutors threatened to seek the harshest punishments available against Plaintiffs if they did not enter "universal" guilty pleas (*i.e.*, the only way Plaintiffs might possibly receive reduced sentences was if they both pled guilty to one of the federal charges and if Mr. Burley pled guilty to the state charge). Indeed, prosecutors made clear that they would seek a sentence that, at minimum, would be "nearly double" that imposed after a universal plea.

105.    As they faced threats of longer federal sentences and with no good way of proving the Officers' misconduct, Messrs. Burley and Matthews ultimately agreed to plead guilty on or about June 9, 2011 to possession with intent to distribute heroin. Likewise, Mr. Burley agreed to plead guilty to the vehicular manslaughter charge in August 2011.

106.    Mr. Burley was sentenced to 15 years in prison for the federal drug charge, which ran concurrently with a 10-year state sentence for vehicular manslaughter.

107.    Mr. Matthews was sentenced to almost four years in prison (46 months) for the heroin that had been planted in the car in which he was a passenger.

### E.    MESSRS. BURLEY'S AND MATTHEWS' INCARCERATION.

108.    On or about September 9, 2013, Mr. Matthews was placed on supervised release after having served years in federal custody.

109.    Mr. Burley served six-and-a-half years in state prison before being transferred to federal custody on February 3, 2017.  He was ultimately exonerated and released later that year.

### F.    MESSRS. BURLEY'S AND MATTHEWS' EXONERATION.

110.    Despite knowing for many years that flex squad, SET, GTTF and BPD officers had committed the same illegal acts that resulted in Plaintiffs' wrongful incarceration, the BPD and relevant policymakers never investigated the circumstances surrounding Plaintiffs' questionable arrests.

111.    On or about June 22, 2017, a federal grand jury returned a superseding indictment against Defendant Jenkins and other BPD officers ("Superseding Indictment").[1]

112.    As part of their investigation into Defendant Jenkins, federal prosecutors interviewed Mr. Burley about his arrest.

113.    It was not until that time that Mr. Burley, and subsequently Mr. Matthews, learned who had planted the heroin in Mr. Burley's car on April 28, 2010.  While both Plaintiffs knew of course that the heroin did not belong to them, because of the manner in which they were held after their arrest, they could neither hear the command to Defendant Gladstone to bring the heroin nor could they see Defendant Jenkins plant the heroin.

114.    Indeed, because they did not know until that interview with federal prosecutors who planted the heroin, neither Plaintiff could have known until that same interview that the statement of probable cause prepared by the Defendants to justify their arrest of Plaintiffs was false.

---

[1] Two other detectives, not currently identified as having direct involvement in this case, were also charged.

115. Having determined that the heroin seized from Mr. Burley's vehicle had been planted by Defendant Jenkins, the United States Government moved to reduce Mr. Burley's sentence to time-served.

116. After a hearing on August 31, 2017, the United States District Court for the District of Maryland granted the Government's motion and released Mr. Burley that same day.

117. On November 30, 2017, a grand jury returned a separate indictment against Defendant Jenkins, in which he was charged with violations of 18 U.S.C. §§ 2, 242, and 1519, in connection with his execution of the false statement of probable cause described above ("Jenkins Indictment").

118. Thereafter, Defendant Jenkins sought to consolidate the Jenkins and RICO (and Superseding) Indictments because, in his words, the allegations of misconduct from his 2010 illegal stop of Plaintiffs and from 2015, which in part form the basis for the RICO charges, were "nearly identical."

119. After further investigation, the Government moved to vacate both Plaintiffs' convictions.

120. After a hearing on December 18, 2017, the Court granted the Government's motions and Messrs. Burley's and Matthews' federal drug convictions were vacated.

121. The State of Maryland and Mr. Burley jointly moved to withdraw his guilty plea relating to the vehicular manslaughter conviction, which was granted by the City Circuit Court on April 9, 2018.

**G.  MESSRS. BURLEY'S AND MATTHEWS' DAMAGES.**

122. Messrs. Burley and Matthews were incarcerated for years in state and federal prisons for crimes they did not commit. During and after their wrongful incarceration, they

suffered significant physical and emotional pain, including but not limited to:

- On the day of the illegal stop, they were stripped of the opportunity to witness the administration of justice against the killer of Mr. Burley's cousin and to provide support to loved ones offering victim impact statements associated with his sentencing.

- Mr. Burley was attacked and stabbed in the face by another inmate while awaiting sentencing.

- They missed, *inter alia*, holidays, birthdays, creating memories with families and young children, and saying goodbye to loved ones who died while they were incarcerated.

- Mr. Burley missed the birth of his grandchildren. He also missed out on the majority of his daughter's life, who was only 7 years-old at the time he was imprisoned and she is now graduating from high school. He was not present when his best friend died and he was unable to care for or say goodbye to the love of his life, Tawanda Sanderlin, who also died while he was incarcerated.

- Like Mr. Burley, Mr. Matthews also missed out on his stepson's formative childhood years, lost his best friend, and lost familial relationships that were strained by the false allegations underlying his illegal conviction.

123. Most importantly, Plaintiffs were stripped of the fundamental freedom to live their lives as autonomous human beings.

124. As a result of the foregoing, Plaintiffs have suffered tremendous damage, including physical injuries and severe emotional trauma (including Post Traumatic Stress Disorder), which were all proximately caused by Defendants' misconduct.

125. Until the USAO revealed the Jenkins Indictment, Plaintiffs did not know and could not have known the full extent of when, how, and why they were injured as described herein, as well as all of those responsible for the same.

126. In fact, upon learning of the Jenkins Indictment, former BPD Police Commissioner Kevin Davis admitted that Defendant Jenkins "was able to operate with impunity for this police department for far too long[.]"

127.     The fact still remains, however, that two innocent men were wrongfully incarcerated "for far too long" as a result of the BPD's failings as described herein.

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983
### Violation of Due Process
### (Against Officer Defendants)

128.     Each paragraph of this Complaint is incorporated and fully stated herein.

129.     As described above, Defendants, while acting individually, jointly, and/or in concert, as well as under color of law and within the scope of their employment, planted heroin to justify their stop of Plaintiffs and fabricated false evidence and statements in reports.

130.     By deliberately failing to disclose the foregoing misconduct, Defendants violated their clearly established duty to report all material exculpatory information to prosecutors.

131.     Absent Defendants' misconduct, the prosecution of Plaintiffs could not and would not have been pursued, and Plaintiffs would not have entered into plea agreements.

132.     Defendants' misconduct directly and proximately resulted in the unjust and wrongful incarceration of both Plaintiffs, thereby denying them their constitutional rights to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

133.     The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

134.     As a direct and proximate result of this violation, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT II – 42 U.S.C. § 1983
## Malicious Prosecution
## (Against All Defendants)

135.     Each paragraph of this Complaint is incorporated and fully stated herein.

136.     As described above, Defendants caused and continued a seizure of Plaintiffs pursuant to a legal process unsupported by probable cause.

137.     The criminal proceedings terminated in Plaintiffs' favor on December 18, 2017 and April 9, 2018 when their convictions were vacated.

138.     As a direct and proximate result of Defendants' malicious prosecution, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and emotional distress.

139.     Defendants had a reasonable opportunity to prevent this harm but failed to do so.

140.     The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

141.     As a direct and proximate result of this violation, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT III – 42 U.S.C. § 1983
## Failure to Intervene
## (Against Officer Defendants)

142.     Each paragraph of this Complaint is incorporated and fully stated herein.

143.     As described above, by their conduct and under color of law, Defendants failed to intervene to prevent the violation of Plaintiffs' constitutional rights, even though they had ample opportunity to do so.

144.     The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

145.    As a direct and proximate result of Defendants' failure to intervene, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

### COUNT IV – 42 U.S.C. §§ 1983 and 1985
### Conspiracy to Deprive Constitutional Rights
### (Against Officer Defendants)

146.    Each paragraph of this Complaint is incorporated and fully stated herein.

147.    Prior to the initial seizure of Mr. Burley's vehicle, Defendants, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert to deprive Plaintiffs of their constitutional rights and of equal protection of the laws.

148.    Additionally, before and after the statement of probable cause was filed, Defendants further conspired to deprive Plaintiffs of exculpatory information to which Plaintiffs were lawfully entitled.  This information would have resulted in no charges being filed against Plaintiffs, no incarceration, or more timely exoneration.

149.    Accordingly, Defendants, acting in concert, conspired to accomplish an unlawful purpose by unlawful means.

150.    In furtherance of this conspiracy, Defendants engaged in and facilitated numerous unlawful acts, including, but not limited to, fabricating evidence and committing perjury in a statement of probable cause, and were otherwise willful participants in the joint activity.

151.    The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.  Moreover, the Officers' misconduct obstructed the administration of justice in federal and state courts and was motivated by an attempt to deprive Plaintiffs of the equal protection of the laws.

152.    As a direct and proximate result of Defendants' illicit prior agreement and actions in furtherance of the conspiracy discussed above, Plaintiffs suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress.

### COUNT V – 42 U.S.C. § 1983
### *Monell* Liability
### (Against Baltimore City Police Department and the State of Maryland)

153.    Each paragraph of this Complaint is incorporated and fully stated herein.

154.    The Officers' actions were undertaken pursuant to custom and usage and/or policies and practices of the BPD and/or the State of Maryland, ratified by policymakers with final policymaking authority.

155.    These policies and practices include, but are not limited to, permitting police officers to illegally stop, detain, search and seize persons; failing to train or supervise police officers with regard to their constitutional obligations; failing to discipline police officers who engaged in constitutional violations; and permitting the use of fabricated evidence to support unconstitutional stops and seizures.

156.    These policies and practices were sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge.

157.    The policies and practices described herein were maintained and implemented by the BPD, under the supervision of the State of Maryland, with deliberate indifference to Plaintiffs' constitutional rights.

158.    The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

159. As a direct and proximate result of BPD's and the State's actions, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT VI – State Law Claims
## Malicious Prosecution
## (Against All Defendants)

160. Each paragraph of this Complaint is incorporated and fully stated herein.

161. Defendants accused Plaintiffs of criminal activity knowing those accusations were without probable cause and they made statements to prosecutors with the intent of exerting influence and to institute and continue judicial proceedings.

162. Defendants caused Plaintiffs to be subjected improperly to judicial proceedings for which there was no probable cause, resulting in Plaintiffs' injuries.

163. Defendants knowingly made false statements regarding Plaintiffs' alleged culpability.

164. Additionally, Defendants fabricated evidence and withheld exculpatory evidence that would have proven Plaintiffs' absolute innocence.

165. Defendants were aware that, as described more fully above, no evidence would have supported Plaintiffs' drug charges.

166. Defendants were further aware that the vehicular manslaughter would not have occurred but for their attempted robbery of Plaintiffs.

167. Defendants intentionally misrepresented to the prosecution certain facts that would have further vitiated the probable cause against Plaintiffs.

168. The criminal proceedings terminated in Plaintiffs' favor on December 18, 2017 when their drug convictions were vacated.

169.    Similarly, the criminal proceedings for the vehicular manslaughter terminated in Mr. Burley's favor on April 9, 2018 when his conviction was vacated.

170.    The misconduct described in this Complaint was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

171.    As a direct and proximate result of this misconduct, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT VII – State Law Claims
### Abuse of Process
### (Against Officer Defendants)

172.    Each paragraph of this Complaint is incorporated and fully stated herein.

173.    As discussed above, Defendants willfully misused the criminal process against Plaintiffs for a purpose different than its intended purpose.

174.    Defendants fabricated evidence to frame Plaintiffs for a crime that they did not commit.

175.    The misconduct described in this Complaint was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

176.    As a direct and proximate result of this misconduct, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT VIII – State Law Claims
### Intentional Infliction of Emotional Distress
### (Against Officer Defendants)

177.    Each paragraph of this Complaint is incorporated and fully stated herein.

178.    Defendants' acts and conduct as set forth above were extreme and outrageous because an average member in the community would not expect police officers to falsely frame, arrest, and imprison an innocent citizen.

179.   Their actions to detain and search Plaintiffs absent any probable cause were rooted in an abuse of power and were undertaken with the intent to cause or were in reckless disregard of the possibility that their conduct would cause severe emotional distress to Plaintiffs.

180.   As a direct and proximate result of this misconduct, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT IX – State Law Claims
## Civil Conspiracy
## (Against Officer Defendants)

181.   Each paragraph of the Complaint is incorporated and fully stated herein.

182.   As described more fully above, Defendants acted in concert with other co-conspirators to accomplish an unlawful purpose by unlawful means.

183.   In furtherance of the conspiracy, Defendants committed overt acts or were otherwise willful participants in joint activity, including, but not limited to, malicious prosecution of Plaintiffs.

184.   The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

185.   As a direct and proximate result of this misconduct, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT X – State Law Claims
## Article 24 of the Maryland Constitution - Declaration of Rights
## (Against Officer Defendants, Baltimore City Police Department, State of Maryland)

186.   Each paragraph of this Complaint is incorporated and fully stated herein.

187.   As described more fully above, Defendants violated Plaintiffs' due process rights because Plaintiffs were wrongfully imprisoned for crimes that they did not commit and which the Defendants knew or should have known they did not commit.

188.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

### COUNT XI – State Law Claims
### Indemnification
### (Against Baltimore City Police Department and State of Maryland)

189.    Each paragraph of this Complaint is incorporated and fully stated herein.

190.    Under Maryland law, public entities are directed to pay any tort judgment for which their employees are liable within the scope of their employment.

191.    Defendants are or were employees of the BPD, who acted within the scope of their employment when committing the misconduct described herein.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, BALTIMORE CITY POLICE DEPARTMENT, STATE OF MARYLAND, WAYNE JENKINS, RYAN GUINN, KEITH GLADSTONE, and THE ESTATE OF SEAN MATTHEW SUITER and award them:

1. Compensatory damages, attorneys' fees, pre- and post-judgment interest, and costs against each Defendant;

2. Punitive damages against each Defendant; and

3. Any other relief as this Court deems appropriate.

### JURY DEMAND

Plaintiffs, Umar Hassan Burley and Brent Andre Matthews, hereby demand a trial by jury pursuant to FED. R. CIV. P. 38(b) on all triable issues.

Dated: June 13, 2018

Respectfully submitted,

_____/s/_____
Steven D. Silverman, Esq. (Bar No. 22887)
ssilverman@mdattorney.com
Andrew C. White, Esq. (Bar No. 08821)
awhite@mdattorney.com
William N. Sinclair, Esq. (Bar No. 28833)
bsinclair@mdattorney.com
Erin Murphy, Esq. (Bar No. 24980)
emurphy@mdattorney.com
SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel: (410) 385-2225
Fax: (410) 547-2432

*Attorneys for Plaintiffs*