**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UMAR HASSAN BURLEY** | * |
| 1722 Aberdeen Road, Apt. 2 | |
| Baltimore, MD 21234, | * |
| | |
| and | * |
| | |
| **BRENT ~~ANDREW~~ANDRE MATTHEWS** | * |
| 700 N. Woodington Road | |
| Baltimore, MD 21229, | * |
| | |
| Plaintiffs, | * |

Civil Action No.

~~ELH-18-1743~~

v.                                                    *          **JURY DEMAND**

**BALTIMORE ~~CITY~~ POLICE**          *
**DEPARTMENT**
                                                         *

    <u>**Serve on**</u>:
    Interim Commissioner Gary Tuggle          *
    601 E. Fayette Street
    Baltimore, MD 21201          *

~~**STATE OF MARYLAND**~~          *

~~Serve on~~:          *
~~Nancy K. Kopp, Treasurer~~
~~80 Calvert Street, Rm. 109~~          *
~~Louis L. Goldstein Treasury Building~~
~~Annapolis, MD 21401,~~          *

**WAYNE JENKINS**          *
~~Individually and in his Official Capacity as a~~
~~Detective of the Baltimore City Police~~          *
~~Department~~
Pollock FCI
1000 Airbase Road          *
Pollock, Louisiana 71467,
                                                         *

<u>**RYAN GUINN**</u>
601 E. Fayette Street          *
Baltimore, MD 21201,



*

RYAN GUINN

Individually and in his Official Capacity as a          *
Detective of the Baltimore City Police
Department                                              *
601 E. Fayette Street
Baltimore, MD 21201                                     *

*

KEITH GLADSTONE

Individually and in his Official Capacity as a          *
Sergeant of the Baltimore City Police
Department                                              *
601 E. Fayette Street
Baltimore, MD 21201                                     *

THE ESTATE OF SEAN MATTHEW                              *
SUITER

*

Serve on:                                              *
Nicole Rochelle Suiter
Personal Representative
90 Hunter Creek828 Alum Rock Road                       *
New Park, PA 17352,

*

and

*

DEAN PALMERE

1323 Crofton Drive                                          *
York, PA 17406Bel Air, MD 21014,

*

Defendants.

*

**AMENDED COMPLAINT**

Plaintiffs Umar Hassan Burley and Brent Andre Matthews, by their undersigned attorneys

Silverman|Thompson|Slutkin|White, LLC and Brown, Goldstein & Levy, LLP, file this Complaint

against the Baltimore City Police Department, the State of Maryland, ("BPD"), Wayne Jenkins,

Ryan Guinn, Keith Gladstone, and the Estate of Sean Matthew Suiter (" (collectively, "Officer

Defendants")." or "Officers"), and Dean Palmere.  In support, Plaintiffs state as follows:

## INTRODUCTION

1.      Plaintiffs Umar Hassan Burley and Brent Andre Matthews lost years of their lives in prison ~~solely~~ because of the unconstitutional practices and policies of the ~~Baltimore City Police Department ("~~BPD~~")~~. and several of its officers and supervisors.

2.      On April 28, 2010, plainclothes ~~BPD officers ("~~Officers~~")~~ Jenkins and ~~members of the elite Gun Trace Task Force ("GTTF"),~~Guinn, while wearing masks, with guns drawn, and acting without reasonable suspicion, illegally stopped Mr. Burley and Mr. Matthews.~~Plaintiffs.~~ Because the ~~Officers~~officers drove unmarked vehicles and did not identify themselves as police, ~~Plaintiffs~~Mr. Burley and Mr. Matthews believed they were about to be robbed and fled in Mr. Burley's car, an action that led to the death of an innocent third party during the ensuing chase.

3.      Ultimately, the Officers arrested ~~Plaintiffs~~Mr. Burley and Mr. Matthews and illegally searched Mr. Burley's car, consistent with their practice of seeking contraband and then selling or using the same to frame innocent people – as they did here.

4.      Finding nothing illegal in Mr. Burley's car, the Officers planted heroin inside it. This heroin had been taken from a stash of drugs that these Officers carried with them for the purpose of framing innocent persons to cover up the Officers' illegal behavior.

5.      The Officers then falsified a statement of probable cause and other police reports relating to what had transpired.

6.      Relying on the planted evidence and falsified statements, state and federal prosecutors pursued the harshest punishments available against Messrs. Burley and Matthews. Faced with threats of long federal sentences unless they pled guilty to all charges against them, and with no good way of proving that the Officers had, in fact, manufactured the entire criminal case against them, Messrs. Burley and Matthews pled guilty to crimes they did not commit.

7. These guilty pleas dramatically reduced the amount of prison time Plaintiffs would have faced compared to convictions after a trial.  Indeed, these circumstances reflected a real-life Hobson's choice between a long prison sentence and a lifetime of incarceration.

8. Years after serving some or all of their sentences, a federal investigation uncovered unconstitutional practices and policies that have long pervaded the GTTF and BPD.  Specifically, the federal investigation revealed that the Officer Defendants had in fact planted the drug evidence in Mr. Burley's car and used this planted evidence in a false and malicious prosecution.

9. With this new information, PlaintiffsMr. Burley and Mr. Matthews could finally prove their innocence.

10. Accordingly, the United States Attorney's Office's petitioned the United States District Court for the District of Maryland to vacate both of theirPlaintiffs' drug convictions, which was granted on December 18, 2017.

11. Likewise, the State of Maryland and Mr. Burley filed a joint motion to withdraw his guilty plea forto the vehicular manslaughter convictioncharge arising from the same illegal stop, which was granted by the Circuit Court for Baltimore City on April 9, 2018.

12. The unconstitutional conduct at issue was part of a longstanding pattern orand practice of deficient training, supervision, and discipline, and training of plainclothes units by the BPD, beginning long before Defendants'the Officers' illegal stop of Plaintiffs,Mr. Burley and Mr. Matthews, that was sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge.

12.13. The illegal stop, search, and seizure of Mr. Burley and Mr. Matthews, as well as the fabrication and suppression of evidence to support that illegal conduct, were part of a longstanding pattern and practice of illegal conduct, including illegal stops, searches, seizures, and

fabrication and suppression of evidence, that was sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge.  Indeed, the illegal stop, search and seizure of Plaintiffs were themselves part of a pattern or practice sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge.  The BPD either intended that these "customs or usages" continue or condoned such behavior by demonstrating deliberate indifference to stopping or correcting them.

13.14.  This lawsuit seeks redress for Messrs. BurleyBurley's and Matthews' injuries resulting from the Officers' misconduct that was in accord with BPD policies or procedures and of which the BPD knew or should have known.

## JURISDICTION AND VENUE

14.15.  This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

15.16.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

16.17.  Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this complaint occurred in this judicial district.

17.18.  On October 12, 2017, Plaintiffs sent Nancy K. Kopp, Treasurer of the State of MarylandAndre M. Davis, Baltimore City Solicitor, notice of Plaintiffs' claims.  A copy of this letter is attached hereto as **Exhibit A**.

19.     The City of Baltimore denied Plaintiffs' claims in a letter dated October 20, 2017. A copy of this letter is attached hereto as **Exhibit B**.

20.     On October 12, 2017, Plaintiffs sent Nancy K. Kopp, Treasurer of the State of Maryland, notice of Plaintiffs' claims.  A copy of this letter is attached hereto as **Exhibit C**.

18.21.  The State did not respond within the 6six-month statutory period, thereby denying Plaintiffs' claims pursuant to Md. Code Ann. State Government Art. § 12-107(d)(2).

## THE PARTIES

19.22. Plaintiff Umar Hassan Burley is 47 years _old.  He was born and raised in Baltimore, Maryland.

20.23. Plaintiff Brent Andre Matthews is 44 years _old.  He was born and raised in Baltimore, Maryland.

21.24. At all times relevant hereto, Defendants Jenkins, Guinn, and Gladstone, and Palmere were police officers withemployed by the BPD.  All are sued in their officialof them committed the acts and individual capacities, while actingomissions described herein under color of law and within the scope of their employment.

22.    Defendants Jenkins is a former member of the GTTF; Defendants Guinn and Gladstone worked with him in specialized units.

25.    At all times relevant hereto, Defendant Suiter, who is now deceased, was a police officer with the BPD.  He died of a single gunshot wound to the head from his own service weapon the day before he was scheduled to testify before a federal grand jury in connection with an ongoing investigation and prosecution of several former GTTF members, which included Defendant Jenkins, for RICO related violations consistent with Defendants' illegal stop of Plaintiffs in this matter.  Nicole Rochelle Suiter, Personal Representative of the Estate of Sean Matthew Suiter, is being sued in her representative capacity for Defendant Suiter's official and individual actions while acting under color of law and within the scope of his employment during the arrest and subsequent investigation of Messrs. Burley and Defendant Wayne Jenkins is a former member of the BPD.  Mr. Jenkins joined the BPD on February 20, 2003.  He was promoted

to Sergeant on November 30, 2012 and became the officer-in-charge of a Special Enforcement Section on October 14, 2013.  In June 2016, then-Sergeant Jenkins was named supervisor of the elite Gun Trace Task Force ("GTTF").

26.     Defendant Ryan Guinn is a current member of the BPD.  Upon information and belief, at all times relevant hereto, Officer Guinn worked as part of a specialized plainclothes unit. He is a former member of the GTTF.

27.     Defendant Keith Gladstone is a former member of the BPD.  Upon information and belief, at all times relevant hereto, then-Officer Gladstone worked as part of a specialized plainclothes unit.

28.     Defendant Dean Palmere is a former member of the BPD.  He was employed by the BPD for more than twenty years before his retirement in 2018.  Mr. Palmere held various supervisory roles within the BPD in which he oversaw plainclothes units.  Beginning in 2006, Mr. Palmere oversaw a plainclothes unit as Commander of the Central District.  From 2008 to 2010, he led the Violent Crime Impact Section ("VCIS," at times known as the Violent Crime Impact Division, or "VCID").  In 2010, he was promoted to Chief of the Criminal Investigations Division, into which VCIS merged.  In 2011, he briefly served as Chief of the Patrol Division before returning in 2012 to his role as Chief of the Criminal Investigations Division.  From 2013 until his retirement in 2018, Mr. Palmere served as Deputy Commissioner overseeing the BPD's Patrol and Operations Bureaus, under which the plainclothes units fell.  Upon information and belief, at all relevant times, Mr. Palmere had supervisory responsibility for plainclothes units, was aware of constitutional violations by officers in those units (including the Officer Defendants), and failed to take reasonable steps to stop those violations.

23.     Matthews.

24.29.  The BPD is a Maryland state agency that employs or has employed each of the Officers.foregoing individual defendants.  It is a "person" within the contextmeaning of 42 U.S.C. § 1983.

25.    The BPD is an agency of Defendant State of Maryland ("State").  The State is a "person" within the context of 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

I.    **THE OFFICER DEFENDANTS' ILLEGAL STOP OF PLAINTIFFS, AS WELL AS THEIR FABRICATION AND SUPPRESSION OF EVIDENCE, IS BUT PART OF A WIDESPREAD BPD PATTERN OR PRACTICE OF ILLEGAL CONDUCT.**

26.30.  The BPD and its supervisors, including Mr. Palmere, knew or should have known years ago that officers given broad authority as part of "elite" plainclothes units to combat violence, guns, and drugs often engaged in a pattern or practice of illegal activities like those that occurred here.

31.    Despite actual or constructive knowledge of this pattern or practice, the BPD condoned misconduct committed by these units by ignoring their widespread abuses.  Rather than discontinuing plainclothes operations or instituting meaningful reforms and supervision after numerous allegations and scandals, the BPD merely rebranded these specialized units periodically.  While the names of these units changed throughout the years, their misconduct remained the same.

27.32.  Unfortunately for Plaintiffs, and many other innocent victims, and for the confidence of the people of Baltimore in their police and the rule of law, the BPD turned a blind eye to this pattern andor practice of illegal activity, allowing Defendants the opportunity they never should have had to engage in the conduct at issue in this case.

A.    **SUBSTANTIALLY  SIMILAR ALLEGATIONS TO THOSE IN THIS COMPLAINT HAVE LONG STAINED THE GTTF'S PREDECESSORSBPD'S PLAINCLOTHES UNITS.**

28.33.  ~~Before~~For many years before the ~~GTTF came into existence~~events at issue here, the BPD ~~utilized similar~~deployed elite units comprised of plainclothes officers ~~driving unmarked vehicles with~~to whom it gave wide latitude to investigate and arrest persons suspected of dealing drugs and/or gun violations, including ~~the~~ so-called "flex squads~~" and,~~" Special Enforcement Teams ("SETs~~").~~"), and the Violent Crime Impact Section.

34.     ~~With regard~~As suggested by the name "plainclothes," members of these units wear ordinary clothes (such as jeans and tee shirts) and tactical vests while on duty rather than traditional police uniforms.

35.     Plainclothes officers are referred to ~~the "flex squads," in~~as "knockers" or "jump out boys" throughout Baltimore, known for driving unmarked vehicles towards groups of people, jumping out of their vehicles, and conducting aggressive searches of anyone in the vicinity.

36.     Since at least the early 2000s, the BPD's plainclothes officers and units have been a frequent and recurrent source of unconstitutional conduct.

37.     In January 2006, the Baltimore Sun published an article regarding the misconduct within the BPD's "flex squads"

29.     ~~That article.~~ titled "Questions Raised for Years About City 'Flex Squad~~,~~'"

30.38.  ~~That article~~ noted, *inter alia*, that:

- The BPD employed "flex squads" in all its districts ~~which,~~; unlike normal officers, officers with the flex squads had enhanced freedom "to chase down suspected criminals in neighborhoods dominated by drug dealing and violence."

- "Defense attorneys, prosecutors and community members say they have heard for years about allegations of misconduct that included planted drugs and troublesome practices about how suspects were treated and charged."

- The Baltimore Sun's "review of court and other records show[ed] that allegations of wrongdoing have dogged some of the squad's members for several years."

- 9 -

- "In a warrant police used to search the flex squad office last month, investigators noted that previous allegations against [certain officers] 'have been made as to the planting of controlled dangerous substances on citizens in an effort to knowingly make false arrests.'"

- "The inquiry in the Southwest [district flex squad] has prompted concern about flex squads in other districts – each of the nine has at least one.  In a statement, the [BPD] said it was examining 'all practices and procedures' of every district's 'flex' and drug enforcement units."

- "A department spokesman said that internal affairs will soon begin conducting annual evaluations of every officer in those units."

31.   But years later, with "internal charges [still] pending against some officers involved with the flex squad," the City of Baltimore "did an about-face, agreeing to pay the [Southwest district flex] squad's supervisor a six figure settlement and issuing a rare public apology."

39.   Whatever became of those "internal charges" is not known, but regardless of whatever exoneration certain flex squadPlainclothes BPD officers working as part of flex squads repeatedly engaged in acts of misconduct, including numerous instances prior to the events at issue in this case involving Messrs. Burley and Matthews.

40.   For instance, in 2004, a BPD officer working as part of a flex squad was accused of dropping a teenage boy in rival gang territory in Southwest Baltimore, where he was assaulted.

41.   In 2005, two officers might have, William King and Antonio Murray, were charged and later received. 100-year federal sentences for robbing drug dealers, drug trafficking, and gun violations, after terrorizing Baltimore citizens as plainclothes officers for over a decade.

42.   Officer Jemini Jones, a member of the Southwest District's flex squad, was accused of raping a woman while on duty on two separate occasions, one in October 2005 and the other in December 2005.

43.   In investigating the squads themselves were eventuallyDecember 2005 incident

involving Officer Jones, "Baltimore drug detectives found that flex squad officers had been stealing drugs and cell phones from people they had arrested, planting evidence and making false arrests."

44.     Police commanders disbanded and BPD was the Southwest District's flex squad as a result of the allegations against Jones and the other flex squad officers involved.  The BPD also announced that it would conduct an internal affairs investigation into "every officer in those units."

32.45.  The BPD was thus on notice of, from at least 2005, of the potential for abuse associated with officers who had the wide latitude to police in a manner similar to that of the flex squad officers.

46.     Coincidentally (or perhaps not), atIn 2010, the BPD disbanded a six-member plainclothes unit in the Northwest District after discovering a supervisor and one of the officers had been using a stolen license plate on an unmarked car.

33.47.  At the same time the allegations first surfaced regarding the flex squads, the Sun reported on similar allegations leveled at the SETsSpecial Enforcement Teams, whose "officers [were] accused of lying in charging documents, most of which involve drug arrests that result from car stops."

34.48.  Like the flex squads, SET members normally worked in plainclothes and patrolled the streets in unmarked cars.  But whereas the flex squads were managed by each of the nine district commanders, the SETs (there were two – one on the east side and one on the west side of Baltimore) were managed directly by the BPD's Chief of Patrol.

35.     Ultimately, the SETs were disbanded.

49.     IndeedAs one former SET member explained in a recent article, he and his fellow unit members were "encouraged to make as many arrests as possible" during their overnight shifts.

"We stopped just about every adult we saw on the street to check their names for open warrants. We conducted car stops with the intended goal of searching the vehicles."

50.     In September 2006, the Associated Press published an article titled "Baltimore police unit reassigned amid scandal."  The article noted, *inter alia*, that the BPD confirmed its investigation of the SET, described as a "discretionary unit," operating in the Southeastern district. It reported that "[d]ozens of criminal cases have been thrown out because of misconduct allegations against [the] specialized unit, allegations that have led the department to reassign all seven of the unit's members to desk jobs."

51.     Despite being aware of the rampant misconduct that plagued the flex squads and SETs, in July 2007, the BPD formed a new elite, plainclothes unit known as the Violent Crime Impact Section (VCIS) to focus on "bad guys with guns."

52.     Like their predecessors, VCIS members operated with little supervision and, unsurprisingly, engaged in widespread abuses.  In short order, the VCIS became the source of a disproportionate number of citizen complaints and came under criticism from members of the community and of the Baltimore City Council.

53.     In September 2014, the Baltimore Sun published an investigative piece entitled "Undue Force."  The article noted, *inter alia*, that:

- Many lawsuits against the City "stemmed from the now-disbanded Violent Crimes Impact Section, which used plainclothes officers to target high-crime areas."

- In 2009, a plainclothes VCIS member beat up a Baltimore citizen, Jerriel Lyles, in an East Baltimore carryout restaurant.  Mr. Lyles subsequently settled his excessive force case with the City for $200,000.

- "Officers in the unit were accused by prosecutors of lying on a search warrant and working to protect a drug dealer in order to make arrests."

- "Three other [VCIS] members were charged in 2010 with kidnapping two city teens

and leaving one in Howard County state park without shoes, socks or his cellphone."  The two separate kidnappings both occurred in May 2009.

54.      In March 2009, BPD Officer Jemell Rayam, who later worked under Mr. Jenkins as part of the GTTF, fatally shot Shawn Cannady while working as part of VCIS.  It was Officer Rayam's third shooting in a span of 20 months.  The City later settled a lawsuit brought by Mr. Cannady's family for $100,000.

55.      In June 2009, Officer Rayam, while driving an unmarked vehicle with two other plainclothes officers, pulled over a driver for allegedly not wearing a seatbelt.  During the subsequent stop, Officer Rayam and the other officers put the driver in flex cuffs and stole the $11,000 they found in the car.

56.      Around this time, Officer Rayam was awarded the Citation of Valor & Silver Star for his work in the Violent Crime Impact Division.

57.      Fabien Laronde, a VCIS officer, was the subject of numerous complaints throughout his lengthy tenure with the BPD, a large portion of which involved work as a plainclothes officer.  Among many other incidents, Laronde was accused of planting evidence and using excessive force in 2006 as well as of conducting an illegal strip search of a man in a shopping center parking lot in 2009.

58.      In 2010, the BPD suspended an officer assigned to the VCIS for pocketing money that had been planted on an undercover officer.

59.      In 2011, the City of Baltimore paid a $100,000 settlement after VCIS members used excessive force against a 65-year-old church deacon who was rolling a tobacco cigarette outside his own home.

60.      The misconduct in the VCIS was so widespread that in 2013 the FBI initiated an

- 13 -

investigation, in which it determined that multiple unit members had falsified reports to further their cases.  Several officers were suspended as a result of the investigation, another received six months of home detention, and yet another pled guilty to federal gun and drug charges and was sentenced to eight years.  On a wiretapped call, the officer who pled guilty discussed planting a gun in an unlicensed cab and then pulling over and arresting the cab driver on a gun violation.

61.    Rather than disbanding the VCIS, the BPD merely "rebranded" it the "Special Enforcement Section" ("SES") in December 2012, retaining many of the VCIS officers.

62.    Then-Sergeant Jenkins was selected as an officer-in-charge of a plainclothes SES unit in October 2013.  In this role, Sergeant Jenkins continued to operate with high levels of discretion and little supervision.

63.    In addition to the illegal searches and seizures by the various plainclothes units, the BPD maintained a pattern or practice of conducting illegal stops and seizures, including but not limited to the conduct that formed the basis of the ACLU's June 2006 lawsuit.

64.    In addition to the fabrication and suppression of evidence by the various plainclothes units, the BPD maintained a pattern or practice of fabricating and suppressing evidence as reflected in numerous complaints, civil actions, settlements, and judgments, including but not limited to numerous individuals who have been exonerated following wrongful convictions, including Walter Lomax, Michael Austin, Wendell Griffin, James Owens, Sabein Burgess, Antoine Pettiford, Tyrone Jones, Malcolm Bryant, and Jerome Johnson.

36.    In sum, for many years before the instant matterOfficer Defendants illegally stopped Mr. Burley and Mr. Matthews, the BPD was keenly awareknew of the illegal acts committed by unsupervised police units and officers, including those of William King and Antonio Murray who received hefty federal sentences for robbing drug dealers, drug trafficking, and gun

- 14 -

violations in 2005 – similar to those charges against the GTTF.

37.65.  In sum,: the illegal conduct of the BPD's flex squads and SETs, SETs, the VCIS, and other plainclothes units was no secret to BPD or its policymakers.  As such, including Mr. Palmere.  Therefore, the BPD had sufficient notice of the problems that could (and did) arise with employingutilizing elite units of plainclothedplainclothes officers driving unmarked vehicles who had wide latitude to combat drug and gun-related offenses years before the Officer Defendants' illegal stop of Plaintiffs.  Indeed, it is a reasonable expectation that givenGiven the knowledge that the BPD had prior to the events at issue in the instant Complaint, ita reasonable police department would have taken sufficient steps to ensure that those events would not occur.  But this itBPD failed to dotake such steps, thus allowing another elite squad, the GTTF, to do exactly what the flex squads and SETs were accused of and disbanded forthe Officer Defendants to illegally stop, search, and seize, fabricate evidence, and suppress exculpatory evidence with respect to Plaintiffs and others, as members of the flex squads, SETs, the VCIS, and other plainclothes units had done before them.

**B.     BEYOND KNOWLEDGE OF THE RAMPANT ILLEGAL CONDUCT WITHIN PLAINCLOTHES UNITS, THE BPD HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THEN-OFFICER JENKINS' MISCONDUCT.**

66.     Mr. Jenkins' illegal actions in this case are part of his long history of misconduct while employed by the BPD.

67.     Among the publicly reported incidents, in 2005, then-Officer Jenkins, at that time a member of the Southeastern Tactical Unit, struck a private citizen, Timothy O'Conner, in the face.  Mr. O'Conner suffered a fracture of the bone near his eye.

68.     According to court documents, Officer Jenkins (and another officer) claimed that they had not seen who harmed Mr. O'Conner as they were purportedly distracted by another

altercation.  But two witnesses testified that they saw an officer throw Mr. O'Conner to the ground and hold him down with a nightstick.

69.     In September 2008, the City agreed to settle the case brought by Mr. O'Conner regarding that incident for $75,000.

70.     In February 2008, Officer Jenkins fabricated an affidavit in support of a search warrant, writing that a confidential source had told him that a black male by the name of Mickie Oakley was distributing large amounts of cocaine and heroin in Baltimore and that the confidential source had been inside an apartment where the drugs were stored with Mr. Oakley.

71.     That same day, Officer Jenkins and another officer who later worked under him as part of the GTTF, Daniel Hersl (who himself was the subject of at least 30 complaints by 2006), stopped and apprehended Mr. Oakley.

72.     At a subsequent motions hearing in 2009, Officer Jenkins took the stand and lied when he stated that a fellow officer (Detective Randolph) had told him that he saw Mr. Oakley exit an apartment building holding a brown paper bag and get into a black SUV.

73.     Federal prosecutors later agreed to Mr. Oakley's release from federal prison due to Officer Jenkins' misconduct.

74.     In November 2010, Officer Defendants Jenkins and Gladstone arrested Jamal Walker during a car stop and then went to Mr. Walker's home, where they tried to break in.  Mr. Walker's wife, Jovonne Walker, set off a silent burglary alarm during the break-in attempt, which brought police to the home.  Officers Jenkins and Gladstone sent the police away so that they could conduct a search of the home themselves.  Prosecutors later dropped the case against Mr. Walker once the inconsistencies in Jenkins' account came to light.

75.     In May 2011, then-Officer Jenkins stole at least $1,800 from an individual's car

after an attempted traffic stop and later authored a false incident report to conceal his illegal conduct.

76.    Upon information and belief, Mr. Jenkins was involved in these as well as numerous other instances of misconduct that were known to BPD supervisors and policymakers, including Mr. Palmere, both before and subsequent to events at issue, some of which are described below.

77.    A fellow GTTF officer, Momodu Gondo, speaking of his experience with Mr. Jenkins at the RICO trial, stated:

> Defendant Wayne Jenkins was very reckless, you know. I mean, he was just out of control, putting citizens at risk, you know, driving on the side of the street, going in people bumpers. I just never saw anything like this . . . . This dude is out of control. . . . It was crazy. Yeah. His -- his tactics in law enforcement, you know, he was -- you know what I mean? He was -- it was crazy. It was bad. It was bad.

78.    ~~B.~~ Mr. Gondo further testified that he never notified any superiors about the corruption within the plainclothes unit because he feared that Mr. Jenkins would retaliate against him, specifying that Mr. Jenkins "knew so many people in command, I'd have been blackballed."

79.    Another GTTF officer, Evodio Hendrix, testified at the RICO trial that Mr. Jenkins was a "golden boy" and "prince" within the BPD who was "untouchable" because he was looked after by higher-ups within the department.

80.    On January 5, 2018, Mr. Jenkins pled guilty to racketeering conspiracy, racketeering, two counts of Hobbs Act Robbery, falsification of records in a federal investigation, and four counts of deprivation of rights under color of law.  In his plea agreement, Mr. Jenkins admitted that, among other things, he and other members of his units authored false incident and

arrest reports, engaged in warrantless stops and seizures without probable cause, made false arrests, created false charging documents, and planted drugs on defendants.

81.     Also as part of his plea agreement, Mr. Jenkins specifically admitted that he willfully deprived Messrs. Burley and Matthews of their rights to be free from deprivation of liberty without due process of law, specifically the right to be free from incarceration due to the fabrication of evidence or due to a law enforcement officer's failure to disclose exculpatory evidence to a prosecutor.  Mr. Jenkins further admitted that he knowingly concealed information from prosecutors and falsified an official Statement of Probable Cause that he knew would be relied upon by prosecutors to detain Messrs. Burley and Matthews.

### C.     DEFENDANT PALMERE HAD ACTUAL OR CONSTRUCTIVE KNOWLEDGE OF THE MISCONDUCT BY OFFICERS IN THE PLAINCLOTHES UNITS, WHOM HE SUPERVISED, BUT WAS DELIBERATELY INDIFFERENT TO THE PRACTICES OF HIS SUBORDINATES.

82.     The illegal actions of the Officer Defendants in this case would not have been possible without the actual or tacit authorization of one or more high-ranking, senior command-level officers within the BPD.

83.     Dean Palmere oversaw many of the BPD's plainclothes units throughout his tenure, and had actual or constructive knowledge of the Officer Defendants' misconduct, yet he did nothing to stop their practices.

84.     Upon information and belief, Mr. Palmere had the authority – indeed, the responsibility – to discipline officers he knew had engaged in misconduct, including the Officer Defendants and others in the plainclothes units.

85.     Mr. Palmere began supervising plainclothes units in 2006 as Commander of the Central District.  There, he oversaw plainclothes officers in the District's first "Safe Zone," an

aggressive patrol program aimed at combating drug dealing and reducing violent crime in the Reservoir Hill and Upton neighborhoods.

86.     From 2008 to 2010, as head of the VCIS, then-Colonel Palmere supervised plainclothes officers during a time of increased citizen complaints and widespread abuses. For example, he supervised the VCIS officer who assaulted Jerriel Lyles, resulting in a $200,000 payout to Mr. Lyles.  And then-Colonel Palmere had direct oversight responsibility for the three VCIS officers who were charged with kidnapping two Baltimore city teenagers and leaving one in Howard County in 2010, as well as the numerous other instances of VCIS abuses detailed above.

87.     The illegal actions of the officers whom Mr. Palmere supervised were not isolated or remote events of which he was unaware.  Indeed, convicted former GTTF member, Momodu Gondo, testified at the recent trial of former GTTF members Daniel Hersl and Marcus Taylor that, in 2009, then-Colonel Palmere assisted and coached former GTTF officer Jemell Rayam in the cover up of the fatal shooting of Mr. Cannady.

88.     Upon information and belief, Mr. Palmere was a supervisor responsible for Defendants Jenkins, Guinn, and Gladstone, and had actual or constructive knowledge of their misconduct, including the misconduct that led to the unlawful incarceration of Messrs. Burley and Matthews.  Mr. Palmere had actual or constructive knowledge of the prior and subsequent misconduct committed by those officers, particularly Mr. Jenkins, who had engaged in several illegal acts by that point, many of which were publicly reported and were known or should have been known to his supervisors within the BPD.

89.     Upon information and belief, when Officer Hendrix testified at the RICO trial that Mr. Jenkins was a "golden boy" and "prince" who was "untouchable" within the BPD due to his support among the department's top leadership, he was referring, at least in part, to Mr. Palmere's

protection and promotion of Mr. Jenkins over an extended period of time.

90.     Upon information and belief, when Mr. Gondo testified at the RICO trial that he feared retribution from Mr. Jenkins because he "knew so many people in command," he was referring in part to Mr. Jenkins' close relationship to Mr. Palmere.

91.     Mr. Palmere awarded Mr. Jenkins and other BPD officers an achievement pin for their work as part of plainclothes units.

92.     Upon information and belief, Mr. Palmere was a longstanding friend of and very close to Sergeant Thomas Allers, GTTF's officer-in-charge from July 2013 to June 2016.  Mr. Palmere had supervisory responsibility for Mr. Allers, who eventually pled guilty to the RICO conspiracy charges and was sentenced to 15 years in prison.

93.     Upon information and belief, Mr. Palmere did not take any steps to report or remedy illegal conduct of the Officer Defendants or other plainclothes officers that he knew of or should have known of.

94.     The continued inaction of Mr. Palmere, over a substantial period of time, in the face of widespread and longstanding abuses committed by plainclothes officers under his supervision, including the Officer Defendants, demonstrates his deliberate indifference to that pattern of misconduct, including the misconduct against Messrs. Burley and Matthews.

95.     In spite of the documented misconduct by the plainclothes officers whom he supervised, Mr. Palmere rose within the ranks of the BPD, thereby allowing those below him, including the Officer Defendants, to continue their actions unabated.

96.     In 2010, Mr. Palmere was named Colonel and Chief of the Criminal Investigations Division, into which the troubled VCIS merged.  In this role, he not only oversaw VCIS, but the Homicide and Sex Offense units.

97.     In 2011, Mr. Palmere was promoted to the Chief of Patrol for all of the BPD's nine districts. The following year, he returned to his role as Chief of the Criminal Investigations Division, where he remained until 2013, when he was named Deputy Commissioner.

98.     As Deputy Commissioner from 2013 to 2018, Mr. Palmere served as Chief of the Patrol and Operations Bureaus.  In these roles, he was the second-in-command of the BPD's operations and responsible for the actions of the various plainclothes unit officers who reported to him.

99.     During the four-plus years in which Deputy Commissioner Palmere led the BPD's operations, the SESs and GTTF operated with impunity. Mr. Jenkins, an officer with whom Mr. Palmere had worked in the past and whom he knew or should have known had committed repeated acts of misconduct, was named head of an SES in 2013 and named supervisor of the GTTF in 2016.

100.    Upon information and belief, at all relevant times, Mr. Palmere had a role in selecting which officers served on which plainclothes units, and also was involved in the promotion decisions regarding plainclothes officers.

101.    The arrests and charges against several GTTF officers for illegal conduct led to the dissolution of the GTTF and precipitated then-Deputy Commissioner Palmere's abrupt retirement from the BPD in 2018.

**D.     BPD KNOWINGLY ALLOWED THE ~~GTTF~~ OFFICER DEFENDANTS TO CONTINUE THE FLEX ~~SQUAD AND~~ SQUADS', SETs', AND VCIS' PATTERN OF ILLEGAL CONDUCT.**

~~38.~~102.         Like the members of the flex squads ~~and,~~ SETs, ~~the GTTF was an~~ and VCIS, the Officer Defendants were members of elite ~~unit~~ plainclothes units within the BPD with broad authority to roam the ~~city~~ City, ostensibly looking for gangs, drugs, and guns.

39.103.        Although the BPD conducted internal investigations into the former elite units, and thus had ample opportunity to correct ~~the~~their illegal behavior, it failed to provide the necessary ~~training or~~ oversight, ~~if any,~~ discipline, or training to ensure that the ~~GTTF~~Officer Defendants did not engage in the same pattern of misconduct.

104.    ~~Indeed, one need only look at~~Instances involving the Officer Defendants and several indictments against GTTF officers since 2017 ~~for evidence of~~ demonstrate this failure.

40.105.        The BPD formed the GTTF in May 2007, around the same~~.~~ time it formed VCIS, with the stated goal of tracking and curbing illegal gun sales and gun activity.

41.106.        ~~For example, on~~On February 23, 2017, a number of GTTF officers, including ~~Defendant~~Wayne Jenkins, were indicted ~~by the United States Attorney's Office for the District of Maryland ("USAO")~~ for various RICO offenses ("RICO Indictment").

107.    On August 24, 2017, Sergeant Allers was indicted on RICO and Hobbs Act Robbery/Extortion claims for the same type of misconduct ("Allers Indictment").

42.108.        The RICO Indictment revealed that the GTTF officers engaged in, among other things, the following overt acts:

- Conducting traffic stops of vehicles and stealing money, property, and narcotics from the vehicle occupants; and

- Preparing false and fraudulent official incident and arrest reports, reports of property seized from arrestees, and charging documents to conceal the fact that the defendants stole money, property, and narcotics from individuals.

43.109.        One of the defendants in that prosecution, Jemell Rayam, pled guilty to a RICO conspiracy charge and cooperated with federal authorities during their investigation.  In his plea agreement, he publicly admitted that, among other things, he:

[r]obbed civilians he detained and in some cases arrested and stole money and drugs from them. RAYAM did this beginning in at least 2009 or 2010 when he joined the

- 22 -

GTTF. At times, RAYAM shared the proceeds with co-defendants Momodu GONDO ("GONDO"), Wayne Jenkins ("JENKINS"), Daniel Hersl ("HERSL"), Marcus Taylor ("TAYLOR"), Defendant A and others, and on other occasions, he kept all the proceeds for himself . . . . RAYAM also sold, through associates of his, drugs that JENKINS gave him and split the proceeds of those sales.  JENKINS obtained the drugs by robbing detainees and arrestees.

44.110.       Astonishingly, theThe BPD was well-aware that on July 14, 2010,Officer Rayam had lied on a BPD-administered polygraph examination about athe June 2009 vehicle stop that had occurred in 2009,which he stole $11,000 (described above), yet he kept his job. and was promoted to the GTTF shortly thereafter.

45.111.       Specifically, heOfficer Rayam was asked two series of questions about his conduct as well as the conduct of fellow officers, including:

- "Did you see Detective Giordano remove a bag from the truck of that car [you pulled over on Lafayette Ave on June 8, 2009]?";

- "Did you see Officer Sylvester take possession of a bag that was removed from that car?"; and

- "Did you conspire with Officer Sylvester to take money from anyone on June 8, 2009?"

46.112.       For each question, Rayam answered, "No."  The BPD's polygraph examiner "found the possibility of deception [by Rayam] to be greater than 99% in both tests." *See infra:*

- 23 -



# BALTIMORE POLICE DEPARTMENT



**POLYGRAPH UNIT**

Stephanie Rawlings Blake
Mayor

FREDERICK BEALEFELD
Police Commissioner

*Polygraph Examination Report*

**Confidential**

| | | | |
|---|---|---|---|
| **To:** | Major Nathan Warfield<br>Internal Investigation Division | **Date:** | 07 / 14 / 2010 |
| **From:** | Detective John T. Brown<br>CID -Polygraph Unit | **Case#:** | IID# 2009-1060 |
| **Subject:** | Polygraph Examination of:<br>Detective Rayam, Jemell Lamar<br>B / M / 29   DOB: 7/16/1980 | **PF#:** | 2010-123 |
| | | **Results:** | *Significant Responses Shown* |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

With reference to the polygraph examination given to the above named subject, herewith is a *confidential brief analysis* of the Polygraph Examiner's report. This information is for *OFFICIAL POLICE USE ONLY* and should not be publicly disseminated.

## Procedures:

On Wednesday, July 14, 2010, Detective Jemell Rayam of the Baltimore Police Department was examined by polygraph. The LX4000 Computerized Polygraph was used. Detective Rayam attorney, Martin E. Cadogan, and Detective Barbra Price were in attendance. The examinee was allowed to confer with his attorney, and review his IID statement. A pre-test interview was conducted and Detective Rayam appeared to be suitable for examination by polygraph. The relevant questions were interspersed with irrelevant and control questions, and placed in a AFMGQT format. Standard polygraph procedures were exercised throughout the examination.

## Summary of case Facts:

Detective Rayam is the focus of an internal investigation and Detective Barbra Price requested that he be given a credibility assessment test (polygraph) to determine the veracity of his statement. During the polygraph pre-test interview, Detective Rayam denied the following: *searching the vehicle, seeing/removing a bag of money, seeing his partner, Detective Giordano search the car, seeing Officer Sylvester take possession of a bag of money, having any knowledge of any plans to steal money, and he denied receiving any of the stolen money.*

c/o 242 W. 29th Street • Baltimore, Maryland 21211

Rayam, Jemell
PF# 2010-123

## Test I

**Relevant Questions.**

1. (SR) Regarding the car you pulled over on Lafayette Ave on June 8, 2009 for Officer Sylvester, do you intend to answer each question truthfully?
   Answer – "Yes"

2. (R) Did you search the interior or trunk of that car?
   Answer – "No"

3. (R) Did you see a bag of money in that car?
   Answer – "No"

4. (R) Did you see Detective Giordano search the interior or trunk of that car?
   Answer – "No"

5. (R) Did you see Detective Giordano remove a bag from the trunk of that car?
   Answer – "No"

6. (R) Did you see Officer Sylvester take possesion of a bag that was removed from that car?
   Answer – "No"

## Test II

**Relevant Questions:**

1. (SR) Regarding the car you pulled over on Lafayette Ave on June 8, 2009 for Officer Sylvester, do you intend to answer each question truthfully?
   Answer – "Yes"

2. (R) Did you make plans to meet with Officer Sylvester on June 8, 2009, before you made the car stop?
   Answer – "No"

3. (R) Did you conspire with Officer Sylvester to take money from anyone on June 8, 2009?
   Answer – "No"

4. (R) Did you receive any money from Officer Sylvester any time after that car stop?
   Answer – "No"

c/o 242 W. 29th Street • Baltimore, Maryland 21211

Rayam, Jemell
PF# 2010-123

## Results:

The polygraph examination was given in two parts (Test I and Test II).  Six charts containing psycho-physiological data were collected from the examinee. Consistent significant levels of biofeedback from the examinee was shown on the highlighted relevant issue questions in both tests.     As requested by Detective Rayam's attorney, no post-test interview was conducted.

The LaFayette computerized polygraph *Polyscore algorithm* found the probability of deception to be greater than 99% in both tests,

It is this examiner's opinion, after conducting a comprehensive pre-test interview and chart analysis, that the responses shown to the   above relevant questions are consistent with being untruthful, and or, not giving full disclosure.

## Final Call:

### *Significant Responses Shown*

Examiner:              John T. Brown

Reviewing Examiner:    Jimmy Hampton

c/o 242 W. 29th Street • Baltimore, Maryland 21211

~~47.     Although the polygraph examiner found the probability of deception concerning Rayam's denial of misconduct "to be greater than 99%," the BPD did nothing to address, or for that matter, investigate the troubling misconduct.~~

113.   ~~Indeed, that~~The BPD did nothing to investigate or address this misconduct.

~~48.~~114.          That was not the only instance in which the BPD and local authorities were aware of GTTF misconduct and did nothing to stop or correct it.

~~49.~~115.          In a 2014 case involving ~~Defendants~~Sergeant Jenkins and Officer Gladstone, Assistant City State's Attorney Molly Webb notified defense counsel that video camera footage taken of a search of a car directly contradicted the sworn statement of probable cause submitted by the officers.

~~50.~~116.          In response to the troubling footage, ASA Webb dismissed the case and reported the ~~disturbing~~ inconsistency to BPD's Internal Affairs Division.

~~51.~~117.          Upon information and belief, after ASA Webb reported the incident, ~~Defendant~~Sergeant Jenkins threatened ASA Webb ~~to~~that she should "stop talking about him~~," and in a suspicious turn of events, ASA Webb later lost her job.~~."

~~52.~~118.          Upon information and belief, no investigation was conducted ~~or~~and no disciplinary actions were taken against any of the Officers concerning their alleged misconduct~~.~~, thus enabling them to conduct further abuses.  In fact, ~~Defendant~~Sergeant Jenkins, who had already risen through the BPD ranks, was promoted to officer-in-charge of the GTTF in 2016.  ~~Likewise, upon information and belief, Defendant Gladstone remains employed by the BPD to this day.~~ Similarly, by 2017, ~~Defendant~~Officer Guinn was selected to serve as a training instructor for the BPD's police academy and continues to train other BPD officers to this day.

~~53.     Similar allegations attach to other, former GTTF officers.  For example, Momodu~~

~~Gondo admitted to "protecting" a Northeast Baltimore drug crew from arrest and "rogue officers who would rob them" and that he conspired with Rayam to rob other drug dealers of contraband and money, all under the supervision of Defendant Jenkins.~~

~~54.     Gondo ultimately admitted to stealing over $100,000.00 in concert with other GTTF officers.  He further admitted to filing false police reports to cover their tracks.~~

~~55.     Speaking of his experience with Defendant Jenkins in the GTTF, Gondo stated:~~

> ~~Defendant Wayne Jenkins was very reckless, you know. I mean, he was just out of control, putting citizens at risk, you know, driving on the side of the street, going in people bumpers. I just never saw anything like this . . . This dude is out of control. . . . It was crazy. Yeah. His -- his tactics in law enforcement, you know, he was -- you know what I mean? He was -- it was crazy. It was bad. It was bad.~~

119.     ~~Gondo further admitted~~When asked about the GTTF following the indictments, then-Police Commissioner Kevin Davis said, "Should someone have known about it?  Absolutely they should have known.  The culture here contributes to it."

~~56.~~     In May 2017, Commissioner Davis announced that he ~~and Rayam seized two individuals, stole $3,500.00 from them, and detained them in an "off-site facility"~~was effectively ending plainclothes policing in Baltimore ~~City~~, explaining that ~~was maintained by the BPD and used by GTTF.  Defendant Jenkins impersonated the United States Attorney to interrogate the individuals.  Thereafter, GTTF~~plainclothes officers ~~committed an armed burglary under color of law of the two detained individuals' residences and, under the guise~~were the subject of a ~~search warrant, stole an additional $20,000.00.~~

~~57.     In another incident, Gondo admitted~~disproportionate number of complaints and had adopted a "cutting-corners mindset."  Commissioner Davis added that ~~he, Rayam, and Defendant Jenkins stole and sold a handgun, along with a pound of marijuana they had seized from another~~

victim's home, for which they never filed an incident report.   Gondo and Rayam admitted to committing other armed robberies and sales of contraband with other GTTF~~requiring~~ officers.

58.      Likewise, on August 24, 2017, a federal grand jury indicted Sergeant Thomas Allers, GTTF's officer-in-charge from July 25, 2013 through June 14, 2016, on RICO and Hobbs Act Robbery/Extortion claims for the same type of misconduct ("Allers Indictment").

59.      The earliest identified overt act in the Allers Indictment occurred on March 11, 2014 when Allers, along with others, was alleged to have stolen approximately $50,000.00 from a potential defendant in the course of executing a search warrant.

~~60.~~120.      ~~The Allers Indictment is replete with a number of instances of Allers allegedly robbing persons against whom he was executing search and/or seizure warrants and then covering his tracks with false~~ to wear police ~~reports as to what~~uniforms would create a level of accountability that had ~~occurred.~~been previously absent.

~~61.      Allers eventually pled guilty to the RICO conspiracy charges and was sentenced to 15 years in prison.~~

121.   ~~C~~In 2018, Baltimore Police Commissioner Darryl De Sousa revived the plainclothes units.

**E**.      **BPD ENTERED INTO A CONSENT DECREE IN WHICH IT ADMITTED TO A PATTERN OR PRACTICE OF CONDUCT** ~~IDENTICAL~~SUBSTANTIALLY SIMILAR **TO THAT AT ISSUE HERE AND BASED IN PART ON** **ACTIVITIES THAT OCCURRED** PRIOR TO AND **IN 2010**.

~~62.~~122.      Following the April 2015 death of Freddie Gray in police custody, then-Baltimore Mayor Stephanie Rawlings-Blake asked the United States Department of Justice, Civil Rights Division, to conduct a pattern-or-practice investigation of BPD's policies.

~~63.~~123.      The Civil Rights Division issued an investigative report on August 10,

2016.  That report presented, in relevant part,included the following findings:

- The Civil Rights Division "reviewed hundreds of thousands of pages of documents, including all relevant policies and training manuals used by the [BPD] since 2010; BPD's database of internal affairs files; a random sample of about 800 case files on non-deadly force incidents; files on all deadly force incidents since 2010" and other data;

- The BPD engaged in a "pattern or practice" of conduct that violates the United States Constitution and federal law, including stops, searches and arrests without the reasonable suspicion or probable cause required under the Fourth Amendment to the United States Constitution;

- The foregoing pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity and resulted in part from BPD's zero tolerance enforcement strategy, dating back to the early 2000s;

- The BPD failed to take action against officers with a long history of misconduct that is well known to the Departmentdepartment.  For example, one officer currently employed by the BPD had received approximately 125 complaints from complainants within the Departmentdepartment and from the community since 2010, and many of these complaints allege serious misconduct.  However, the DOJ found that the BPD had sustained only one complaint against the officer for minor misconduct;

- In June 2006, the ACLU of Maryland sued the BPD regarding its illegal arrests of thousands of Baltimore residents.  In 2010, that case settled with BPD agreeing to change its policies and procedures and submit to an independent auditor to evaluate its progress toward adopting stop and arrest practices consistent with the United States Constitution;

- The final report of the auditor from 2014 noted that there were no systemic improvements in reporting for those stop and arrest offenses during the monitoring period; and

- Various policies that pre-date the events at issue in the instant complaintinvolving Messrs. Burley and Matthews demonstrate that BPD failed to adequately equip its officers to police effectively and constitutionally.

124.   The DOJ Report specifically highlighted the illegal conduct of the various plainclothes units (recognizing that, as outlined above, "the names and organizations of the plainclothes units have changed multiple times over the years").  It noted that a "disproportionate

share of complaints" identified plainclothes officers as "particularly aggressive and unrestrained in their practice of stopping individuals without cause and performing public, humiliating searches."

64.125.     On January 12, 2017, the United States filed a complaint in the United States District Court for the District of Maryland against the BPD.  That complaint alleged in relevant part that:

> In the late 1990s, BPD adopted zero tolerance policing strategies that prioritized officers making large numbers of stops, searches, and arrests for misdemeanor offenses without ensuring robust oversight to hold officers accountable for misconduct and protect the constitutional rights of Baltimore City residents;

> Based on data from 2010 – 2015, BPD engaged in a pattern or practice of conduct that violated the United States Constitution and federal laws.  Those violations included unconstitutional stops, searches, and arrests that run afoul of the rights guaranteed to Baltimore's citizens by the Fourth and Fourteenth Amendments to the United States Constitution; and

> BPD's violations of the Constitution and federal law are driven by BPD's systemic deficiencies in policies, training, supervision, and accountability structures.  BPD has been aware of these structural challenges for many years but has not taken adequate steps to comply with the Constitution or federal law.

65.126.     That same day, the United States and the BPD jointly filed a motion asking the court to approve a 227-page consent decree.  That decree provides in relevant part that:

> BPD will provide its officers with training on stops, searches, and seizures;

> BPD will ensure that a supervising officer reviews all documentation relating to stops, searches, seizures, and arrests for completeness and adherence to the law and BPD policy; and

> BPD will audit the aforementioned supervisory reviews.

66.127.     On April 7, 2017, the court granted that motion, entered a slightly-modified version of the consent decree, and stated that it will retain jurisdiction over the decree until it is terminated.  As of the filing of this complaint, the decree remains in place.

### ~~D~~F.   THE POLICIES AND "~~CUSTOM~~CUSTOMS AND USAGE" OF THE BPD.

128.   BPD policymakers, aware ~~of the potential for abuse among elite units like the GTTF~~ since at least the ~~mid-~~early 2000s ~~when the Baltimore Sun reported on flex squad and SET~~of numerous instances of misconduct ~~and having the final authority to establish and implement policies, permitted and condoned the GTTF's~~ committed by plainclothes officers and units similar to that at issue here, failed to adequately supervise their plainclothes units, thus allowing the unconstitutional conduct ~~alleged~~described herein ~~by, *inter alia*, failing to establish and implement training policies designed~~ to ~~curb~~occur.

129.   BPD supervisors condoned the widespread misconduct within plainclothes units. Despite knowledge that plainclothes units were the source of a disproportionate share of complaints against the BPD for many years, and at the center of numerous allegations and cases of police misconduct, the BPD continued to permit plainclothes officers to roam the streets with high levels of discretion and little supervision. Even after several public scandals highlighting the abuses ~~carried out~~endemic to flex squads, SETs, and VCIS, and others, as detailed above, the BPD did not institute any meaningful oversight of these specialized plainclothes units. The BPD's continued inaction in the face of pervasive constitutional violations evidences its deliberate indifference to the rights of it citizens.

~~67.~~130.   To make matters worse, despite knowledge that Mr. Jenkins engaged in repeated acts of misconduct, the BPD did not punish Mr. Jenkins but rather rewarded him by ~~officers assigned~~promoting him to ~~BPD~~lead two of those very units ~~like the GTTF.~~.

131.   ~~That unconstitutional conduct~~On multiple occasions, the BPD promoted Mr. Palmere to high-ranking, senior command-level positions, in spite of rampant misconduct by the officers he supervised, of which BPD knew or should have known.

132.   The frequency and duration of the misconduct involving plainclothes units demonstrate the misconduct was pervasive within the BPD at time of the events at issue, and, upon information and belief (especially considering the extensive public reporting), the misconduct was committed with the knowledge of BPD supervisors, or because of their deliberate indifference to this misconduct.

133.   Upon information and belief, plainclothes officers were encouraged and pressured by BPD supervisors to recover as many guns and make as many as arrests as possible, and in fact plainclothes officers were promoted in large part based on their arrest statistics, without regard for the methods the plainclothes officers used to recover those guns and make those arrests.

134.   Upon information and belief, plainclothes officers were praised by BPD supervisors, notwithstanding the numerous allegations of misconduct.  For instance, Mr. Palmere awarded Mr. Jenkins and others an achievement pin for their work as part of plainclothes units. Further, in a BPD newsletter, Lieutenant Christopher O'Ree wrote: "I am extremely proud to showcase the work of Sergeant Wayne Jenkins and [his team] . . . Their relentless pursuit to make our streets safer by removing guns and arresting the right people for the right reasons has made our City safer.  I couldn't be more proud of the strong work of this team."  O'Ree added, "This team of dedicated detectives has a work ethic that is beyond reproach."

68.135.       The unconstitutional conduct at issue in this case – including, but not limited to, illegally stopping, detaining, searching, and seizing persons; permitting the use of fabricated evidence to support unconstitutional stops and seizures; and suppressing exculpatory and/or impeachment evidence – was sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

136.   With respect to stops and searches, BPD supervisors conducted minimal

substantive review of plainclothes officers' justifications for those activities.

69.137.      The BPD had actual or constructive knowledge of the same as identified above and either intended that the "custom or usage" or pattern or practice continue or was deliberately indifferent to stopping or correcting the same, which caused Plaintiffs' injuries.

70.138.      BPD policymakers, aware of specific instances of police misconduct acutely similar to that at issue here since at least 20062004 and armed with actual knowledge of GTTF officers' misconduct both before and after the events at issue here took place, failed to adequately supervise and/or discipline their officers, thus allowing for the unconstitutional conduct described herein to occur.

139.    That conductDespite rampant misconduct within the plainclothes units, the BPD did not take seriously its obligation to supervise or discipline its officers.

140.    At all times relevant hereto, the BPD lacked adequate systems and processes to investigate and punish officers who had engaged in misconduct.  For instance, prior to the events at issue, the BPD's Internal Affairs Division ("IAD") did not track or investigate complaints made against its officers through civil lawsuits, even those that resulted in judgments against officers, like the settlement reached by Timothy O'Conner concerning the actions of Officer Jenkins in 2005.  This failing, among many others, allowed officers like Mr. Jenkins to engage in repeated misconduct without consequence.

141.    As detailed in the DOJ Report, among other things, the BPD's disciplinary system, including IAD, was deficient in the following respects:

- discouraged individuals from filing complaints;

- tolerated excessive and chronic delays in resolving disciplinary complaints;

- supervisors misclassified serious complaints as minor ones so that they could be

resolved at the command level without IAD involvement;

- supervisors summarily closed complaints without investigation;

- failed to investigate complaints in a timely manner;

- failed to consider evidence that contradicted explanations provided by officers accused of misconduct;

- failed to probe beyond reports the accused officer already provided;

- provided officers with a detailed notice of the alleged misconduct at the outset of an investigation, compromising the investigation and creating the possibility that the complaining party could be targeted for retaliation or intimidation;

- used a trial board system beset by delays and deficiencies;

- failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

- supervisors failed to identify deficiencies or questionable findings in investigations; and

- did not take steps to ensure that investigators did not have conflicts of interest vis-a-vis the officers they were investigating.

142. Additionally, the BPD's Internal Affairs Division was underprepared and overburdened during the relevant time period. IAD detectives, as detailed in an independent report, lacked key training on how to investigate officers suspected of misconduct. Upon information and belief, at all times relevant hereto, IAD investigators were also assigned, on average, between 35-50 cases to investigate (far above the national average), and were also frequently ordered to patrol the streets, further limiting their already-stretched capacity to handle their investigations of officer misconduct. At times IAD investigators were detailed to patrol alongside the very officers they were investigating.

143. Retired Police Sergeant Chad Ellis, who worked in the Internal Affairs Division, and specifically on the 2009 investigation of Officer Rayam concerning his theft of $11,000 (the

investigation that included the polygraph examination described above), explained that IAD was "ill-prepared and inexperienced in their area of alleged expertise – from top to bottom" at that point in time.

144.    A police spokesperson likewise acknowledged that, in 2009, the BPD did not have an adequate early intervention system in place at that time for flagging problem police officers.

145.    In 2013, then-Police Commissioner Anthony Batts acknowledged in the BPD's "Strategic Plan for Improvement" that "[d]iscipline has not always been a priority for the Baltimore Police Department."  He explained that for "many years" the "internal affairs system accrued numerous deficiencies," including "a backlog of disciplinary verdicts that were never carried out and a substantial case backlog."  "It has not been uncommon," Commissioner Batts wrote, "for cases in the department to take as many as three years to resolve."

71.146.    The police misconduct was sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

72.147.    The BPD had actual or constructive knowledge of the same as identified herein and either intended that the "custom or usage" or pattern or practice continue or was deliberately indifferent to stopping or correcting the same, which caused Plaintiffs' injuries.

148.    BPD, aware of the potential for abuse among elite units like the GTTF since at least the early 2000s, when the Baltimore Sun reported on flex squad and SET misconduct, and having the final authority to establish and implement policies, permitted and condoned the GTTF's unconstitutional conduct alleged herein, failed to establish and implement training policies.

149.    For instance, as detailed in the DOJ Report, a BPD training lesson plan from 2009 regarding stop and frisk training misstated the relevant standard for search and seizures ("Investigative contacts of citizens by members of this agency will be conducted with articulable

reason.").  The 2009 training also mistakenly instructed officers that the standard of suspicion required for an investigatory stop and a subsequent frisk was the same.

150.    Additionally, at all times relevant hereto, the BPD lacked adequate staffing to conduct trainings of its officers, facilities for training, and mechanisms to ensure that officers had received and understood the supposedly mandatory training.

151.    In 2015, the former director of the BPD's Training Academy released a document outlining numerous deficiencies in training and highlighted the department's "internal culture of placing training second."

73.152.          The stop, search, arrest, and seizure of Plaintiffs was, as well as the fabrication and suppression of evidence relating to them, were part of a pattern or practice of illegal conduct sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

74.153.          The BPD had actual or constructive knowledge of the same misconduct as identified herein and either intended that the "custom or usage" or pattern or practice continue or was deliberately indifferent to stopping or correcting the same, which caused Plaintiffs' injuries.

75.154.          In sum, sinceSince at least 2005the early 2000s, the BPD (and therefore the State) had repeated notice through, *inter alia*, convictions of theirits police officers, complaints and suits lodged against their police officers, public reporting, failed polygraph tests, and notifications from state prosecutors, that its plainclothes officers engaged in a widespread pattern of flagrant unconstitutional violations.  Rather than take any action to stop such conduct, BPD condoned that pattern and practice by ignoring it.

155.    In sum, the BPD's policy, custom, or practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional policing, and its policy, custom, and pattern or

practice of failing to adequately supervise, discipline, and train BPD plainclothes units was reflected in numerous prior allegations and cases of misconduct involving plainclothes units. The long history of misconduct committed by plainclothes units was actually or constructively known to BPD supervisors or policymakers, who failed to supervise, discipline, or train in response to such notice. The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of individuals like Umar Hassan Burley and Brent Andre Matthews.

II.    **PLAINTIFFS UNNECESARILY SERVED SUBSTANTIAL PRISON SENTENCES** ~~SOLELY~~ **BECAUSE OF DEFENDANTS' ILLEGAL POLICIES AND PRACTICES**~~.~~.

~~76.~~156.         As demonstrated below, the Officer Defendants' illegal stop of Plaintiffs, and all that followed, fits part and parcel ~~with~~of the illegal custom and usage, pattern and practice and/or policies and practices of the BPD that ~~have~~ existed since long before Defendants illegally stopped Plaintiffs. Specifically, at all times relevant hereto, BPD plainclothes officers engaged in warrantless stops and seizures without probable cause, made false arrests, and covered their tracks with fabricated evidence and false statements like Defendants did here.

A.    **THE UNCONSTITUTIONAL STOP.**

~~77.~~157.         On April 28, 2010, Messrs. Burley and Matthews were planning to attend a sentencing hearing in the Circuit Court for Baltimore County for a defendant recently convicted of murdering Mr. Burley's cousin. ~~Specifically, they~~They wanted to attend the sentencing to provide emotional support to loved ones who were delivering victim impact statements.

~~78.~~158.         Mr. Burley was waiting for Mr. Matthews in his car, which was located near an apartment building on the 3800 block of Parkview Avenue, Baltimore, Maryland.

~~79.~~159.         Mr. Matthews ~~exited~~left the building and ~~entered~~got into Mr. Burley's

- 38 -

vehicle.

80.160.        As far as Plaintiffs knew, thereThere were no illicit drugs or other illegal

contraband inside ofMr. Burley's vehicle.  Plaintiffs had no illicit drugs or other illegal contraband

on their personpersons.

81.161.        Although there was no reasonable suspicion of criminal activity,

DefendantsOfficers Jenkins and Guinn, in an unmarked BPD vehicle, suddenly pulled in front of

Mr. Burley's vehicle.

82.162.        A second unmarked BPD vehicle, operated by DefendantOfficer Sean

Suiter, quickly pulled behind Mr. Burley's vehicle and bumped it so that Mr. Burley was boxed-

in and prevented from leaving the area.

83.163.        The plainclothes Officers jumped out of their vehicles wearing masks and

with their guns drawn.

84.164.        None of them were in police uniform, displayed identification, or

verballyorally identified themselves as police officers.

85.165.        Prior to this time, PlaintiffsMessrs. Burley and Matthews were personally

familiar with friends and family who had been robbed and/or kidnapped in thisa similar manner.

86.166.        With only a split second to react and fearing that they were about to be

robbed or kidnapped by armed gunmen, Mr. Burley, with Mr. Matthews in the passenger seat,

maneuvered his vehicle and narrowly escaped the attempted illegal stop.

87.167.        The Officers returned to their unmarked BPD vehicles and a high-speed

chase ensued.  At no time did the Officers turn on police sirens or lights to indicate that they were,

in fact, police officers.

88.168.        During the course of that chase, Plaintiffs' car reached an intersection with

a four-way stop.  A car being driven by Elbert Davis reached the intersection at approximately the same time and proceeded in front of Plaintiffs' car.  Mr. Burley, who was driving the car, sought to speed through the intersection to avoid hitting the other car but, unfortunately, the two cars collided, and Mr. Davis ultimately died from his injuries.

89.169.        Fearing for their lives, Messrs. Burley and Matthews exited the car after the accident (not knowing that Mr. Davis had been injured) and fled on foot to evade the Officers, but were ultimately apprehended.

### B.     THE ILLEGAL PLANTING OF HEROIN.

90.170.        Once Messrs. Burley and Matthews were detained on the side of the street, DefendantOfficer Jenkins instructed one of the OfficersOfficer Guinn to call DefendantOfficer Gladstone and ask him to bring the "stuff" or "shit" in his car (referring to the stash of illegal drugs used by the GTTF and BPD to plant on innocent victims).

91.171.        Upon information and belief, DefendantOfficer Gladstone was asked to bring the "stuff" or "shit" because the Officers needed evidence to justify their illegal stop and search and seizure of Messrs. Burley and Matthews in case they could not find anything in the car that would have justified their stop.

92.172.        Because there was nothing inside of Mr. Burley's vehicle to justify theirjustified the Officers' illegal acts, DefendantOfficer Jenkins took 32 grams of heroin from DefendantOfficer Gladstone's vehicle and planted it on the floor of Mr. Burley's vehicle.

93.173.        Once DefendantOfficer Jenkins planted the heroin, he asked DefendantOfficer Guinn to instruct DefendantOfficer Suiter to search the vehicle.

94.174.        DefendantOfficer Suiter searched Mr. Burley's car and signaled that he "found" something.

95.175.      Despite knowledge of their illicit acts, the Officers intentionally withheld this information from others and used it to arrest the PlaintiffsMr. Burley and Mr. Matthews.

96.176.      In sum, and in light of what was revealed in, *inter alia*, the DOJ Report, the RICO Indictment, the Jenkins and Superseding Indictments (*see* discussion *infra*), and the October 25, 2017 testimony of Gondo recounted above, the purpose of the warrantless search and seizure of Messrs. Burley and Matthews was to rob them of any drugs or money they may have possessed, as was the policy and practice of the plainclothes units, like the flex squads, SETs, the VCIS, GTTF, and other BPDplainclothes officers, all under the supervision of the BPD.

97.177.      Further, upon information and belief, DefendantOfficer Gladstone possessed the planted heroin because he and his co-conspirators had stolen it from other victims, as described in the preceding paragraphs, as was the policy and practice of the plainclothes units, like the flex squads, SETs, the VCIS, GTTF, and other BPDplainclothes officers, all under the supervision of the BPD.  Had the planted heroin been obtained as part of a properly-documented seizure, DefendantOfficer Jenkins would not have been able to plant it inside of Mr. Burley's vehicle without raising chain of custody concerns and potentially implicating the Officers in their illegal activity.

C.      **THE FABRICATED STATEMENT OF PROBABLE CAUSE.**

98.178.      Later that day, DefendantOfficer Jenkins authored a fabricated statement of probable cause in which he falsely claimed that "32 individually wrapped pieces of plastic containing a tan powder substance each weighing approximately one gram (all of which was suspected high purity heroin)" was recovered from Mr. Burley's car.

99.179.      Although DefendantOfficer Jenkins knew that he had planted this evidence, he signed the statement affirmatively declaring that his statements were true under the penalties of

perjury.

~~100.~~181.          Based solely on ~~Defendant~~Officer Jenkins' fabricated statement of probable

cause, Messrs. Burley and Matthews were charged with two counts: (1) conspiracy to possess with

intent to distribute heroin and (2) possession with intent to distribute heroin.

~~101.~~181.          Mr. Burley~~, individually,~~ was also charged with vehicular manslaughter.

**D.     THE PLEA DEALS.**

~~102.~~182.          After they were arrested, Plaintiffs were given the same choice that ~~any~~most

criminal ~~defendant faces~~defendants face: take a plea and hope for a reduced sentence or roll the

dice and hope a jury acquits because if they do not, the full sentence available for the crime will

likely be imposed.

~~103.~~183.          But for Plaintiffs, there was no real choice to make.  Both were charged in

~~the~~ federal ~~courts~~court, where convictions typically result in sentences far harsher than those for

similar convictions in state court.   Additionally, federal prosecutors' success rates with juries

~~eclipses~~far eclipse that of state prosecutors~~ by far~~, particularly when one compares cases tried in

the United States District Court, where Plaintiffs ultimately entered guilty pleas, with those of the

Circuit Court for Baltimore City ("City Circuit Court"), the only other venue in which they could

have been prosecuted.  And a federal jury, which is generally far more predisposed to accepting

the testimony of a police officer than a jury empaneled in the City Circuit Court, would have heard

the coordinated testimony of multiple, veteran, police officers~~, some of whom were members of~~

~~the elite GTTF,~~ while Plaintiffs would have had no evidence to contradict the Officers' testimony

save to testify themselves.

~~104.~~184.          In sum, armed with falsified statements by Officers of the BPD~~ and the~~

~~acclaimed GTTF~~ and the tragic death of a third-party, state and federal prosecutors threatened to

seek the harshest punishments available against Plaintiffs if they did not enter "universal" guilty pleas (*i.e.*, the only way Plaintiffs might possibly receive reduced sentences was if they both pled guilty to one of the federal charges and if Mr. Burley pled guilty to the state charge).   Indeed, prosecutors made clear that they would seek a sentence that, at minimum, would be "nearly double" that imposed after a universal plea.

~~105.~~185.        As they faced threats of longer federal sentences and with no good way of proving the Officers' misconduct, Messrs. Burley and Matthews ultimately agreed to plead guilty on or about June 9, 2011 to possession with intent to distribute heroin.   Likewise, Mr. Burley agreed to plead guilty to the vehicular manslaughter charge in August 2011.

~~106.~~186.        Mr. Burley was sentenced to 15 years in prison for the federal drug charge, which ran concurrently with a 10-year state sentence for vehicular manslaughter.

~~107.~~187.        Mr. Matthews was sentenced to almost four years in prison (46 months) for the heroin that had been planted in the car in which he was a passenger.

### E.       MESSRS. BURLEY'S AND MATTHEWS' INCARCERATION.

~~108.~~188.        On or about September 9, 2013, Mr. Matthews ~~was placed on~~began a three-year supervised release term after having served over two-and-a-half years in federal custody.

~~109.~~189.        Mr. Burley served six-and-a-half years in state prison before being transferred to federal custody on February 3, 2017.   He was ultimately exonerated and released later that year.

### F.       MESSRS. BURLEY'S AND MATTHEWS' EXONERATION.

~~110.~~190.        Despite knowing for many years that the plainclothes units, like the flex ~~squad, SET~~squads, SETs, the VCIS, GTTF~~,~~ and ~~BPD~~other plainclothes officers had committed the same illegal acts that resulted in Plaintiffs' wrongful incarceration, the BPD and relevant

policymakers never investigated the circumstances surrounding Plaintiffs' questionable arrests.

111.191.        On or about June 22, 2017, a federal grand jury returned a superseding indictment against DefendantMr. Jenkins and other BPD officers ("Superseding Indictment").[1]

112.192.        As part of their investigation into DefendantMr. Jenkins, federal prosecutors interviewed Mr. Burley about his arrest.

113.193.        It was not until that time thatOnly then did Mr. Burley, and subsequently Mr. Matthews, learnedlearn who had planted the heroin in Mr. Burley's car on April 28, 2010. While both Plaintiffs knew of course that the heroin did not belong to them, because of the manner in which they were held after their arrest, they could neither hear the command to DefendantOfficer Gladstone to bring the heroin nor could they see DefendantOfficer Jenkins plant the heroin.

114.194.        Indeed, because they did not know until that interview with federal prosecutors who planted the heroin, neither Plaintiff could have known until that same interview that the statement of probable cause prepared by the Officer Defendants to justify their arrest of Plaintiffs was false.had been falsified.

115.195.        Having determined that the heroin seized from Mr. Burley's vehicle had been planted by Defendantthen-Officer Jenkins, the United States Government moved to reduce Mr. Burley's sentence to time-served.

116.196.        After a hearing on August 31, 2017, the United States District Court for the District of Maryland granted the Government's motion and released Mr. Burley that same day.

117.197.        On November 30, 2017, a grand jury returned a separate indictment against DefendantMr. Jenkins, in which he was charged with violations of 18 U.S.C. §§ 2, 242, and 1519,

---

[1] Two other detectives, not currently identified as having direct involvement in this case, were also charged.

in connection with his execution of the false statement of probable cause described above ("Jenkins Indictment").

~~118.~~198.        Thereafter, ~~Defendant~~Mr. Jenkins sought to consolidate the Jenkins and RICO (and Superseding) Indictments because, in his words, the allegations of misconduct from his 2010 illegal stop of Plaintiffs and from 2015, which in part form the basis for the RICO charges, were "nearly identical."

~~119.~~199.        After further investigation, the Government moved to vacate both Plaintiffs' convictions.

~~120.~~200.        After a hearing on December 18, 2017, the Court granted the Government's motions and Messrs. Burley's and Matthews' federal drug convictions were vacated.

~~121.~~201.        The State of Maryland and Mr. Burley jointly moved to withdraw his guilty plea relating to the vehicular manslaughter conviction, which was granted by the City Circuit Court on April 9, 2018.

### G.    MESSRS. BURLEY'S AND MATTHEWS' DAMAGES.

~~122.~~202.        Messrs. Burley and Matthews were incarcerated for years in state and federal prisons for crimes they did not commit.  During and after their wrongful incarceration, they suffered significant physical and emotional pain, including but not limited to:

- On the day of the illegal stop, they were stripped of the opportunity to witness the administration of justice against the killer of Mr. Burley's cousin and to provide support to loved ones offering victim impact statements associated with his sentencing.

- Mr. Burley was attacked and stabbed in the face by another inmate while awaiting sentencing.

- They missed, *inter alia*, holidays, birthdays, creating memories with families and young children, and saying goodbye to loved ones who died while they were incarcerated.

- Mr. Burley missed the birth of his grandchildren.  He also missed out on the majority of the life of his ~~daughter's life~~daughter, who was only ~~7~~seven years old at the time he was imprisoned and ~~she~~is now graduating from high school.  He was not present when his best friend died, and he was unable to care for or say goodbye to the love of his life, Tawanda Sanderlin, who also died while he was incarcerated.

- ~~Like~~Mr. ~~Burley, Mr.~~Matthews ~~also~~ missed out on his stepson's formative childhood years, lost his best friend, and lost familial relationships that were strained by the false allegations underlying his illegal conviction.

~~123.~~203.        Most importantly, Plaintiffs were stripped of the fundamental freedom to live their lives as autonomous human beings.

~~124.~~204.        As a result of the foregoing, ~~Plaintiffs~~Mr. Burley and Mr. Matthews have suffered tremendous damage, including physical injuries and severe emotional trauma (including ~~Post Traumatic Stress Disorder),~~post-traumatic stress disorder), all of which were ~~all~~ proximately caused by Defendants' misconduct.

~~125.~~205.        Until the USAO revealed the Jenkins Indictment, ~~Plaintiffs~~Messrs. Burley and Matthews did not know and could not have known the full extent of when, how, and why they were injured as described herein, as well as all of those responsible for the same.

~~126.~~206.        ~~In fact, upon~~Upon learning of the Jenkins Indictment, former BPD Police Commissioner Kevin Davis admitted that ~~Defendant~~Mr. Jenkins "was able to operate with impunity for this police department for far too long[.]"

~~127.~~207.        ~~The fact still remains, however, that~~As a result of Mr. Jenkins and the other Officer Defendants, under the supervision of Mr. Palmere, operating with impunity as part of the pattern and practice of BPD's lawless plainclothes units, two innocent men were wrongfully incarcerated "for far too long~~" as a result of the BPD's failings as described herein.~~."

**CAUSES OF ACTION**

- 46 -

**COUNT I – 42 U.S.C. § 1983**
**Violation of Due Process**
**(Against Officer Defendants)**

128.208.      Each paragraph of this Complaint is incorporated andas if fully stated herein.

129.209.      As described above, Officers Jenkins, Guinn, and Gladstone (the Officer Defendants)., while acting individually, jointly, and/or in concert, as well as under color of law and within the scope of their employment, planted heroin to justify their stop and arrest of PlaintiffsMessrs. Burley and Matthews and fabricated false evidence and statements in reports relating to that stop and arrest.

130.210.      By deliberately failing to disclose the foregoing misconduct, the Officer Defendants violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

131.211.      Absent the Officer Defendants' misconduct, the prosecution of PlaintiffsMr. Burley and Mr. Matthews could not and would not have been pursued, and PlaintiffsMr. Burley and Mr. Matthews would not have entered into plea agreements.

132.212.      The Officer Defendants' misconduct directly and proximately resulted in the unjust and wrongful incarceration of both Plaintiffs, thereby denying them their constitutional rights to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

133.213.      The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

134.214.    As a direct and proximate result of this violation, PlaintiffsMr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT II – 42 U.S.C. § 1983**
**Malicious Prosecution**
**(Against AllOfficer Defendants)**

135.215.    Each paragraph of this Complaint is incorporated andas if fully stated herein.

136.216.    As described above, the Officer Defendants caused and continued a seizure of PlaintiffsMr. Burley and Mr. Matthews pursuant to a legal process unsupported by probable cause.

137.217.    The criminal proceedings terminated in Plaintiffs'Mr. Burley's and Mr. Matthews' favor on December 18, 2017. and April 9, 2018, when their convictions were vacated.

138.    As a direct and proximate result of Defendants' malicious prosecution, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and emotional distress.

139.218.    The Officer Defendants had a reasonable opportunity to prevent this harm but failed to do so.

140.219.    The The Officer Defendants undertook the misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

141.220.    As a direct and proximate result of this violation, Plaintiffsthe Officer Defendants' malicious prosecution, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT III – 42 U.S.C. § 1983**
**Failure to Intervene**
**(Against Officer Defendants and Defendant Palmere)**

142.221.     Each paragraph of this Complaint is incorporated andas if fully stated herein.

143.222.     As described above, by their conduct and under color of law, the Officer Defendants and Mr. Palmere failed to intervene to prevent the violation of Plaintiffs'Mr. Burley's and Mr. Matthews' constitutional rights, even though they had ample opportunity to do so.

144.223.     The Officer Defendants and Mr. Palmere undertook the misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

145.224.     As a direct and proximate result of the Officer Defendants' and Mr. Palmere's failure to intervene, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT IV – 42 U.S.C. §§ 1983 and 1985**
**Conspiracy to Deprive Constitutional Rights**
**(Against Officer Defendants)**

146.225.     Each paragraph of this Complaint is incorporated andas if fully stated herein.

147.226.     Prior to the initial seizure of Mr. Burley's vehicle, DefendantsOfficers Jenkins, Guinn, and Gladstone, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert to deprive PlaintiffsMr. Burley and Mr. Matthews of their constitutional rights and of equal protection of the laws.

148.227.     Additionally, before and after the statement of probable cause was filed, the Officer Defendants further conspired to deprive PlaintiffsMr. Burley and Mr. Matthews of exculpatory information to which Plaintiffsthey were lawfully entitled.  This information would have resulted in no charges being filed against Plaintiffs, no incarceration, or more timely exoneration.

149.228.     Accordingly, the Officer Defendants, acting in concert, conspired to accomplish an unlawful purpose by unlawful means.

150.229.     In furtherance of this conspiracy, the Officer Defendants engaged in and facilitated numerous unlawful acts, including, but not limited to, fabricating evidence and committing perjury in a statement of probable cause, and were otherwise willful participants in the joint activity.

151.230.     The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.   Moreover, the Officers'Officer Defendants' misconduct obstructed the administration of justice in federal and state courts and was motivated by an attempt to deprive Plaintiffs of the equal protection of the laws.

152.231.     As a direct and proximate result of the Officer Defendants' illicit prior agreement and actions in furtherance of the conspiracy discussed above, PlaintiffsMr. Burley and Mr. Matthews suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress.

**COUNT V – 42 U.S.C. § 1983**
**Supervisory Liability**
**(Against Defendant Dean Palmere)**

232.    Each paragraph of this Complaint is incorporated as if fully stated herein.

233.    Mr. Palmere supervised many of the BPD's plainclothes units through their various iterations. Upon information and belief, in 2010, Mr. Palmere supervised the Officer Defendants, all of whom were working as plainclothes officers at the time of the unconstitutional conduct at issue.

234.    Mr. Palmere had actual or constructive knowledge that the Officer Defendants and other members of the plainclothes units were engaged in widespread misconduct over a period of years that posed an unreasonable risk of constitutional injury to Plaintiffs and other citizens of Baltimore.

235.    In spite of this knowledge, Mr. Palmere took no action to prevent or remedy the misconduct by the Officer Defendants and other members of the plainclothes units.  Mr. Palmere was deliberately indifferent to the persistent constitutional violations by the Officer Defendants and other plainclothes officers whom he directly supervised.  He routinely failed to supervise and discipline the Officer Defendants and his other subordinates, thus allowing the misconduct to continue and thrive.

236.    As a direct and proximate result of Mr. Palmere's inaction, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT VI – 42 U.S.C. § 1983**
***Monell* Liability**
**(Against Baltimore City Police Department and the State of Maryland)**

153.237.    Each paragraph of this Complaint is incorporated ~~and~~as if fully stated herein.

154.238.    The Officers' actions were undertaken pursuant to custom and usage and/or policies and practices of the BPD ~~and/or the State of Maryland~~, ratified by policymakers with final policymaking authority.

155.239.    These policies and practices ~~include~~included, but ~~are~~were not limited to, permitting police officers to illegally stop, detain, search, and seize persons; ~~failing to train or supervise police officers with regard to their constitutional obligations; failing to discipline police officers who engaged in constitutional violations; and~~ permitting the use of fabricated evidence to support unconstitutional stops and seizures; and suppressing exculpatory and/or impeachment evidence.

156.240.    These policies and practices were sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge.

157.241.    The policies and practices described herein were maintained and implemented by the BPD ~~, under the supervision of the State of Maryland,~~ with deliberate indifference to Plaintiffs' constitutional rights.

242.    Prior to and at the time of the events at issue, the BPD, by and through its final policymakers, maintained a policy, custom, pattern, or practice of failing to adequately supervise, discipline, and train members of its plainclothes units with respect to their constitutional obligations.

158.243.    The misconduct described herein was undertaken with malicious intent and willful indifference to ~~Plaintiffs'~~the clearly established constitutional rights of Mr. Burley, Mr.

Matthews, and other citizens of Baltimore, particularly other African-American male citizens of Baltimore.

159.244.      As a direct and proximate result of BPD's and the State's actions, PlaintiffsMr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT ~~VI~~VII – State Law Claims**
**Malicious Prosecution**
**(Against ~~All~~Officer Defendants)**

160.245.      Each paragraph of this Complaint is incorporated andas if fully stated herein.

161.246.      DefendantsOfficers Jenkins, Guinn, and Gladstone accused PlaintiffsMr. Burley and Mr. Matthews of criminal activity knowing those accusations were without probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue judicial proceedings.

162.247.      The Officer Defendants caused Plaintiffs to be subjected improperly to judicial proceedings for which there was no probable cause, resulting in Plaintiffs' injuries.

163.248.      The Officer Defendants knowingly made false statements regarding Plaintiffs' alleged culpability.

164.249.      Additionally, the Officer Defendants fabricated evidence and withheld exculpatory evidence that would have proven Plaintiffs' absolute innocence.

165.250.      The Officer Defendants were aware that, as described more fully above, no actual or truthful evidence would have supported Plaintiffs' drug charges against Mr. Burley or Mr. Matthews.

166.251.      The Officer Defendants were further aware that the vehicular manslaughter would not have occurred but for their attempted robbery of Plaintiffs.

167.252.      The Officer Defendants intentionally misrepresented to the prosecutionboth federal and state prosecutors certain facts that would have further vitiated the probable cause against Plaintiffs.

168.253.      The federal criminal proceedings terminated in Plaintiffs' favor on December 18, 2017, when their drug convictions were vacated.

169.254.      Similarly, the criminal proceedings for the vehicular manslaughter terminated in Mr. Burley's favor on April 9, 2018, when his conviction for that charge was vacated.

170.255.      The misconduct described in this Complaint was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

171.256.      As a direct and proximate result of this misconduct, PlaintiffsMr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT VIIVIII – State Law Claims**
**Abuse of Process**
**(Against Officer Defendants)**

172.257.      Each paragraph of this Complaint is incorporated andas if fully stated herein.

173.258.      As discusseddescribed above, DefendantsOfficers Jenkins, Guinn, and Gladstone willfully misused the criminal process against PlaintiffsMr. Burley and Mr. Matthews for a purpose different than its intended purpose.

174.259.      The Officer Defendants fabricated evidence to frame Plaintiffs for a crime that they did not commit.

- 54 -

175.260.     The misconduct described in this Complaint was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

261.   As a direct and proximate result of this misconduct, ~~Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury,~~Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT IX – State Law Claims**
~~176.    severe emotional distress.~~

~~COUNT VIII    State Law Claims~~
**Intentional Infliction of Emotional Distress**
**(Against Officer Defendants)**

177.262.     Each paragraph of this Complaint is incorporated ~~and~~as if fully stated herein.

178.263.     ~~Defendants'~~The acts and conduct of Officers Jenkins, Guinn, and Gladstone as set forth above were extreme and outrageous ~~because~~; an average member in the community would not expect police officers to falsely frame, arrest, and imprison an innocent citizen.

179.264.     ~~Their~~The Officer Defendants' actions to detain and search ~~Plaintiffs~~Mr. Burley and Mr. Matthews absent any probable cause were rooted in an abuse of power and were undertaken with the intent to cause, or ~~were~~ in reckless disregard of the possibility that their conduct would cause, severe emotional distress to Plaintiffs.

~~180.1.~~As a direct and proximate result of this misconduct, ~~Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.~~

~~COUNT IX – State Law Claims~~
265.     Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT X – State Law Claims**

**Civil Conspiracy**
**(Against Officer Defendants)**

181.266.        Each paragraph of the Complaint is incorporated andas if fully stated herein.

182.267.        As described more fully above, DefendantsOfficers Jenkins, Guinn, and Gladstone acted in concert with each other and with other co-conspirators to accomplish an unlawful purpose by unlawful means.

183.268.        In furtherance of the conspiracy, the Officer Defendants committed overt acts or were otherwise willful participants in joint activity, including, but not limited to, malicious prosecution of PlaintiffsMr. Burley and Mr. Matthews.

184.269.        The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

185.270.        As a direct and proximate result of this misconduct, PlaintiffsMr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT XXI – State Law Claims**
**Article 24 of the Maryland Constitution - Declaration of Rights**
**(Against Officer Defendants, Baltimore City Police Department, State of Maryland)**

186.271.        Each paragraph of this Complaint is incorporated andas if fully stated herein.

187.272.        As described more fully above, DefendantsOfficers Jenkins, Guinn, and Gladstone violated Plaintiffs'Mr. Burley's and Mr. Matthews' due process rights because Plaintiffs were wrongfully imprisoned for crimes that they did not commit and which the Officer Defendants knew or should have known they did not commit.

188.273.    As a direct and proximate result of the Officer Defendants' actions, PlaintiffsMr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.


**COUNT XIXII – State Law Claims**
**Indemnification**
**(Against Baltimore City Police Department and State of Maryland)**

189.274.    Each paragraph of this Complaint is incorporated andas if fully stated herein.

190.275.    Under Maryland law, public entities are directed to pay any tort judgment for which their employees are liable within the scope of their employment.

191.276.    DefendantsOfficers Jenkins, Guinn, Gladstone, and Palmere are or were employees of the BPD, who acted within the scope of their employment when committing the misconduct described herein.

277.    Officers Jenkins, Guinn, and Gladstone were acting pursuant to the BPD's instruction to get guns and drugs off the streets of Baltimore, and pursuant to BPD's implicit or explicit message to its plainclothes officers that the Department did not care about the methods those officers used towards that end.  They chased, framed, arrested, and prosecuted Mr. Burley and Mr. Matthews using BPD cars and guns, carrying BPD badges, during working hours for which they were being paid by BPD.

278.    In all respects in which he supervised (or failed to supervise) and failed to discipline the Officer Defendants and other plainclothes officers and failed to take reasonable steps to assure that they respected the constitutional rights of Mr. Burley, Mr. Matthews, and other citizens, Mr.

Palmere was acting within the scope of his employment as the Officers' supervisor within the BPD.

279.   Accordingly, BPD is required to indemnify any and all of the individual defendants against whom a judgment is entered in this case.

## REQUEST FOR DAMAGES

WHEREFORE, Plaintiffs ~~respectfully~~Umar Hassan Burley and Brent Andre Matthews request that this Court enter judgment in their favor and against Defendants~~, BALTIMORE CITY POLICE DEPARTMENT, STATE OF MARYLAND, WAYNE JENKINS, RYAN GUINN, KEITH GLADSTONE, and THE ESTATE OF SEAN MATTHEW SUITER~~ Baltimore Police Department, Wayne Jenkins, Ryan Guinn, Keith Gladstone, and Dean Palmere, and award them:

1.   Compensatory damages, attorneys' fees, ~~pre- and post-judgment interest, and~~ and costs, jointly and severally against each Defendant;

2.   Punitive damages against each Defendant; and

3.   Any and all other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs, Umar Hassan Burley and Brent Andre Matthews, hereby demand a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all triable issues.

Dated: ~~June 13~~September 11, 2018~~—~~                    Respectfully submitted,

                             /s/
Steven D. Silverman, Esq. (Bar No. 22887)
ssilverman@mdattorney.com
~~Andrew~~Andre C. White, Esq. (Bar No. 08821)
awhite@mdattorney.com
William N. Sinclair, Esq. (Bar No. 28833)
bsinclair@mdattorney.com
Erin Murphy, Esq. (Bar No. 24980)
emurphy@mdattorney.com
SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC
201 N. Charles Street, Suite 2600
Baltimore, Maryland 21201
Tel: (410) 385-2225
Fax: (410) 547-2432

                             /s/
Joshua R. Treem (Bar No. 00037)
jtreem@browngold.com
Andrew D. Freeman (Bar No. 03867)
adf@browngold.com
Chelsea J. Crawford (Bar No. 19155)
ccrawford@browngold.com
Neel K. Lalchandani (Bar No. 20291)
nlalchandani@browngold.com
Brown, Goldstein & Levy, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland 21201
Tel: (410) 962-1030
Fax: (410) 385-0869

*Attorneys for Plaintiffs Umar Hassan Burley and Brent Andre Matthews*