## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UMAR HASSAN BURLEY** | * | |
| and | * | |
| **BRENT ANDRE MATTHEWS,** | * | |
| | * | |
| Plaintiffs, | | Civil Action No. ELH-18-1743 |
| | * | |
| v. | | **JURY DEMAND** |
| | * | |
| **BALTIMORE POLICE DEPARTMENT,** | * | |
| **WAYNE JENKINS,** | * | |
| **RYAN GUINN,** | * | |
| **KEITH GLADSTONE,** | * | |
| **RICHARD WILLARD** 7810 Clark Road TRLR E30 Jessup, MD 20794, | * * | |
| **WILLIAM KNOERLEIN** 601 E. Fayette Street Baltimore, MD 21201, | * * | |
| **MICHAEL FRIES** 601 E. Fayette Street Baltimore, MD 21201, | * * | |
| and | * | |
| **DEAN PALMERE,** | * | |
| Defendants. | * | |

## SECOND AMENDED COMPLAINT

Plaintiffs Umar Hassan Burley and Brent Andre Matthews, by their undersigned attorneys Silverman|Thompson|Slutkin|White, LLC and Brown, Goldstein & Levy, LLP, file this Complaint against the Baltimore Police Department ("BPD"); Wayne Jenkins, Ryan Guinn, and Keith Gladstone (collectively, "Officer Defendants" or "Officers"); Richard Willard, William Knoerlein, Michael Fries, and Dean Palmere.  In support, Plaintiffs state as follows:

## INTRODUCTION

1.      Plaintiffs Umar Hassan Burley and Brent Andre Matthews lost years of their lives in prison because of the unconstitutional practices and policies of the Baltimore Police Department and several of its officers and supervisors.

2.      On April 28, 2010, plainclothes officers Jenkins and Guinn, while wearing masks, with guns drawn, and acting without reasonable suspicion, illegally stopped Mr. Burley and Mr. Matthews.  Because the officers drove unmarked vehicles and did not identify themselves as police, Mr. Burley and Mr. Matthews believed they were about to be robbed and fled in Mr. Burley's car, an action that led to the death of an innocent third party during the ensuing chase.

3.      Ultimately, the Officers arrested Mr. Burley and Mr. Matthews and illegally searched Mr. Burley's car, consistent with their practice of seeking contraband and then selling or using the same to frame innocent people – as they did here.

4.      Finding nothing illegal in Mr. Burley's car, the Officers, joined by Sergeant Willard, planted heroin inside it.  This heroin had been taken from a stash of drugs that the Officers carried with them for the purpose of framing innocent persons to cover up the Officers' illegal behavior.

5.      The Officers then falsified a statement of probable cause and other police reports

relating to what had transpired.

6.      Relying on the planted evidence and falsified statements, state and federal prosecutors pursued the harshest punishments available against Messrs. Burley and Matthews. Faced with threats of long federal sentences unless they pled guilty to all charges against them, and with no good way of proving that the Officers had, in fact, manufactured the entire criminal case against them, Messrs. Burley and Matthews pled guilty to crimes they did not commit.

7.      These guilty pleas dramatically reduced the amount of prison time Plaintiffs would have faced compared to convictions after a trial.  Indeed, these circumstances reflected a real-life Hobson's choice between a long prison sentence and a lifetime of incarceration.

8.      Years after serving some or all of their sentences, a federal investigation uncovered unconstitutional practices and policies that have long pervaded the BPD.  Specifically, the federal investigation revealed that the Officer Defendants had in fact planted the drug evidence in Mr. Burley's car and used this planted evidence in a false and malicious prosecution.

9.      With this new information, Mr. Burley and Mr. Matthews could finally prove their innocence.

10.      Accordingly, the United States Attorney's Office's petitioned the United States District Court for the District of Maryland to vacate Plaintiffs' drug convictions, which was granted on December 18, 2017.

11.      Likewise, the State of Maryland and Mr. Burley filed a joint motion to withdraw his guilty plea to the vehicular manslaughter charge arising from the same illegal stop, which was granted by the Circuit Court for Baltimore City on April 9, 2018.

12.      The unconstitutional conduct at issue was part of a longstanding pattern and practice of deficient supervision, discipline, and training of plainclothes units by the BPD,

beginning long before the Officers' illegal stop of Mr. Burley and Mr. Matthews, that was sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD supervisors and policymakers had actual or constructive knowledge.

13.    The illegal stop, search, and seizure of Mr. Burley and Mr. Matthews, as well as the fabrication and suppression of evidence to support that illegal conduct, were part of a longstanding pattern and practice of illegal conduct, including illegal stops, searches, seizures, and fabrication and suppression of evidence, that was sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge.  The BPD either intended that these "customs or usages" continue or condoned such behavior by demonstrating deliberate indifference to stopping or correcting them.

14.    This lawsuit seeks redress for Messrs. Burley's and Matthews' injuries resulting from the Officers' misconduct that was in accord with BPD policies or procedures and of which the BPD knew or should have known.

## JURISDICTION AND VENUE

15.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1985 to redress the deprivation under color of law of Plaintiffs' rights as secured by the United States Constitution.

16.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

17.    Venue is proper under 28 U.S.C. § 1391(b) because the events giving rise to this complaint occurred in this judicial district.

18.    On October 12, 2017, Plaintiffs sent Andre M. Davis, Baltimore City Solicitor, notice of Plaintiffs' claims.  A copy of this letter is attached hereto as **Exhibit A**.

19.    The City of Baltimore denied Plaintiffs' claims in a letter dated October 20, 2017. A copy of this letter is attached hereto as **Exhibit B**.

20.     On October 12, 2017, Plaintiffs sent Nancy K. Kopp, Treasurer of the State of Maryland, notice of Plaintiffs' claims.  A copy of this letter is attached hereto as **Exhibit C**.

21.     The State did not respond within the six-month statutory period, thereby denying Plaintiffs' claims pursuant to Md. Code Ann. State Government Art. § 12-107(d)(2).

## THE PARTIES

22.     Plaintiff Umar Hassan Burley is 47 years old.  He was born and raised in Baltimore, Maryland, where he currently resides.

23.     Plaintiff Brent Andre Matthews is 44 years old.  He was born and raised in Baltimore, Maryland, where he currently resides.

24.     At all times relevant hereto, Defendants Jenkins, Guinn, Gladstone, Willard, Knoerlein, Fries, and Palmere were employed by the BPD.  All of them committed the acts and omissions described herein under color of law and within the scope of their employment.

25.     Defendant Wayne Jenkins is a former member of the BPD.  Mr. Jenkins joined the BPD on February 20, 2003.  In November 2003, Mr. Jenkins patrolled the Eastern District.  In May 2005, he was transferred to the Special Enforcement Team in the Eastern District.  In June 2006, Mr. Jenkins joined the Violent Crimes Impact Division ("VCID," at times known as the Violent Crime Impact Section, or "VCIS," and formerly known as the Organized Crime Division). He was promoted to Sergeant on November 30, 2012, and became the officer-in-charge of a Special Enforcement Section on October 14, 2013.  In June 2016, then-Sergeant Jenkins was named supervisor of the Gun Trace Task Force ("GTTF").

26.     Defendant Ryan Guinn is a current member of the BPD.  Mr. Guinn was a member of VCID at the time of the incident involving Messrs. Burley and Matthews in April 2010.  He is a former member of the GTTF.

27.     Defendant Keith Gladstone is a former member of the BPD.  Mr. Gladstone joined the BPD in 1992.  From 1994 to 1995, he was assigned to the Eastern District Flex Unit.  After stints in various drug units, he worked as part of the Northwest District Patrol Division and the Northwest District Flex Unit from 2002 to 2004.  From 2004 to 2008, he worked on a Drug Enforcement Agency task force.  Beginning in 2008, Mr. Gladstone joined VCID and was a member of that unit at the time of the events at issue.

28.     Defendant Richard Willard is a former member of the BPD.  Mr. Willard joined the BPD in 1992.  Mr. Willard was a Sergeant in VCID and directly supervised then-Officer Jenkins, including before and at the time of the incident involving Messrs. Burley and Matthews in April 2010.

29.     Defendant William Knoerlein is a current member of the BPD.  On information and belief, Mr. Knoerlein was a Sergeant in VCID and directly supervised both Officer Gladstone and Officer Jenkins prior to and at the time of the incident involving Messrs. Burley and Matthews in April 2010.

30.     Defendant Michael Fries is a current member of the BPD.  Mr. Fries was part of a Special Enforcement Team from at least 2004 to 2006, during which time he supervised Officer Jenkins.  On information and belief, Mr. Fries was a Lieutenant in VCID and directly supervised Mr. Gladstone prior to and at the time of the incident involving Messrs. Burley and Matthews in April 2010.

31.     Defendant Dean Palmere is a former member of the BPD.  He was employed by the BPD for more than twenty years before his retirement in 2018.  Mr. Palmere held various supervisory roles within the BPD in which he oversaw plainclothes units.  Beginning in 2006, Mr. Palmere oversaw a plainclothes unit as Commander of the Central District.  From 2008 to 2010,

he led VCID.  In 2010, he was promoted to Chief of the Criminal Investigations Division, into

which VCID merged.  In 2011, he briefly served as Chief of the Patrol Division before returning

in 2012 to his role as Chief of the Criminal Investigations Division.  From 2013 until his retirement

in 2018, Mr. Palmere served as Deputy Commissioner overseeing the BPD's Patrol and Operations

Bureaus, under which the plainclothes units fell.  On information and belief, at all relevant times,

Mr. Palmere had supervisory responsibility for plainclothes units, was aware of constitutional

violations by officers in those units (including the Officer Defendants), and failed to take

reasonable steps to stop those violations.

32.     Defendant Baltimore Police Department employs or has employed each of the

foregoing individual defendants.  It is a "person" within the meaning of 42 U.S.C. § 1983.

## FACTUAL BACKGROUND

**I.     THE OFFICER DEFENDANTS' ILLEGAL STOP OF PLAINTIFFS, AS WELL AS
THEIR FABRICATION AND SUPPRESSION OF EVIDENCE, IS PART OF
A WIDESPREAD BPD PATTERN OR PRACTICE OF ILLEGAL CONDUCT.**

33.     The BPD and its supervisors, including Messrs. Willard, Knoerlein, Fries, and

Palmere, knew or should have known years ago that officers given broad authority as part of "elite"

plainclothes units to combat violence, guns, and drugs often engaged in a pattern or practice of

illegal activities like those that occurred here.

34.     Despite actual or constructive knowledge of this pattern or practice, the BPD and

its supervisors condoned misconduct committed by these units by ignoring their widespread

abuses.  Rather than discontinuing plainclothes operations or instituting meaningful reforms and

supervision after numerous allegations and scandals, the BPD merely rebranded these specialized

units periodically.  While the names of these units changed throughout the years, their misconduct

remained the same.

35.     Unfortunately for Plaintiffs and many other innocent victims, and for the confidence of the people of Baltimore in their police and the rule of law, the BPD turned a blind eye to this pattern or practice of illegal activity, allowing Defendants the opportunity they never should have had to engage in the conduct at issue in this case.

### A.     Substantially similar allegations to those in this complaint have long stained BPD's plainclothes units.

36.     For many years before the events at issue here, the BPD deployed elite units comprised of plainclothes officers to whom it gave wide latitude to investigate and arrest persons suspected of dealing drugs and/or gun violations, including so-called "flex squads," Special Enforcement Teams ("SETs"), and the Violent Crime Impact Section.

37.     As suggested by the name "plainclothes," members of these units wear ordinary clothes (such as jeans and tee shirts) and tactical vests while on duty rather than traditional police uniforms.

38.     Plainclothes officers are referred to as "knockers" or "jump out boys" throughout Baltimore, known for driving unmarked vehicles towards groups of people, jumping out of their vehicles, and conducting aggressive searches of anyone in the vicinity.

39.     Since at least the early 2000s, the BPD's plainclothes officers and units have been a frequent and recurrent source of unconstitutional conduct, including but not limited to the incidents described below.

40.     On January 16, 2003, then-United States District Judge for the District of Maryland, Andre M. Davis rebuked several BPD officers for their conduct in arresting a defendant named Mason A. Weaver.

41.     At the close of a two-day hearing, Judge Davis granted the defendant's motion and

- 8 -

ordered the suppression of evidence against Mr. Weaver due to the unconstitutional conduct of the

BPD officers.   Among other things, Judge Davis stated at the hearing:

- That the police affidavit used to secure the search warrant contained "knowing lies."

- "These officers had no justification to seize Mr. Weaver . . . handcuff him and transport him back to – I almost fell out of my chair when I heard that yesterday – transport him back from the shopping center to the apartments and, using the key they had seized from him, go into his apartment."

- "Where are they learning this stuff? . . . Clearly, this was a roll of the constitutional dice on the part of these officers."

- "I am here to protect everybody's constitutional rights.  Everybody's.  And I don't understand why the police don't understand that."

- "They [the officers] are not making cases.   They're not building investigations.  And I say that with all respect to Detective [Keith] Gladstone [seated in court].  They are just making arrests.  They are just making seizures.

42.     In January 2006, the Baltimore Sun published an article regarding the misconduct

within the BPD's "flex squads"

43.     That article, titled "Questions Raised for Years About City 'Flex Squad,'" noted,

*inter alia*, that:

- The BPD employed "flex squads" in all its districts; unlike normal officers, officers with the flex squads had enhanced freedom "to chase down suspected criminals in neighborhoods dominated by drug dealing and violence."

- "Defense attorneys, prosecutors and community members say they have heard for years about allegations of misconduct that included planted drugs and troublesome practices about how suspects were treated and charged."

- The Baltimore Sun's "review of court and other records show[ed] that allegations of wrongdoing have dogged some of the squad's members for several years."

- "In a warrant police used to search the flex squad office last month, investigators noted that previous allegations against [certain officers] 'have been made as to the planting of controlled dangerous substances on citizens in an effort to knowingly

make false arrests.'"

- "The inquiry in the Southwest [district flex squad] has prompted concern about flex squads in other districts – each of the nine has at least one.  In a statement, the [BPD] said it was examining 'all practices and procedures' of every district's 'flex' and drug enforcement units."

44.     Plainclothes BPD officers working as part of flex squads repeatedly engaged in acts of misconduct, including numerous instances prior to the events at issue in this case involving Messrs. Burley and Matthews.

45.     For instance, in 2004, a BPD officer working as part of a flex squad was accused of dropping a teenage boy in rival gang territory in Southwest Baltimore, where he was assaulted.

46.     In 2005, two officers, William King and Antonio Murray, were charged and later received 100-year federal sentences for robbing drug dealers, drug trafficking, and gun violations, after terrorizing Baltimore citizens as plainclothes officers for over a decade.

47.     Officer Jemini Jones, a member of the Southwest District's flex squad, was accused of raping a woman while on duty on two separate occasions, one in October 2005 and the other in December 2005.

48.     In investigating the December 2005 incident involving Officer Jones, "Baltimore drug detectives found that flex squad officers had been stealing drugs and cell phones from people they had arrested, planting evidence and making false arrests."

49.     Police commanders disbanded the Southwest District's flex squad as a result of the allegations against Jones and the other flex squad officers involved.  The BPD also announced that it would conduct an internal affairs investigation into "every officer in those units."

50.      The BPD was thus on notice, from at least 2003, of the potential for abuse associated with officers who had the wide latitude to police in a manner similar to that of the flex

squad officers.

51.     In 2010, the BPD disbanded a six-member plainclothes unit in the Northwest District after discovering a supervisor and one of the officers had been using a stolen license plate on an unmarked car.

52.     At the same time the allegations first surfaced regarding the flex squads, the Sun reported on similar allegations leveled at the Special Enforcement Teams, whose "officers [were] accused of lying in charging documents, most of which involve drug arrests that result from car stops."

53.     Like the flex squads, SET members normally worked in plainclothes and patrolled the streets in unmarked vehicles.  But whereas the flex squads were managed by each of the nine district commanders, the SETs (there were two – one on the east side and one on the west side of Baltimore) were managed directly by the BPD's Chief of Patrol.

54.     As one former SET member explained in a recent article, he and his fellow unit members were "encouraged to make as many arrests as possible" during their overnight shifts. "We stopped just about every adult we saw on the street to check their names for open warrants. We conducted car stops with the intended goal of searching the vehicles."

55.     In September 2006, the Associated Press published an article titled "Baltimore police unit reassigned amid scandal."  The article noted, *inter alia*, that the BPD confirmed its investigation of the SET, described as a "discretionary unit," operating in the Southeastern district. It reported that "[d]ozens of criminal cases have been thrown out because of misconduct allegations against [the] specialized unit, allegations that have led the department to reassign all seven of the unit's members to desk jobs."

56.     Despite being aware of the rampant misconduct that plagued the flex squads and

SETs, in July 2007, the BPD formed a new elite, plainclothes unit known as the Violent Crime Impact Division to focus on "bad guys with guns." The BPD transferred many of the same officers who had been part of the beleaguered flex squads and SETs to the newly formed VCID (at times referred to as VCIS).

57.     Like their predecessors, VCIS members operated with little supervision and, unsurprisingly, engaged in widespread abuses. In short order, the VCIS became the source of a disproportionate number of citizen complaints and came under criticism from members of the community and of the Baltimore City Council.

58.     In September 2014, the Baltimore Sun published an investigative piece entitled "Undue Force." The article noted, *inter alia*, that:

- Many lawsuits against the City "stemmed from the now-disbanded Violent Crimes Impact Section, which used plainclothes officers to target high-crime areas."

- In 2009, a plainclothes VCIS member beat up a Baltimore citizen, Jerriel Lyles, in an East Baltimore carryout restaurant. Mr. Lyles subsequently settled his excessive force case with the City for $200,000.

- "Officers in the unit were accused by prosecutors of lying on a search warrant and working to protect a drug dealer in order to make arrests."

- "Three other [VCIS] members were charged in 2010 with kidnapping two city teens and leaving one in Howard County state park without shoes, socks or his cellphone." The two separate kidnappings both occurred in May 2009.

59.     In March 2009, video evidence confirmed that BPD Officer Michael W. Woodlon, a member of VCID, had lied on charging documents to justify a drug arrest for three defendants. Officer Woodlon then joined the Baltimore County Police Department in 2012, but resigned from that department in August 2018 after his ties to the corrupt GTTF officers came to light.

60.     Also, in March 2009, BPD Officer Jemell Rayam, who later worked under Mr. Jenkins as part of the GTTF, fatally shot Shawn Cannady while working as part of VCIS. It was

Officer Rayam's third shooting in a span of 20 months.  The City later settled a lawsuit brought by Mr. Cannady's family for $100,000.

61.    In June 2009, Officer Rayam, while driving an unmarked vehicle with two other plainclothes officers, pulled over a driver for allegedly not wearing a seatbelt.  During the subsequent stop, Officer Rayam and the other officers put the driver in flex cuffs and stole the $11,000 they found in the car.

62.    Around this time, Officer Rayam was awarded the Citation of Valor & Silver Star for his work in the Violent Crime Impact Division.

63.    Fabien Laronde, a VCIS officer, was the subject of numerous complaints throughout his lengthy tenure with the BPD, a large portion of which involved work as a plainclothes officer.  Among many other incidents, Laronde was accused of planting evidence and using excessive force in 2006 as well as of conducting an illegal strip search of a man in a shopping center parking lot in 2009.

64.    In 2010, the BPD suspended an officer assigned to the VCIS for pocketing money that had been planted on an undercover officer.

65.    In 2011, the City of Baltimore paid a $100,000 settlement after VCIS members used excessive force against a 65-year-old church deacon who was rolling a tobacco cigarette outside his own home.

66.    The misconduct in the VCIS was so widespread that in 2013 the FBI initiated an investigation, in which it determined that multiple unit members had falsified reports to further their cases.  Several officers were suspended as a result of the investigation, another received six months of home detention, and yet another pled guilty to federal gun and drug charges and was sentenced to eight years.  On a wiretapped call, the officer who pled guilty discussed planting a

gun in an unlicensed cab and then pulling over and arresting the cab driver on a gun violation.

67.     Rather than disbanding the VCIS, the BPD merely "rebranded" it the "Special Enforcement Section" ("SES") in December 2012, retaining many of the VCIS officers.

68.     Then-Sergeant Jenkins was selected as an officer-in-charge of a plainclothes SES unit in October 2013.  In this role, Sergeant Jenkins continued to operate with high levels of discretion and little supervision.

69.     In addition to the illegal searches and seizures by the various plainclothes units, the BPD maintained a pattern or practice of conducting illegal stops and seizures, including but not limited to the conduct that formed the basis of the ACLU's June 2006 lawsuit.

70.     In addition to the fabrication and suppression of evidence by the various plainclothes units, the BPD maintained a pattern or practice of fabricating and suppressing evidence as reflected in numerous complaints, civil actions, settlements, and judgments, including but not limited to numerous individuals who have been exonerated following wrongful convictions, including Walter Lomax, Michael Austin, Wendell Griffin, James Owens, Sabein Burgess, Antoine Pettiford, Tyrone Jones, Malcolm Bryant, and Jerome Johnson.

71.     In sum, for many years before the Officer Defendants illegally stopped Mr. Burley and Mr. Matthews, the BPD knew of the illegal acts committed by unsupervised police units and officers; the illegal conduct of the BPD's flex squads, SETs, the VCIS, and other plainclothes units was no secret to BPD or its supervisors, including Messrs. Willard, Knoerlein, Fries, and Palmere. Therefore, the BPD had sufficient notice of the problems that could (and did) arise with utilizing elite units of plainclothes officers driving unmarked vehicles who had wide latitude to combat drug and gun-related offenses years before the Officer Defendants' illegal stop of Plaintiffs.  Given the knowledge that the BPD had prior to the events at issue in the instant Complaint, a reasonable

police department would have taken sufficient steps to ensure that those events would not occur. But BPD failed to take such steps, thus allowing the Officer Defendants to illegally stop, search, and seize, fabricate evidence, and suppress exculpatory evidence with respect to Plaintiffs and others, as members of the flex squads, SETs, the VCIS, and other plainclothes units had done before them.

**B.**     **Beyond knowledge of the rampant illegal conduct within plainclothes units, the BPD had actual or constructive knowledge of then-Officers Gladstone's and Jenkins' misconduct.**

72.     Mr. Gladstone's and Mr. Jenkins' illegal actions in this case are part of their long history of misconduct while employed by the BPD.

73.     On information and belief, Officer Gladstone was involved in the 2003 arrest of Mason Weaver, in which a federal judge held that the BPD officers involved had violated Mr. Weaver's constitutional rights.

74.     On information and belief, the BPD's Internal Affairs Division ("IAD") sustained a finding of misconduct against Officer Gladstone for misconduct he committed between 2002 and 2004 while working in the Northwest District.

75.     On information and belief, on multiple occasions prior to 2010, Officer Gladstone allowed his sources to keep drugs in exchange for information.

76.     In May 2015, Lieutenant Christopher O'Ree, while working with Officer Gladstone, pepper sprayed a man in the face from only a few feet away.  Officer Gladstone then grabbed the man by his hair and pulled him to the ground, before running to chase other residents in the vicinity with pepper spray.

77.      A jury later found Mr. Gladstone and Mr. O'Ree had used excessive force and awarded $75,000 to the man who had been pepper sprayed.

78.     Mr. Gladstone served as a mentor to Mr. Jenkins, and they began working with each other as early as 2008, frequently making arrests together in 2010.

79.     Like Mr. Gladstone, Mr. Jenkins engaged in repeated misconduct as a police officer.

80.     Throughout his tenure with the BPD, Officer Jenkins repeatedly crashed BPD-issued vehicles, damaging them and/or rendering them inoperable.  On information and belief, Mr. Jenkins went through as many as one department-issued vehicle per month.

81.     On or about July 24, 2004, Officer Jenkins was involved in a car accident while on duty.  IAD subsequently conducted an investigation and disciplined Mr. Jenkins for an accident that it deemed "preventable."

82.     On information and belief, Officer Jenkins modified or enhanced the department-issued vehicles in an effort to withstand frequent collisions – in contravention of BPD policy.

83.     On information and belief, Officer Jenkins' supervisors and other high-ranking officials in the BPD had actual or constructive knowledge of Officer Jenkins' reckless driving.

84.     Above and beyond his reckless driving, Mr. Jenkins repeatedly engaged in misconduct while employed with the BPD.  Among the publicly-reported incidents, in 2005, then-Officer Jenkins, at that time a member of the SET in the Eastern District, struck a private citizen, Timothy O'Conner, in the face.  Mr. O'Conner suffered a fracture of the bone near his eye.

85.     According to court documents, Officer Jenkins (and another officer) claimed that they had not seen who had harmed Mr. O'Conner as they were purportedly distracted by another altercation.  But two witnesses testified that they saw an officer throw Mr. O'Conner to the ground and hold him down with a nightstick.

86.     In September 2008, the City agreed to settle the case brought by Mr. O'Conner

regarding that incident for $75,000.   On information and belief, Officer Jenkins suffered no consequences for his actions, despite BPD supervisors' and policymakers' knowledge of the same.

87.     In February 2008, as a member of VCID, Officer Jenkins fabricated an affidavit in support of a search warrant, writing that a confidential source had told him that a black male by the name of Mickey Oakley was distributing large amounts of cocaine and heroin in Baltimore and that the confidential source had been inside an apartment where the drugs were stored with Mr. Oakley.

88.     Officer Jenkins and others entered Mr. Oakley's apartment without a search warrant – a practice that the officers referred to and was known within the BPD as a "sneak and peek."

89.     That same day, Officer Jenkins and another officer who later worked under him as part of the GTTF, Daniel Hersl (who himself was the subject of at least 30 complaints by 2006), stopped and apprehended Mr. Oakley.

90.     At a subsequent motions' hearing in 2009, Officer Jenkins took the stand and lied when he stated that a fellow officer (Detective Randolph) had told him that he saw Mr. Oakley exit an apartment building holding a brown paper bag and get into a black SUV.

91.     Federal prosecutors later agreed to Mr. Oakley's release from federal prison due to Officer Jenkins' misconduct.

92.     In November 2010, Officers Jenkins and Gladstone, while working in VCID, arrested Jamal Walker during a car stop and then went to Mr. Walker's home, where they tried to break in.  Mr. Walker's wife, Jovonne Walker, set off a silent burglary alarm during the break-in attempt, which brought police to the home.  Officers Jenkins and Gladstone sent the police away so that they could conduct a search of the home themselves.  Prosecutors later dropped the case against Mr. Walker once the inconsistencies in Jenkins' account came to light.

93.     In May 2011, then-Officer Jenkins stole at least $1,800 from an individual's car after an attempted traffic stop and later authored a false incident report to conceal his illegal conduct.

94.     On information and belief, Mr. Jenkins was involved in these as well as numerous other instances of misconduct that were known to BPD supervisors and policymakers, including Messrs. Willard, Knoerlein, Fries, and Palmere, both before and subsequent to events at issue, some of which are described below.

95.     On information and belief, Mr. Jenkins was the subject of several IAD investigations.

96.     A fellow GTTF officer, Momodu Gondo, speaking of his experience with Mr. Jenkins at the RICO trial, stated:

> Defendant Wayne Jenkins was very reckless, you know. I mean, he was just out of control, putting citizens at risk, you know, driving on the side of the street, going in people bumpers.  I just never saw anything like this . . . . This dude is out of control. . . . It was crazy.  Yeah.  His -- his tactics in law enforcement, you know, he was -- you know what I mean?  He was -- it was crazy.  It was bad.  It was bad.

97.     Mr. Gondo further testified that he feared that, if he spoke up about Mr. Jenkins' conduct, he would "have been blackballed" because Jenkins "knew so many people in command."

98.     Another GTTF officer, Evodio Hendrix, testified at the RICO trial that Mr. Jenkins was a "golden boy" and "prince" within the BPD who was "untouchable" because he was looked after by higher-ups within the department.

99.     On January 5, 2018, Mr. Jenkins pled guilty to racketeering conspiracy, racketeering, two counts of Hobbs Act Robbery, falsification of records in a federal investigation, and four counts of deprivation of rights under color of law.  In his plea agreement, Mr. Jenkins

admitted that, among other things, he and other members of his units authored false incident and arrest reports, engaged in warrantless stops and seizures without probable cause, made false arrests, created false charging documents, and planted drugs on defendants.

100.    As part of his plea agreement, Mr. Jenkins expressly admitted that heroin had been planted in Mr. Burley's car on April 28, 2010.  Specifically, he admitted that:

- "[B]etween in or about April 28, 2010 and November 30, 2017, he knowingly concealed, covered up and falsified and made false entries in an official Statement of Probable Cause . . . reflecting his actions, and actions of his fellow Baltimore Police Department officers, in relation to the seizure of heroin from an automobile operated by U.B. [Mr. Burley] and in which B.M. [Mr. Matthews] was a passenger on April 28, 2010, with the intent to impede, obstruct and influence the investigation and proper administration" of that matter.

- "[W]hile acting under color of law, he willfully deprived" Mr. Burley and Mr. Matthews "of the right, secured and protected by the Constitution and laws of the United States, to be free from the deprivation of liberty without due process of law, which includes the right to be free from incarceration due to the fabrication of evidence by a law enforcement officer.

- He submitted a false Statement of Probable Cause in which he claimed that drugs had been recovered from Mr. Burley's car, even though he knew that the drugs had been planted.

- He failed to correct his false statement during the entire length of Mr. Burley's and Mr. Matthews' incarceration.

- "[W]hile acting under color of law," he willfully deprived Mr. Burley and Mr. Matthews of the constitutional right to "be free from incarceration due to a law enforcement officer's willful failure to disclose exculpatory evidence to a prosecutor."

- He "willfully violated his ongoing obligation to disclose to a prosecutor the fact that he had lied in a Statement of Probable Cause that he knew would be relied upon, and that was in fact relied upon" to detain Mr. Burley and Mr. Matthews.

101.    On June 7, 2018, a federal judge sentenced Mr. Jenkins to 25 years in prison based on his admissions that heroin was planted in Mr. Burley's car, as well as the numerous other instances of egregious misconduct throughout his tenure with the BPD to which he admitted.

**C.     Defendants Willard, Knoerlein, and Fries were deliberately indifferent to the misconduct of subordinates within plainclothes units, including Officers Jenkins and Gladstone, whom they supervised both prior to and at the time <u>of the incident involving Messrs. Burley and Matthews.</u>**

102.    The misconduct of the Officer Defendants in this case resulted from and was permitted by the deliberate indifference of their direct supervisors who, despite actual or constructive knowledge that plainclothes officers (including Officers Jenkins and Gladstone) had posed a pervasive and unreasonable risk of constitutional injury to citizens like Plaintiffs, condoned their illegal conduct by failing to supervise and/or correct their misconduct.

103.    On information and belief, at all times relevant hereto, Defendants Willard, Knoerlein, and Fries held supervisory roles within the plainclothes units in which the Officer Defendants worked.  As such, they were responsible for supervising, disciplining, and training the Officer Defendants.

104.    Messrs. Willard, Knoerlein, and Fries each served as a direct supervisor for Officer Jenkins and/or Officer Gladstone at various times prior to and during the events at issue.

105.    Lieutenant Fries supervised both Officers Jenkins and Gladstone.  Beginning in 2004 and continuing into 2006, Lieutenant Fries supervised Mr. Jenkins while part of the Special Enforcement Team.

106.    On information and belief, Lieutenant Fries was Officer Jenkins' supervisor in 2004 when IAD sustained a finding against Officer Jenkins for a vehicular accident it deemed "preventable."

107.    Lieutenant Fries was Officer Jenkins' supervisor in 2005, when Officer Jenkins struck Timothy O'Conner in the face, later resulting in a settlement paid by the City as earlier described.

108.    On information and belief, Lieutenant Fries had actual or constructive knowledge of Officer Jenkins' use of excessive force against Timothy O'Conner (as well as numerous other instances of Officer Jenkins' misconduct), but nonetheless took no remedial or disciplinary action against Officer Jenkins.

109.    On information and belief, Lieutenant Fries played a role in selecting which officers served in which plainclothes units.  Despite knowledge of Officer Jenkins' prior misconduct, Lieutenant Fries selected Officer Jenkins to join VCID (formerly the Organized Crime Division) in June 2006.

110.    Beginning in 2008, Lieutenant Fries served as Officer Gladstone's direct supervisor in VCID.

111.    On information and belief, Lieutenant Fries was his supervisor when Officer Gladstone, together with Officer Jenkins, arrested Mickey Oakley in 2008 and Jamal Walker in 2010.

112.    Beginning in 2006, Sergeant Knoerlein supervised Officer Jenkins in VCID.

113.    On information and belief, Sergeant Knoerlein had actual or constructive knowledge of Officer Jenkins' history of misconduct prior to joining VCID, including but not limited to the 2004 sustained IAD finding and the 2005 incident involving Timothy O'Connor.

114.    Beginning in 2008, Sergeant Knoerlein supervised Officer Gladstone in VCID.

115.    On information and belief, Sergeant Knoerlein had actual or constructive knowledge of Officer Gladstone's history of misconduct prior to joining VCID, including but not limited to an earlier sustained IAD finding and his practice of allowing individuals to keep drugs in exchange for information.

116.    On information and belief, Sergeant Knoerlein directly supervised both Officer

Jenkins and Officer Gladstone in VCID when they committed numerous acts of misconduct, including in connection with their arrests of Messrs. Oakley and Walker.

117.    Sergeant Willard supervised Officer Jenkins in VCID, both prior to and on April 28, 2010.

118.    On information and belief, Sergeant Willard had actual or constructive knowledge of Officer Jenkins' history of misconduct prior to joining VCID, including but not limited to the 2004 sustained IAD finding and the 2005 incident involving Timothy O'Connor.

119.    On information and belief, Sergeant Willard was present at the scene when drugs were planted in Mr. Burley's car, as discussed above.

120.    On information and belief, Messrs. Fries, Knoerlein, and Willard had knowledge of several other instances of misconduct involving Officers Jenkins and Gladstone prior to the events at issue.

121.    On information and belief, as supervisors within BPD's plainclothes units, Messrs. Fries, Knoerlein, and Willard each had actual or constructive knowledge of the rampant misconduct present within those units in the early-to-mid 2000s, including the misconduct in the flex squads, SETs, and VCID, as described above, yet did nothing to address it.

122.    Mr. Fries was a supervisor in a SET in the Eastern District when that unit's officers were committing widespread abuses.

123.    Messrs. Willard, Knoerlein, and Fries held supervisory roles in VCID during the time when that unit's officers were committing widespread abuses, including the repeated illegal conduct of Jemell Rayam.

124.    On information and belief, neither Mr. Willard, Mr. Knoerlein, nor Mr. Fries took any steps (let alone reasonable steps) to report or remedy illegal conduct that each of them knew

or should have known was occurring in the plainclothes units under their supervision.

125.     Messrs. Willard's, Knoerlein's, and Fries' failure to properly investigate, supervise, and discipline plainclothes officers, even after these scandals, demonstrates a gross disregard for the constitutional rights of the public and those of Messrs. Burley and Matthews, and their failure was a proximate cause of their injuries.

126.     On information and belief, Defendants Willard, Knoerlein, and Fries did not conduct or request any meaningful training specific for plainclothes officers under their supervision, even after the misconduct within the SETs and VCIS was publicly reported.

127.     Despite actual or constructive knowledge of Officers Jenkins' and Gladstone's history of misconduct and the unreasonable risk they posed to citizens, Lieutenant Fries, Sergeant Knoerlein, and Sergeant Willard specifically failed to adequately train, investigate, supervise, or discipline Officers Jenkins and Gladstone.

128.     Messrs. Fries, Knoerlein, and Willard knew of the significant risk that plainclothes officers, and specifically Officers Jenkins and Gladstone, would violate the rights of Mr. Burley, Mr. Matthews, and other Baltimore residents, but they deliberately chose a course of action that allowed these violations to continue.

129.     The continued inaction of Messrs. Fries, Knoerlein, and Willard, over a substantial period of time, in the face of widespread and longstanding abuses committed by plainclothes officers under their supervision allowed the Officers to violate the constitutional rights of numerous residents, including Messrs. Burley and Matthews.

130.     In addition to condoning the numerous instances of misconduct, on information and belief, Messrs. Willard, Knoerlein, and Fries actively encouraged plainclothes officers under their supervision, including Officers Jenkins and Gladstone, to violate the constitutional rights of

Baltimore residents.  On information and belief, they directed their subordinates to conduct searches without regard for the limitations of the Fourth Amendment.  On information and belief, they also encouraged and incentivized the officers under their supervision to get as many guns off the street by whatever means necessary, legal or otherwise.

131.    On information and belief, Messrs. Fries, Knoerlein, and Willard not only were aware of, but actively encouraged and approved, the overtime fraud committed by their subordinates.

132.    In spite of the well-documented misconduct by the plainclothes officers whom they supervised, Messrs. Willard, Knoerlein, and Fries rose within the ranks of the BPD, thereby allowing those below them, including the Officer Defendants, to continue their actions unabated.

**D.      Defendant Palmere had actual or constructive knowledge of the misconduct by officers in the plainclothes units, whom he supervised, but was deliberately indifferent to the practices of his subordinates.**

133.    The illegal actions of the Officer Defendants in this case would not have been possible without the actual or tacit authorization of one or more high-ranking, senior command-level officers within the BPD.

134.    Dean Palmere oversaw many of the BPD's plainclothes units throughout his tenure as a senior officer within the BPD, and had actual or constructive knowledge of the Officer Defendants' misconduct, yet he did nothing to stop their practices.

135.    On information and belief, Mr. Palmere had the authority – indeed, the responsibility – to discipline officers he knew had engaged in misconduct, including the Officer Defendants and others in the plainclothes units.

136.    Mr. Palmere began supervising plainclothes units in the mid-2000s as Commander of the Central District.  There, he oversaw plainclothes officers in the District's first "Safe Zone,"

- 24 -

an aggressive patrol program aimed at combating drug dealing and reducing violent crime in the Reservoir Hill and Upton neighborhoods.

137.     In 2005, Mr. Palmere served on the trial board for Officer Thomas E. Wilson, who had entered and searched a home without a warrant, later obtained a warrant, and then falsified police reports to state that he had received the warrant prior to the home invasion (a "sneak and peek").  Even though IAD recommended that Officer Wilson be fired, Mr. Palmere voted for a reduced sentence, allowing Mr. Wilson to remain on the force and sending a message to other officers that "sneak and peaks" would be tolerated.

138.     From 2008 to 2010, as head of the VCIS, then-Colonel Palmere supervised plainclothes officers during a time of increased citizen complaints and widespread abuses.  For example, he supervised the VCIS officer who assaulted Jerriel Lyles, resulting in a $200,000 payout to Mr. Lyles.  And then-Colonel Palmere had direct oversight responsibility for the three VCIS officers who were charged with kidnapping two Baltimore city teenagers and leaving one in Howard County in 2010, as well as the numerous other instances of VCIS abuses detailed above.

139.     The illegal actions of the officers whom Mr. Palmere supervised were not isolated or remote events of which he was unaware.  Indeed, convicted former GTTF member Momodu Gondo testified at the recent trial of former GTTF members Daniel Hersl and Marcus Taylor that, in 2009, then-Colonel Palmere assisted and coached former GTTF officer Jemell Rayam in the cover-up of the fatal shooting of Mr. Cannady.

140.     On information and belief, Mr. Palmere, as the head of VCID during the relevant times, was a supervisor responsible for Officers Jenkins, Guinn, and Gladstone, and had actual or constructive knowledge of their misconduct, including the misconduct that led to the unlawful incarceration of Messrs. Burley and Matthews.  Mr. Palmere had actual or constructive knowledge

of the prior and subsequent misconduct committed by those officers, particularly Officer Jenkins, who had engaged in several illegal acts by that point, many of which were publicly reported and thus were known or should have been known to his supervisors.

141.    On information and belief, when Officer Hendrix testified at the RICO trial that Officer Jenkins was a "golden boy" and "prince" who was "untouchable" within the BPD due to his support among the department's top leadership, he was referring, at least in part, to Mr. Palmere's protection and promotion of Officer Jenkins over an extended period of time.

142.    On information and belief, when Mr. Gondo testified at the RICO trial that he feared retribution from Officer Jenkins because he "knew so many people in command," he was referring in part to Officer Jenkins' close relationship to Mr. Palmere.

143.    Mr. Palmere awarded Officer Jenkins and other BPD officers an achievement pin for their work as part of plainclothes units.

144.    On information and belief, Mr. Palmere was a longstanding friend of and very close to Sergeant Thomas Allers, GTTF's officer-in-charge from July 2013 to June 2016.  Mr. Palmere had supervisory responsibility for Sergeant Allers, who eventually pled guilty to the RICO conspiracy charges and was sentenced to 15 years in prison.

145.    On information and belief, Mr. Palmere did not take any steps to report or remedy illegal conduct of the Officer Defendants or other plainclothes officers that he knew of or should have known of.

146.    The continued inaction of Mr. Palmere, over a substantial period of time, in the face of widespread and longstanding abuses committed by plainclothes officers under his supervision, including the Officer Defendants, demonstrates his deliberate indifference to that pattern of misconduct, including the misconduct against Messrs. Burley and Matthews.

147.    In spite of the documented misconduct by the plainclothes officers whom he supervised, Mr. Palmere rose within the ranks of the BPD, thereby allowing those below him, including the Officer Defendants, to continue their actions unabated.

148.    In 2010, Mr. Palmere was named Colonel and Chief of the Criminal Investigations Division, into which the troubled VCIS merged.  In this role, he not only oversaw VCIS (the unit the Officers were part of at the time of the incident involving Messrs. Burley and Matthews), but the Homicide and Sex Offense units.

149.    In 2011, Mr. Palmere was promoted to the Chief of Patrol for all of the BPD's nine districts. The following year, he returned to his role as Chief of the Criminal Investigations Division, where he remained until 2013, when he was named Deputy Commissioner.

150.    As Deputy Commissioner from 2013 to 2018, Mr. Palmere served as Chief of the Patrol and Operations Bureaus.  In these roles, he was the second-in-command of the BPD's operations and responsible for the actions of the various plainclothes unit officers.

151.    During the four-plus years in which Deputy Commissioner Palmere led the BPD's operations, the SESs and GTTF operated with impunity. Mr. Jenkins, an officer with whom Mr. Palmere had worked in the past and whom he knew or should have known had committed repeated acts of misconduct, was named head of an SES in 2013 and named supervisor of the GTTF in 2016.

152.    On information and belief, at all relevant times, Mr. Palmere had a role in selecting which officers served on which plainclothes units and also was involved in the promotion decisions regarding plainclothes officers.

153.    The arrests and charges against several GTTF officers for illegal conduct led to the dissolution of the GTTF and precipitated then-Deputy Commissioner Palmere's abrupt retirement

from the BPD in 2018.

**E.    BPD knowingly allowed the Officer Defendants to continue the flex squads', SETs', and VCID's pattern of illegal conduct.**

154.    Like the members of the flex squads, SETs, and VCIS, the Officer Defendants were members of elite plainclothes units within the BPD with broad authority to roam the City, ostensibly looking for gangs, drugs, and guns.

155.    Although the BPD conducted internal investigations into the former elite units, and thus had ample opportunity to correct their illegal behavior, it failed to provide the necessary oversight, discipline, or training to ensure that the Officer Defendants did not engage in the same pattern of misconduct.

156.    Instances involving the Officer Defendants and several indictments against GTTF officers since 2017 demonstrate this failure.

157.    The BPD formed the GTTF in May 2007, around the same time it formed VCIS, with the stated goal of tracking and curbing illegal gun sales and gun activity.

158.    On February 23, 2017, a number of GTTF officers, including Wayne Jenkins, were indicted for various RICO offenses ("RICO Indictment").

159.    On August 24, 2017, Sergeant Allers was indicted on RICO and Hobbs Act Robbery/Extortion claims for the same type of misconduct ("Allers Indictment").

160.    The RICO Indictment revealed that the GTTF officers engaged in, among other things, the following overt acts:

- Conducting traffic stops of vehicles and stealing money, property, and narcotics from the vehicle occupants; and

- Preparing false and fraudulent official incident and arrest reports, reports of property seized from arrestees, and charging documents to conceal the fact that the defendants stole money, property, and narcotics from individuals.

161.     One of the defendants in that prosecution, Jemell Rayam, pled guilty to a RICO

conspiracy charge and cooperated with federal authorities during their investigation.  In his plea

agreement, he publicly admitted that, among other things, he:

> [r]obbed civilians he detained and in some cases arrested and stole money and drugs
> from them. RAYAM did this beginning in at least 2009 or 2010 when he joined the
> GTTF. At times, RAYAM shared the proceeds with co-defendants Momodu
> GONDO ("GONDO"), Wayne Jenkins ("JENKINS"), Daniel Hersl ("HERSL"),
> Marcus Taylor ("TAYLOR"), Defendant A and others, and on other occasions, he
> kept all the proceeds for himself . . . . RAYAM also sold, through associates of his,
> drugs that JENKINS gave him and split the proceeds of those sales.  JENKINS
> obtained the drugs by robbing detainees and arrestees.

162.     The BPD was well-aware that Officer Rayam had lied on a BPD-administered

polygraph examination about the June 2009 vehicle stop in which he stole $11,000 (described

above), yet he kept his job and was promoted to the GTTF shortly thereafter.

163.     Specifically, Officer Rayam was asked two series of questions about his conduct as

well as the conduct of fellow officers, including:

- "Did you see Detective Giordano remove a bag from the truck of that car [you pulled over on Lafayette Ave on June 8, 2009]?";

- "Did you see Officer Sylvester take possession of a bag that was removed from that car?"; and

- "Did you conspire with Officer Sylvester to take money from anyone on June 8, 2009?"

164.     For each question, Officer Rayam answered, "No."   The BPD's polygraph

examiner "found the possibility of deception [by Rayam] to be greater than 99% in both tests."

165.     The BPD did nothing to investigate or address this misconduct.

166.     That was not the only instance in which the BPD and local authorities were aware

of GTTF misconduct and did nothing to stop or correct it.

167.     In a 2014 case involving Officers Jenkins and Gladstone, Assistant City State's

Attorney Molly Webb notified defense counsel that video camera footage taken of a search of a car directly contradicted the sworn statement of probable cause submitted by the officers.

168.    In response to the troubling footage, ASA Webb dismissed the case and reported the inconsistency to BPD's Internal Affairs Division.

169.    On information and belief, after ASA Webb reported the incident, Officer Jenkins threatened ASA Webb that she should "stop talking about him."

170.    On information and belief, no investigation was conducted and no disciplinary actions were taken against any of the Officers concerning their alleged misconduct, thus enabling them to conduct further abuses.  In fact, Officer Jenkins, who had already risen through the BPD ranks, was promoted to officer-in-charge of the GTTF in 2016.  Similarly, by 2017, Officer Guinn was promoted to Sergeant and selected to serve as a training instructor for the BPD's police academy and continues to train other BPD officers to this day.

171.    Despite knowing of the recurrent misconduct by its plainclothes officers, BPD failed to establish reasonable and necessary systems to train, supervise, investigate, and hold accountable (including by "stings" in which it monitored their integrity) those officers or to take the necessary steps to eliminate those units' culture of corruption.

172.    When asked about the GTTF following the indictments, then-Police Commissioner Kevin Davis said, "Should someone have known about it?  Absolutely they should have known. The culture here contributes to it."

173.    In May 2017, Commissioner Davis announced that he was effectively ending plainclothes policing in Baltimore, explaining that plainclothes officers were the subject of a disproportionate number of complaints and had adopted a "cutting-corners mindset." Commissioner Davis added that requiring officers to wear police uniforms would create a level of

accountability that had been previously absent.

174.   In 2018, then-Baltimore Police Commissioner Darryl De Sousa revived the plainclothes units.

**F.**   **BPD entered into a consent decree in which it admitted to a pattern or practice of conduct substantially similar to that at issue here and based in part on activities that occurred prior to and in 2010.**

175.   Following the April 2015 death of Freddie Gray in police custody, then-Baltimore Mayor Stephanie Rawlings-Blake asked the United States Department of Justice, Civil Rights Division, to conduct a pattern-or-practice investigation of BPD's policies.

176.   The Civil Rights Division issued an investigative report on August 10, 2016.  That report included the following findings:

- The Civil Rights Division "reviewed hundreds of thousands of pages of documents, including all relevant policies and training manuals used by the [BPD] since 2010; BPD's database of internal affairs files; a random sample of about 800 case files on non-deadly force incidents; files on all deadly force incidents since 2010" and other data;

- The BPD engaged in a "pattern or practice" of conduct that violates the United States Constitution and federal law, including stops, searches and arrests without the reasonable suspicion or probable cause required under the Fourth Amendment to the United States Constitution;

- The foregoing pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity and resulted in part from BPD's zero tolerance enforcement strategy, dating back to the early 2000s;

- The BPD failed to take action against officers with a long history of misconduct that is well known to the department.  For example, one officer currently employed by the BPD had received approximately 125 complaints from complainants within the department and from the community since 2010, and many of these complaints allege serious misconduct.  However, the DOJ found that the BPD had sustained only one complaint against the officer for minor misconduct;

- In June 2006, the ACLU of Maryland sued the BPD regarding its illegal arrests of thousands of Baltimore residents.  In 2010, that case settled with BPD agreeing to change its policies and procedures and submit to an independent auditor to evaluate

its progress toward adopting stop and arrest practices consistent with the United States Constitution;

- The final report of the auditor from 2014 noted that there were no systemic improvements in reporting for those stop and arrest offenses during the monitoring period; and
- Various policies that pre-date the events at issue involving Messrs. Burley and Matthews demonstrate that BPD failed to adequately equip its officers to police effectively and constitutionally.

177.   The DOJ Report specifically highlighted the illegal conduct of the various plainclothes units (recognizing that, as outlined above, "the names and organizations of the plainclothes units have changed multiple times over the years"). It noted that a "disproportionate share of complaints" identified plainclothes officers as "particularly aggressive and unrestrained in their practice of stopping individuals without cause and performing public, humiliating searches."

178.   On January 12, 2017, the United States filed a complaint in the United States District Court for the District of Maryland against the BPD. That complaint alleged that:

- In the late 1990s, BPD adopted zero tolerance policing strategies that prioritized officers making large numbers of stops, searches, and arrests for misdemeanor offenses without ensuring robust oversight to hold officers accountable for misconduct and protect the constitutional rights of Baltimore City residents;

- Based on data from 2010 – 2015, BPD engaged in a pattern or practice of conduct that violated the United States Constitution and federal laws. Those violations included unconstitutional stops, searches, and arrests that run afoul of the rights guaranteed to Baltimore's citizens by the Fourth and Fourteenth Amendments to the United States Constitution; and

- BPD's violations of the Constitution and federal law are driven by BPD's systemic deficiencies in policies, training, supervision, and accountability structures. BPD has been aware of these structural challenges for many years but has not taken adequate steps to comply with the Constitution or federal law.

179.   That same day, the United States and the BPD jointly filed a motion asking the court to approve a 227-page consent decree. That decree provides in relevant part that:

- 32 -

- BPD will provide its officers with training on stops, searches, and seizures;

- BPD will ensure that a supervising officer reviews all documentation relating to stops, searches, seizures, and arrests for completeness and adherence to the law and BPD policy; and
- BPD will audit the aforementioned supervisory reviews.

180. On April 7, 2017, the court granted that motion, entered a slightly-modified version of the consent decree, and stated that it will retain jurisdiction over the decree until it is terminated. As of the filing of this complaint, the decree remains in place.

**G.    The policies and "customs and usage" of the BPD.**

181. BPD policymakers, aware since at least the early 2000s of numerous instances of misconduct committed by plainclothes officers and units similar to that at issue here, failed to adequately supervise their plainclothes units, thus allowing the unconstitutional conduct described herein to occur.

182.    BPD supervisors condoned the widespread misconduct within plainclothes units. Despite knowledge that plainclothes units were the source of a disproportionate share of complaints against the BPD for many years, and at the center of numerous allegations and cases of police misconduct, the BPD continued to permit plainclothes officers to roam the streets with high levels of discretion and little supervision.  Even after several public scandals highlighting the abuses endemic to flex squads, SETs, and VCIS, and others, as detailed above, the BPD did not institute any meaningful oversight of these specialized plainclothes units.  The BPD's continued inaction in the face of pervasive constitutional violations evidences its deliberate indifference to the rights of its citizens.

183.    To make matters worse, despite knowledge that Officer Jenkins engaged in repeated acts of misconduct, the BPD did not punish Officer Jenkins but rather rewarded him by

promoting him to lead two of those very units.

184.    On multiple occasions, the BPD promoted Mr. Palmere to high-ranking, senior command-level positions, in spite of rampant misconduct by the officers he supervised, of which BPD knew or should have known.

185.    The frequency and duration of the misconduct involving plainclothes units demonstrate the misconduct was pervasive within the BPD at time of the events at issue, and, on information and belief (especially considering the extensive public reporting), the misconduct was committed with the knowledge of BPD supervisors, or because of their deliberate indifference to this misconduct.

186.    On information and belief, plainclothes officers were encouraged and pressured by BPD supervisors, including Messrs. Willard, Knoerlein, Fries, and Palmere, to recover as many guns and make as many as arrests as possible, and in fact plainclothes officers were promoted in large part based on their arrest statistics, without regard for the methods the plainclothes officers used to recover those guns and make those arrests.

187.    On information and belief, plainclothes officers were praised by BPD supervisors, notwithstanding the numerous allegations of misconduct.  For instance, Mr. Palmere awarded Officer Jenkins and others an achievement pin for their work as part of plainclothes units.

188.    In September 2011, the BPD held a Medal Day ceremony to honor a select few officers within the department.  At the ceremony, the BPD awarded Bronze Medals to Messrs. Jenkins and Gladstone, as well as one to Mr. Knoerlein, which accounted for three out of the seven Bronze Medals awarded at the ceremony.

189.    In a BPD newsletter, Lieutenant Christopher O'Ree wrote, "I am extremely proud to showcase the work of Sergeant Wayne Jenkins and [his team] . . . Their relentless pursuit to

make our streets safer by removing guns and arresting the right people for the right reasons has made our City safer.  I couldn't be more proud of the strong work of this team."  O'Ree added, "This team of dedicated detectives has a work ethic that is beyond reproach."

190.    The unconstitutional conduct at issue in this case – including, but not limited to, illegally stopping, detaining, searching, and seizing persons; permitting the use of fabricated evidence to support unconstitutional stops and seizures; and suppressing exculpatory and/or impeachment evidence – was sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

191.    With respect to stops and searches, BPD supervisors conducted minimal substantive review of plainclothes officers' justifications for those activities.

192.    The BPD had actual or constructive knowledge of the same as identified above and either intended that the "custom or usage" or pattern or practice continue or was deliberately indifferent to stopping or correcting the same, which caused Plaintiffs' injuries.

193.    BPD supervisors and policymakers, aware of specific instances of police misconduct similar to that at issue here since at least 2004 and armed with actual knowledge of officers' misconduct before the events at issue here took place, failed to adequately supervise, investigate, or discipline their officers, thus allowing for the unconstitutional conduct described herein to occur.

194.    Despite rampant misconduct within the plainclothes units, the BPD did not take seriously its obligation to supervise, investigate, or discipline its officers.

195.    At all times relevant hereto, the BPD lacked adequate systems and processes to investigate and punish officers who had engaged in misconduct.  For instance, prior to the events at issue, the BPD's IAD did not track or investigate complaints made against its officers through

civil lawsuits, even those that resulted in judgments against officers, like the settlement reached by Timothy O'Conner concerning the actions of Officer Jenkins in 2005. This failing, among many others, allowed officers like Mr. Jenkins to engage in repeated misconduct without consequence.

196.   As detailed in the DOJ Report, among other things, the BPD's disciplinary system, including IAD, was deficient in the following respects:

- discouraged individuals from filing complaints;

- tolerated excessive and chronic delays in resolving disciplinary complaints;

- supervisors misclassified serious complaints as minor ones so that they could be resolved at the command level without IAD involvement;

- supervisors summarily closed complaints without investigation;

- failed to investigate complaints in a timely manner;

- failed to consider evidence that contradicted explanations provided by officers accused of misconduct;

- failed to probe beyond reports the accused officer already provided;

- provided officers with a detailed notice of the alleged misconduct at the outset of an investigation, compromising the investigation and creating the possibility that the complaining party could be targeted for retaliation or intimidation;

- used a trial board system beset by delays and deficiencies;

- failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

- supervisors failed to identify deficiencies or questionable findings in investigations; and

- did not take steps to ensure that investigators did not have conflicts of interest vis-a-vis the officers they were investigating.

197.   Additionally, the BPD's Internal Affairs Division was underprepared and

overburdened during the relevant time period. IAD detectives, as detailed in an independent report, lacked key training on how to investigate officers suspected of misconduct. On information and belief, at all times relevant hereto, IAD investigators were also assigned, on average, between 35-50 cases to investigate (far above the national average), and were also frequently ordered to patrol the streets, further limiting their already-stretched capacity to handle their investigations of officer misconduct. At times IAD investigators were detailed to patrol alongside the very officers they were investigating.

198.    Retired Police Sergeant Chad Ellis, who worked in the Internal Affairs Division (including working on the 2009 investigation of Officer Rayam concerning his theft of $11,000 – the investigation that included the polygraph examination described above), explained that IAD was "ill-prepared and inexperienced in their area of alleged expertise – from top to bottom" at that point in time.

199.    A police spokesperson likewise acknowledged that, in 2009, the BPD did not have an adequate early intervention system in place for flagging problem police officers.

200.    In 2013, then-Police Commissioner Anthony Batts acknowledged in the BPD's "Strategic Plan for Improvement" that "[d]iscipline has not always been a priority for the Baltimore Police Department." He explained that for "many years" the "internal affairs system accrued numerous deficiencies," including "a backlog of disciplinary verdicts that were never carried out and a substantial case backlog." "It has not been uncommon," Commissioner Batts wrote, "for cases in the department to take as many as three years to resolve."

201.    The police misconduct was sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

202.    The BPD had actual or constructive knowledge of the same as identified herein and

either intended that the "custom or usage" or pattern or practice continue or was deliberately indifferent to stopping or correcting the same, which caused Plaintiffs' injuries.

203. BPD, aware of the potential for abuse among elite units like the GTTF since at least the early 2000s, when the Baltimore Sun reported on flex squad and SET misconduct, and having the final authority to establish and implement policies, permitted and condoned the GTTF's unconstitutional conduct alleged herein, failed to establish and implement training policies.

204. For instance, as detailed in the DOJ Report, a BPD training lesson plan from 2009 regarding stop and frisk training misstated the relevant standard for search and seizures ("Investigative contacts of citizens by members of this agency will be conducted with articulable reason."). The 2009 training also mistakenly instructed officers that the standard of suspicion required for an investigatory stop and a subsequent frisk was the same.

205. Additionally, at all times relevant hereto, the BPD lacked adequate staffing to conduct trainings of its officers, facilities for training, and mechanisms to ensure that officers had received and understood the supposedly mandatory training.

206. In 2015, the former director of the BPD's Training Academy released a document outlining numerous deficiencies in training and highlighted the department's "internal culture of placing training second."

207. The stop, search, arrest, and seizure of Plaintiffs, as well as the fabrication and suppression of evidence relating to them, were part of a pattern or practice of illegal conduct sufficiently widespread and pervasive within the BPD that it assumed the quality of a "custom or usage" or pattern or practice of the BPD.

208. The BPD had actual or constructive knowledge of the same misconduct as identified herein and either intended that the "custom or usage" or pattern or practice continue or

was deliberately indifferent to stopping or correcting the same, which caused Plaintiffs' injuries.

209.   Since at least the early 2000s, the BPD had repeated notice through, *inter alia*, convictions of its police officers, complaints and suits lodged against their police officers, public reporting, failed polygraph tests, and notifications from state prosecutors, that its plainclothes officers engaged in a widespread pattern of flagrant unconstitutional violations.  Rather than take any action to stop such conduct, BPD condoned that pattern and practice by ignoring it.

210.   In sum, the BPD's policy, custom, or practice of promoting, facilitating, or condoning improper, illegal, and unconstitutional policing, and its policy, custom, and pattern or practice of failing to adequately supervise, discipline, and train BPD plainclothes units was reflected in numerous prior allegations and cases of misconduct involving plainclothes units.  The long history of misconduct committed by plainclothes units was actually or constructively known to BPD supervisors or policymakers, who failed to supervise, discipline, or train in response to such notice.  The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of individuals like Umar Hassan Burley and Brent Andre Matthews.

## II.   PLAINTIFFS UNNECESSARILY SERVED SUBSTANTIAL PRISON SENTENCES BECAUSE OF DEFENDANTS' ILLEGAL POLICIES AND PRACTICES.

211.   As demonstrated below, the Officer Defendants' illegal stop of Plaintiffs, and all that followed, fits squarely within the illegal custom and usage, pattern and practice and/or policies and practices of the BPD that existed since long before Defendants illegally stopped Plaintiffs. Specifically, at all times relevant hereto, BPD plainclothes officers engaged in warrantless stops and seizures without probable cause, made false arrests, and covered their tracks with fabricated evidence and false statements, as Defendants did here.

A.        The unconstitutional stop.

212.    On April 28, 2010, Messrs. Burley and Matthews were planning to attend a sentencing hearing in the Circuit Court for Baltimore County for a defendant recently convicted of murdering Mr. Burley's cousin.  They wanted to attend the sentencing to provide emotional support to loved ones who were delivering victim impact statements.

213.    Mr. Burley was waiting for Mr. Matthews in his car, which was located near an apartment building on the 3800 block of Parkview Avenue, Baltimore, Maryland.

214.    Mr. Matthews left the building and got into Mr. Burley's car.

215.    There were no illicit drugs or other illegal contraband inside Mr. Burley's car. Plaintiffs had no illicit drugs or other illegal contraband on their persons.

216.    Although there was no reasonable suspicion of criminal activity, Officers Jenkins and Guinn, in an unmarked BPD vehicle, suddenly pulled in front of Mr. Burley's car.

217.    A second unmarked BPD vehicle, operated by Officer Sean Suiter, quickly pulled behind Mr. Burley's car and bumped it so that Mr. Burley was boxed-in and prevented from leaving the area.

218.    The Officers, wearing plainclothes and members of the Violent Crimes Impact Division, jumped out of their cars wearing masks and with their guns drawn.

219.    None of them were in police uniform, displayed identification, or orally identified themselves as police officers.

220.    Prior to this time, Messrs. Burley and Matthews were personally familiar with friends and family who had been robbed and/or kidnapped in a similar manner.

221.    With only a split second to react and fearing that they were about to be robbed or kidnapped by armed gunmen, Mr. Burley, with Mr. Matthews in the passenger seat, maneuvered

his car and narrowly escaped the attempted illegal stop.

222.    The Officers returned to their unmarked BPD vehicles, and a high-speed chase ensued.  At no time did the Officers turn on police sirens or lights to indicate that they were, in fact, police officers.

223.    During the course of that chase, Plaintiffs' car reached an intersection with a four-way stop.  A car being driven by Elbert Davis reached the intersection at approximately the same time and proceeded in front of Mr. Burley's car.  Mr. Burley, who was driving the car, sought to speed through the intersection to avoid hitting the other car but, unfortunately, the two cars collided, and Mr. Davis ultimately died from his injuries.

224.    Fearing for their lives, Messrs. Burley and Matthews left the car after the accident (not knowing that Mr. Davis had been injured) and fled on foot in an attempt to evade the Officers, but were apprehended.

**B.      The illegal planting of heroin.**

225.    Once Messrs. Burley and Matthews were detained on the side of the street, the Officers searched Mr. Burley's car but did not find not find any drugs or weapons.

226.    Officer Jenkins instructed Officer Guinn to call another officer and ask him to bring the "stuff" or "shit" in his car (referring to a stash of illegal drugs to plant on innocent victims).

227.    The Officers needed evidence to justify their illegal stop and search and seizure of Messrs. Burley and Matthews.

228.    In addition to Officers Jenkins and Guinn, who had chased Messrs. Burley and Matthews, two other BPD officers, Officer Gladstone and Sergeant Willard, both part of VCID, were also present on the scene.  Because nothing inside Mr. Burley's car justified these Officers' illegal acts, they planted approximately 32 grams of heroin on the floor of Mr. Burley's car.

229.    Once the heroin was planted, Officer Suiter, was instructed to search the car.

230.    Officer Suiter searched Mr. Burley's car and signaled that he found something.

231.    Despite knowledge that the heroin had been planted, Officers Jenkins, Gladstone, and Guinn, together with Sergeant Willard, intentionally withheld this information from others and used it to arrest Mr. Burley and Mr. Matthews.

232.    In sum, and in light of what was revealed in, *inter alia*, the DOJ Report, the RICO Indictment, the Jenkins and Superseding Indictments (*see* discussion above), and the October 25, 2017, testimony of Mr. Gondo recounted above, the purpose of the warrantless search and seizure of Messrs. Burley and Matthews was to rob them of any drugs or money they may have possessed, as was the policy and practice of the plainclothes units, like the flex squads, SETs, the VCIS, GTTF, and other plainclothes officers, all under the supervision of the BPD.

233.    Further, on information and belief, the Officers possessed the planted heroin because they had stolen it from other victims, as described in the preceding paragraphs, as was the policy and practice of the plainclothes units like the flex squads, SETs, the VCIS, GTTF, and other plainclothes officers, all under the supervision of the BPD.  Had the planted heroin been obtained as part of a properly-documented seizure, the Officers would not have been able to plant it inside of Mr. Burley's car without raising chain of custody concerns and potentially implicating themselves in illegal activity.

### C.    The fabricated statement of probable cause.

234.    Later that day, Officer Jenkins authored a fabricated statement of probable cause in which he falsely claimed that "32 individually wrapped pieces of plastic containing a tan powder substance each weighing approximately one gram (all of which was suspected high purity heroin)" was recovered from Mr. Burley's car.

- 42 -

235.     Although Officer Jenkins knew that he had planted this evidence, he signed the statement affirmatively declaring that his statements were true under the penalties of perjury.

236.     Following the incident, and as admitted in his plea agreement, Officer Jenkins listened to recorded jail calls of Messrs. Burley and Matthews.  On these calls, they said that the heroin recovered from Mr. Burley's car had been planted.

237.     As Officer Jenkins further admitted in his plea agreement, he told a fellow officer that he could not testify if the case went to trial because, "something had been put in the car," or words to that effect, referring to the heroin that had been planted in Mr. Burley's car.   On information and belief, Officer Jenkins made this statement to Officer Guinn.

238.     Based solely on Officer Jenkins' fabricated statement of probable cause, Messrs. Burley and Matthews were charged with two counts: (1) conspiracy to possess with intent to distribute heroin and (2) possession with intent to distribute heroin.

239.     Mr. Burley was also charged with vehicular manslaughter.

**D.     The plea deals.**

240.     After they were arrested, Plaintiffs were given the same choice that most criminal defendants face: take a plea and hope for a reduced sentence or roll the dice and hope a jury acquits, because if it convicts, the full sentence available for the crime will likely be imposed.

241.     For Mr. Burley and Mr. Matthews, there was no real choice to make.  Both were charged in the federal courts, where convictions typically result in sentences far harsher than those for similar convictions in state court.  Additionally, federal prosecutors' success rates with juries far eclipse that of state prosecutors, particularly when one compares cases tried in the United States District Court, where Plaintiffs ultimately entered guilty pleas, with those of the Circuit Court for Baltimore City ("City Circuit Court"), the only other venue in which they could have been

prosecuted.  And a federal jury, which is generally far more predisposed to accept the testimony of a police officer than a jury empaneled in the City Circuit Court, would have heard the coordinated testimony of multiple, veteran, police officers while Plaintiffs would have had no evidence to contradict the Officers' testimony save to testify themselves.

242.   In sum, armed with falsified statements by BPD officers and the tragic death of a third-party, state and federal prosecutors threatened to seek the harshest punishments available against Plaintiffs if they did not enter "universal" guilty pleas (*i.e.*, the only way Plaintiffs might possibly receive reduced sentences was if they both pled guilty to one of the federal charges and if Mr. Burley pled guilty to the state charge).  The prosecutors made clear that they would seek a sentence that, at minimum, would be "nearly double" that imposed after a universal plea.

243.   Faced with the threats of longer federal sentences and with no good way of proving the Officers' misconduct, Messrs. Burley and Matthews ultimately agreed to plead guilty on or about June 9, 2011, to possession with intent to distribute heroin.  Likewise, Mr. Burley agreed to plead guilty to the vehicular manslaughter charge in August 2011.

244.   Mr. Burley was sentenced to 15 years in prison for the federal drug charge, which ran concurrently with a 10-year state sentence for vehicular manslaughter.

245.   Mr. Matthews was sentenced to almost four years in prison (46 months) for the heroin that had been planted in the car in which he was a passenger.

**E.      Messrs. Burley's and Matthews' incarceration.**

246.   On or about September 9, 2013, Mr. Matthews began a three-year supervised release term after having served over two-and-a-half years in federal custody.

247.   Mr. Burley served six-and-a-half years in state prison before being transferred to federal custody on February 3, 2017.  He was ultimately exonerated and released later that year.

F.      **Messrs. Burley's and Matthews' exoneration.**

248.    Despite knowing for many years that the plainclothes units, like the flex squads, SETs, the VCIS, GTTF, and other plainclothes officers had committed the same illegal acts that resulted in Plaintiffs' wrongful incarceration, the BPD and relevant policymakers never investigated the circumstances surrounding Plaintiffs' questionable arrests.

249.    On or about June 22, 2017, a federal grand jury returned a superseding indictment against Mr. Jenkins and other BPD officers ("Superseding Indictment").[1]

250.    As part of their investigation into Mr. Jenkins, federal prosecutors interviewed Mr. Burley about his arrest.

251.    Only then did Mr. Burley, and subsequently Mr. Matthews, learn who had planted the heroin in Mr. Burley's car on April 28, 2010.  While both Plaintiffs knew that the heroin did not belong to them, because of the manner in which they were held after their arrest, they could neither hear the command to bring the heroin nor see the planting of the heroin.

252.    Indeed, because they did not know until that interview with federal prosecutors who planted the heroin, it was not until that interview that either Mr. Burley or Mr. Matthews had confirmation that the statement of probable cause prepared by the Officer Defendants to justify their arrest of Plaintiffs had been falsified.

253.    Having determined that the heroin seized from Mr. Burley's car had been planted, the United States moved to reduce Mr. Burley's sentence to time served.

254.    After a hearing on August 31, 2017, the United States District Court for the District

---

[1]  Two other detectives, not currently identified as having direct involvement in this case, were also charged.

of Maryland granted the Government's motion and released Mr. Burley that same day.

255.   On November 30, 2017, a grand jury returned a separate indictment against Mr. Jenkins, in which he was charged with violations of 18 U.S.C. §§ 2, 242, and 1519, in connection with his execution of the false statement of probable cause described above ("Jenkins Indictment").

256.   Thereafter, Mr. Jenkins sought to consolidate the Jenkins and RICO (and Superseding) Indictments because, in his words, the allegations of misconduct from his 2010 illegal stop of Plaintiffs and from 2015, which in part form the basis for the RICO charges, were "nearly identical."

257.   After further investigation, the Government moved to vacate both Plaintiffs' convictions.

258.   After a hearing on December 18, 2017, the Court granted the Government's motions and vacated Messrs. Burley's and Matthews' federal drug convictions.

259.   The State of Maryland and Mr. Burley jointly moved to withdraw his guilty plea relating to the vehicular manslaughter conviction, which was granted by the City Circuit Court on April 9, 2018.

## G.   **Messrs. Burley's and Matthews' damages**.

260.   Messrs. Burley and Matthews were incarcerated for years in state and federal prisons for crimes they did not commit.  During and after their wrongful incarceration, they suffered significant physical and emotional pain, including but not limited to:

- On the day of the illegal stop, they were stripped of the opportunity to witness the administration of justice against the killer of Mr. Burley's cousin and to provide support to loved ones offering victim impact statements associated with his sentencing.

- Mr. Burley was attacked and stabbed in the face by another inmate while awaiting sentencing.

- They missed, *inter alia*, holidays, birthdays, creating memories with families and young children, and saying goodbye to loved ones who died while they were incarcerated.

- Mr. Burley missed the birth of his grandchildren.  He also missed out on the majority of the life of his daughter, who was only seven years old at the time he was imprisoned and is now graduating from high school.  He was not present when his best friend died, and he was unable to care for or say goodbye to the love of his life, Tawanda Sanderlin, who also died while he was incarcerated.

- Mr. Matthews missed out on his stepson's formative childhood years, lost his best friend, and lost familial relationships that were strained by the false allegations underlying his illegal conviction.

261.     Most importantly, Messrs. Burley and Matthews were stripped of the fundamental freedom to live their lives as autonomous human beings.

262.     As a result of the foregoing, Messrs. Burley and Matthews have suffered tremendous damage, including physical injuries and severe emotional trauma (including post-traumatic stress disorder), all of which were proximately caused by Defendants' misconduct.

263.     Notwithstanding the grave unfairness suffered by Messrs. Burley and Matthews, Mr. Burley is also subject to an insurmountable civil judgment due to Defendants' misconduct. On January 29, 2014, the family of Elbert Davis obtained a judgment against Mr. Burley in the amount of $1,092,500 for the wrongful death of their father, which was proximately caused by the acts of Defendants.

264.     Until the U.S. Attorney's Office revealed the Jenkins Indictment, Messrs. Burley and Matthews did not know and could not have known the full extent of when, how, and why they were injured as described herein, as well as all of those responsible for the same.

265.     On learning of the Jenkins Indictment, former BPD Police Commissioner Kevin Davis admitted that Mr. Jenkins "was able to operate with impunity for this police department for

far too long[.]"

266.    As a result of Mr. Jenkins and the other Officer Defendants, under the supervision of Messrs. Willard, Knoerlein, Fries, and Palmere, operating with impunity as part of the pattern and practice of BPD's lawless plainclothes units, two innocent men were wrongfully incarcerated "for far too long."

## CAUSES OF ACTION

### COUNT I – 42 U.S.C. § 1983
### Violation of Due Process
### (Against Officer Defendants and Defendant Willard)

267.    Each paragraph of this Complaint is incorporated as if fully stated herein.

268.    As described above, Officers Jenkins, Guinn, and Gladstone (the Officer Defendants) and Sergeant Willard, while acting individually, jointly, and/or in concert, as well as under color of law and within the scope of their employment, planted heroin to justify their stop and arrest of Messrs. Burley and Matthews and fabricated false evidence and statements in reports relating to that stop and arrest.

269.    By deliberately failing to disclose the foregoing misconduct, the Officer Defendants and Sergeant Willard violated their clearly established duty to report all material exculpatory and impeachment information to prosecutors.

270.    Absent the Officer Defendants' and Sergeant Willard's misconduct, the prosecution of Mr. Burley and Mr. Matthews could not and would not have been pursued, and Mr. Burley and Mr. Matthews would not have entered into plea agreements.

271.    Officer Defendants' and Sergeant Willard's misconduct directly and proximately resulted in the unjust and wrongful incarceration of both Plaintiffs, thereby denying them their constitutional rights to a fair trial, in violation of the Due Process Clause of the Fourteenth

Amendment to the United States Constitution.

272.    The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

273.    As a direct and proximate result of this violation, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT II – 42 U.S.C. § 1983
## Malicious Prosecution
## (<u>Against Officer Defendants and Defendant Willard</u>)

274.    Each paragraph of this Complaint is incorporated as if fully stated herein.

275.    As described above, the Officer Defendants and Sergeant Willard caused and continued a seizure of Mr. Burley and Mr. Matthews pursuant to a legal process unsupported by probable cause.

276.    The criminal proceedings terminated in Mr. Burley's and Mr. Matthews' favor on December 18, 2017, and April 9, 2018, when their convictions were vacated.

277.    The Officer Defendants and Sergeant Willard had a reasonable opportunity to prevent this harm but failed to do so.

278.    The Officer Defendants and Sergeant Willard undertook the misconduct described herein with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

279.    As a direct and proximate result of the Officer Defendants' and Sergeant Willard's malicious prosecution, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT III – 42 U.S.C. § 1983

- 49 -

**Failure to Intervene**
**(<u>Against Officer Defendants and Defendants Willard, Knoerlein, Fries, and Palmere</u>)**

280.    Each paragraph of this Complaint is incorporated as if fully stated herein.

281.    As described above, by their conduct and under color of law, the Officer Defendants, as well as Messrs. Willard, Knoerlein, Fries, and Palmere failed to intervene to prevent the violation of Mr. Burley's and Mr. Matthews' constitutional rights, even though they had ample opportunity to do so.

282.    The Officer Defendants and Messrs. Willard, Knoerlein, Fries, and Palmere undertook the misconduct described herein with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

283.    As a direct and proximate result of the Officer Defendants' and Messrs. Willard's, Knoerlein's, Fries', and Palmere's failure to intervene, Plaintiffs suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT IV – 42 U.S.C. §§ 1983 and 1985**
**Conspiracy to Deprive Constitutional Rights**
**(<u>Against Officer Defendants and Defendant Willard</u>)**

284.    Each paragraph of this Complaint is incorporated as if fully stated herein.

285.    Prior to the initial seizure of Mr. Burley's car, the Officer Defendants and Sergeant Willard, acting within the scope of their employment and under color of law, agreed among themselves and with other individuals to act in concert to deprive Mr. Burley and Mr. Matthews of their constitutional rights and of equal protection of the laws.

286.    Additionally, before and after the statement of probable cause was filed, the Officer Defendants and Sergeant Willard further conspired to deprive Mr. Burley and Mr. Matthews of exculpatory information to which they were lawfully entitled.  This information would have

- 50 -

resulted in no charges being filed against Plaintiffs, no incarceration, or more timely exoneration.

287.    Accordingly, the Officer Defendants and Sergeant Willard, acting in concert, conspired to accomplish an unlawful purpose by unlawful means.

288.    In furtherance of this conspiracy, the Officer Defendants and Sergeant Willard engaged in and facilitated numerous unlawful acts, including, but not limited to, fabricating evidence and committing perjury in a statement of probable cause, and were otherwise willful participants in the joint activity.

289.    The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.    Moreover, the Officer Defendants' and Sergeant Willard's misconduct obstructed the administration of justice in federal and state courts and was motivated by an attempt to deprive Plaintiffs of the equal protection of the laws.

290.    As a direct and proximate result of the Officer Defendants' and Sergeant Willard's illicit prior agreement and actions in furtherance of the conspiracy discussed above, Mr. Burley and Mr. Matthews suffered injuries, including but not limited to loss of liberty, physical injury, and severe emotional distress.

### COUNT V – 42 U.S.C. § 1983
### Supervisory Liability
### (<u>Against Defendants Willard, Knoerlein, Fries, and Palmere</u>)

291.    Each paragraph of this Complaint is incorporated as if fully stated herein.

292.    Messrs. Willard, Knoerlein, and Fries were supervisors within BPD's plainclothes units and specifically supervised Messrs. Jenkins and Gladstone prior to and during the events at issue.

293.    Mr. Palmere supervised many of the BPD's plainclothes units through their various

- 51 -

iterations. On information and belief, in 2010, Mr. Palmere supervised the Officer Defendants, all of whom were working as plainclothes officers at the time of the unconstitutional conduct at issue.

294.    Messrs. Willard, Knoerlein, Fries, and Palmere had actual or constructive knowledge that the Officer Defendants and other members of the plainclothes units were engaged in widespread misconduct over a period of years that posed an unreasonable risk of constitutional injury to Plaintiffs and other citizens of Baltimore.

295.    In spite of this knowledge, Messrs. Willard, Knoerlein, Fries, and Palmere took no action to prevent or remedy the misconduct by the Officer Defendants and other members of the plainclothes units.  They were deliberately indifferent to the persistent constitutional violations by the Officer Defendants and other plainclothes officers whom he directly supervised.  They routinely failed to supervise and discipline the Officer Defendants and his other subordinates, thus allowing the misconduct to continue and thrive.

296.    As a direct and proximate result of Messrs. Willard's, Knoerlein's, Fries', and Palmere's inaction, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT VI – 42 U.S.C. § 1983**
***Monell* Liability**
**(<u>Against Baltimore Police Department</u>)**

297.    Each paragraph of this Complaint is incorporated as if fully stated herein.

298.    The Officers Defendants' and Sergeant Willard's actions were undertaken pursuant to custom and usage and/or policies and practices of the Baltimore Police Department, ratified by policymakers with final policymaking authority.

299.    These policies and practices included, but were not limited to, permitting police officers to illegally stop, detain, search, and seize persons; permitting the use of fabricated

evidence to support unconstitutional stops and seizures; and suppressing exculpatory and/or impeachment evidence.

300.    These policies and practices were sufficiently widespread within the BPD to assume the quality of a "custom or usage" of which BPD policymakers had actual or constructive knowledge.

301.    The policies and practices described herein were maintained and implemented by the BPD with deliberate indifference to Plaintiffs' constitutional rights.

302.    Prior to and at the time of the events at issue, the BPD, by and through its final policymakers, maintained a policy, custom, pattern, or practice of failing to adequately supervise, discipline, and train members of its plainclothes units with respect to their constitutional obligations.

303.    The misconduct described herein was undertaken with malicious intent and willful indifference to the clearly established constitutional rights of Mr. Burley, Mr. Matthews, and other citizens of Baltimore, particularly other African-American male citizens of Baltimore.

304.    As a direct and proximate result of BPD's actions, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT VII – State Law Claims**
**Malicious Prosecution**
**(Against Officer Defendants and Defendant Willard)**

305.    Each paragraph of this Complaint is incorporated as if fully stated herein.

306.    The Officer Defendants and Sergeant Willard accused Mr. Burley and Mr. Matthews of criminal activity knowing those accusations were without probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue

judicial proceedings.

307.    The Officer Defendants and Sergeant Willard caused Plaintiffs to be subjected improperly to judicial proceedings for which there was no probable cause, resulting in Plaintiffs' injuries.

308.    The Officer Defendants and Sergeant Willard knowingly made false statements regarding Plaintiffs' alleged culpability.

309.    Additionally, the Officer Defendants and Sergeant Willard fabricated evidence and withheld exculpatory evidence that would have proven Plaintiffs' innocence.

310.    The Officer Defendants and Sergeant Willard were aware that, as described more fully above, no actual or truthful evidence would have supported drug charges against Mr. Burley or Mr. Matthews.

311.    The Officer Defendants and Sergeant Willard were further aware that the vehicular manslaughter would not have occurred but for their attempted robbery of Plaintiffs.

312.    The Officer Defendants and Sergeant Willard intentionally misrepresented to both federal and state prosecutors certain facts that would have further vitiated the probable cause against Plaintiffs.

313.    The federal criminal proceedings terminated in Plaintiffs' favor on December 18, 2017, when their drug convictions were vacated.

314.    Similarly, the criminal proceedings for vehicular manslaughter terminated in Mr. Burley's favor on April 9, 2018, when his conviction for that charge was vacated.

315.    The misconduct described in this Complaint was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

316.    As a direct and proximate result of this misconduct, Mr. Burley and Mr. Matthews

suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT VIII – State Law Claims
### Abuse of Process
### (<u>Against Officer Defendants and Defendant Willard</u>)

317.     Each paragraph of this Complaint is incorporated as if fully stated herein.

318.     As described above, the Officer Defendants and Sergeant Willard willfully misused the criminal process against Mr. Burley and Mr. Matthews for a purpose different than its intended purpose.

319.     The Officer Defendants and Sergeant Willard fabricated evidence to frame Plaintiffs for a crime that they did not commit.

320.     The misconduct described in this Complaint was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

321.     As a direct and proximate result of this misconduct, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT IX – State Law Claims
### Intentional Infliction of Emotional Distress
### (<u>Against Officer Defendants and Defendant Willard</u>)

322.     Each paragraph of this Complaint is incorporated as if fully stated herein.

323.     The acts and conduct of the Officer Defendants and Sergeant Willard, as set forth above, were extreme and outrageous; an average member in the community would not expect police officers to falsely frame, arrest, and imprison an innocent citizen.

324.     The Officer Defendants' and Sergeant Willard's actions to detain and search Mr. Burley and Mr. Matthews absent any probable cause were rooted in an abuse of power and were

undertaken with the intent to cause, or in reckless disregard of the possibility that their conduct would cause, severe emotional distress to Plaintiffs.

325.    As a direct and proximate result of this misconduct, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT X – State Law Claims
## Civil Conspiracy
## (<u>Against Officer Defendants and Defendant Willard</u>)

326.    Each paragraph of the Complaint is incorporated as if fully stated herein.

327.    As described more fully above, the Officer Defendants and Sergeant Willard acted in concert with each other and with other co-conspirators to accomplish an unlawful purpose by unlawful means.

328.    In furtherance of the conspiracy, the Officer Defendants and Sergeant Willard committed overt acts or were otherwise willful participants in joint activity, including, but not limited to, malicious prosecution of Mr. Burley and Mr. Matthews.

329.    The misconduct described herein was undertaken with malicious intent and willful indifference to Plaintiffs' clearly established constitutional rights.

330.    As a direct and proximate result of this misconduct, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

## COUNT XI – State Law Claims
## Article 24 of the Maryland Constitution - Declaration of Rights
## (<u>Against Officer Defendants and Defendant Willard</u>)

331.    Each paragraph of this Complaint is incorporated as if fully stated herein.

332.    As described more fully above, the Officer Defendants and Sergeant Willard

violated Mr. Burley's and Mr. Matthews' due process rights because Plaintiffs were wrongfully imprisoned for crimes that they did not commit and which the Officer Defendants and Sergeant Willard knew or should have known they did not commit.

333.    As a direct and proximate result of the Officer Defendants' and Sergeant Willard's actions, Mr. Burley and Mr. Matthews suffered injuries, including, but not limited to, loss of liberty, physical injury, and severe emotional distress.

**COUNT XII – State Law Claims**
**Indemnification**
**(Against Baltimore Police Department)**

334.    Each paragraph of this Complaint is incorporated as if fully stated herein.

335.    Under Maryland law, public entities are directed to pay any tort judgment for which their employees are liable within the scope of their employment.

336.    The Officer Defendants and Messrs. Willard, Knoerlein, Fries, and Palmere are or were employees of the BPD, who acted within the scope of their employment when committing the misconduct described herein.

337.    The Officer Defendants were acting pursuant to the BPD's instruction to get guns and drugs off the streets of Baltimore, and pursuant to BPD's implicit or explicit message to its plainclothes officers that the Department did not care about the methods those officers used towards that end.  They chased, framed, arrested, and prosecuted Messrs. Burley and Matthews using BPD vehicles and guns, carrying BPD badges, during working hours for which they were being paid by BPD.

338.    Accordingly, BPD is required to indemnify any and all of the individual defendants against whom a judgment is entered in this case.

**COUNT XIII – State Law Claims**
**Indemnification for Civil Judgment**
**(Against Officer Defendants and Baltimore Police Department)**

339.     Each paragraph of this Complaint is incorporated as if fully stated herein.

340.     Under Maryland law, a party has a right to indemnification when, without personal fault, he has become subject to tort liability for the unauthorized and wrongful conduct of another.

341.     But for the Officer Defendants' illegal pursuit of Messrs. Burley and Matthews and BPD's knowing failure to supervise and correct such practices, Mr. Burley would not be subject to the over $1 million civil judgment against him (plus post-judgment interest).  The death of Elbert Davis was caused in whole or in part by the acts of the Officer Defendants and the BPD's failure to supervise the Officer Defendants.

342.     Accordingly, the Officer Defendants and BPD are required to indemnify Mr. Burley for the civil judgment that was entered against him due to their misconduct.

## REQUEST FOR DAMAGES

WHEREFORE, Plaintiffs Umar Hassan Burley and Brent Andre Matthews request that this Court enter judgment in their favor and against Defendants Baltimore Police Department, Wayne Jenkins, Ryan Guinn, Keith Gladstone, Richard Willard, William Knoerlein, Michael Fries, and Dean Palmere, and award them:

1.     Compensatory damages, attorneys' fees, and costs, jointly and severally against each Defendant;

2.     Punitive damages against each Defendant;

3.     Payment for the $1,092,500 judgment obtained by the Elbert Davis family against Mr. Burley, plus the post-judgment interest on that judgment; and

4.     Any and all other relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs Umar Hassan Burley and Brent Andre Matthews hereby demand a trial by jury pursuant to Fed. R. Civ. P. 38(b) on all triable issues.

Dated: December 21, 2018                    Respectfully submitted,

                                            _____/s/_____
                                            Steven D. Silverman, Esq. (Bar No. 22887)
                                            ssilverman@mdattorney.com
                                            Andrew C. White, Esq. (Bar No. 08821)
                                            awhite@mdattorney.com
                                            William N. Sinclair, Esq. (Bar No. 28833)
                                            bsinclair@mdattorney.com
                                            Erin Murphy, Esq. (Bar No. 24980)
                                            emurphy@mdattorney.com
                                            SILVERMAN|THOMPSON|SLUTKIN|WHITE, LLC
                                            201 N. Charles Street, Suite 2600
                                            Baltimore, Maryland 21201
                                            Tel: (410) 385-2225
                                            Fax: (410) 547-2432

                                            _____/s/_____
                                            Joshua R. Treem (Bar No. 00037)
                                            jtreem@browngold.com
                                            Andrew D. Freeman (Bar No. 03867)
                                            adf@browngold.com
                                            Chelsea J. Crawford (Bar No. 19155)
                                            ccrawford@browngold.com
                                            Neel K. Lalchandani (Bar No. 20291)
                                            nlalchandani@browngold.com
                                            Brown, Goldstein & Levy, LLP
                                            120 E. Baltimore Street, Suite 1700
                                            Baltimore, Maryland 21201
                                            Tel: (410) 962-1030
                                            Fax: (410) 385-0869

                                            *Attorneys for Plaintiffs Umar Hassan Burley and*
                                            *Brent Andre Matthews*