THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UMAR HASSAN BURLEY, et al.
    *Plaintiffs*,

    v.

BALTIMORE POLICE DEPARTMENT,
et al.

    *Defendants*.

Civil Action No. ELH-18-1743

## MEMORANDUM OPINION

This civil rights case is rooted in the disturbing events of April 28, 2010, and involves current and former members of the Baltimore Police Department ("BPD" or the "Department") and its now defunct Gun Trace Trask Force ("GTTF").

In a 59-page Second Amended Complaint ("SAC," ECF 23), plaintiffs Umar Hassan Burley and Brent Andre Matthews filed suit against the BPD; former Deputy Commissioner Dean Palmere; and several former and current police officers: former Sergeant Wayne Earl Jenkins; former Sergeant Richard Willard; Sergeant William Knoerlein; Sergeant Ryan Guinn; Lieutenant Michael Fries; and former Officer Keith Gladstone.[1]

---

[1] Plaintiffs filed their initial Complaint on June 13, 2018, naming as defendants the BPD, the State of Maryland, Jenkins, Guinn, Gladstone and the Estate of Sean Suiter. ECF 1. They filed a First Amended Complaint on September 11, 2018 (ECF 3), adding Palmere as a defendant, and dismissing the suit as to the State of Maryland and the Estate of Sean Suiter. They also added a count of supervisory liability. On December 21, 2018, plaintiffs filed the SAC, adding Willard, Knoerlein, and Fries as defendants, as well as a claim of "Indemnification for Civil Judgment." ECF 23.

Suiter was a member of the GTTF. He died of a gunshot wound to the head on November 16, 2017, one day before he was scheduled to appear before a federal grand jury. The cause of his death – suicide or homicide – is the subject of continued investigation and debate.

Plaintiffs allege that on April 28, 2010, members of the BPD, "wearing plainclothes" and "masks," "jumped out" of their vehicles "with their guns drawn." *Id*. ¶¶ 216, 217, 218. Plaintiffs, in fear that "they were about to be robbed," sped away in Burley's motor vehicle. *Id*. ¶¶ 2, 221. During the high speed chase that ensued, Burley drove through an intersection and crashed into a vehicle driven by Elbert Davis. *Id*. ¶ 223. Tragically, Mr. Davis was killed. *Id*.[2] The police officers then "planted approximately 32 grams of heroin on the floor" of Burley's vehicle to justify their "illegal acts[.]" *Id*. ¶ 228. Thereafter, based on "a fabricated statement of probable cause," *id*. ¶ 234, Burley and Matthews were charged in federal court with drug related offenses. *See United States v. Burley, et al.*, Case No. RDB-11-74; *see also* ECF 23, ¶ 238. In addition, the State charged Burley with vehicular manslaughter. *See* Baltimore City Circuit Court Case No. 110294026; ECF 23, ¶ 239.

In the federal case, Burley and Matthews ultimately pleaded guilty to possession with intent to distribute heroin. And, Burley pleaded guilty in State court to vehicular manslaughter. *Id*. ¶ 243. However, in 2017 and 2018, plaintiffs' convictions were vacated, after it was determined that the underlying federal charges were unfounded and the product of police corruption. *Id*. ¶¶ 10, 11.

The SAC contains thirteen counts. *Id*. ¶¶ 267-342. Counts I through VI assert claims under federal law, and Counts VII through XIII are premised on Maryland law. Plaintiffs seek compensatory damages, punitive damages, and payment for the civil judgment obtained by the

---

[2] On August 2, 2018, suit was filed by Shirley Johnson, as Personal Representative of the Estate of Mr. Davis, and several relatives of Mr. Davis, against the BPD; Jenkins; Guinn; and several other defendants, including the Estate of Sean Suiter. *See Shirley Johnson, Personal Representative of the Estate of Elbert Davis, Sr., et al. v. Baltimore City Police Department, et al.*, Case No. ELH-18-2375.

family of Mr. Davis against Burley, in the amount of $1,092,500, plus post-judgment interest. *Id.* at 58.

Count I, titled "Violation of Due Process," is lodged under 42 U.S.C. § 1983 against Jenkins, Guinn, Gladstone, and Willard. *Id.* ¶¶ 267-73. Count II asserts a claim of "Malicious Prosecution" under § 1983 against Jenkins, Guinn, Gladstone, and Willard. *Id.* ¶¶ 274-79. Count III, lodged against Jenkins, Guinn, Gladstone, Willard, Knoerlein, Fries, and Palmere, alleges a claim of "Failure to Intervene" under § 1983. *Id.* ¶¶ 280-83. Count IV, filed pursuant to 42 U.S.C. §§ 1983 and 1985, asserts a claim against Jenkins, Guinn, Gladstone, and Willard for "Conspiracy to Deprive Constitutional Rights." *Id.* ¶¶ 284-90. Count V alleges a "Supervisor Liability" claim under § 1983 against Willard, Knoerlein, Fries, and Palmere. *Id.* ¶¶ 291-96. Count VI asserts a "*Monell* Liability" claim against the BPD, pursuant to § 1983. *Id.* ¶¶ 297-304.

Count VII asserts a claim of "Malicious Prosecution" against Jenkins, Guinn, Gladstone, and Willard. *Id.* ¶¶ 305-316. In Count VIII, plaintiffs allege "Abuse of Process," filed against Jenkins, Guinn, Gladstone, and Willard. *Id.* ¶¶ 317-21. Count IX asserts a claim of "Intentional Infliction of Emotional Distress" against Jenkins, Guinn, Gladstone, and Willard. *Id.* ¶¶ 322-25. In Count X, plaintiffs assert a claim of "Civil Conspiracy" against Guinn, Gladstone, and Willard. *Id.* ¶¶ 326-30. Count XI, lodged against Guinn, Gladstone, and Willard, is filed pursuant to Article 24 of the Maryland Declaration of Rights. *Id.* ¶¶ 331-33. In Count XII, plaintiffs seek "Indemnification" against the BPD. And, in Count XIII, they seek "Indemnification for Civil Judgment" against Jenkins, Guinn, Gladstone, and the BPD. *Id.* ¶¶ 334-42.

Three motions to dismiss are pending. BPD and Palmere move to dismiss the SAC, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim. ECF 29. It is supported by a memorandum of law. ECF 29-2 (collectively, the "BPD Motion"). They contend that plaintiffs'

claims against them are time-barred. *Id*. at 2. BPD also asserts that it is protected by sovereign immunity as to plaintiffs' State law claims. *Id*. In addition, defendants argue that plaintiffs fail to state a claim against Palmere for failure to intervene in Count III, and lack standing to seek indemnification in Counts XII and XIII. *Id*.

Fries, Gladstone, Guinn, Knoerlein, and Willard (the "Officer Defendants")[3] join the BPD motion and move to dismiss the SAC for failure to state a claim under Fed. R. Civ. P. 12(b)(6). ECF 33. Their motion is supported by a memorandum of law. ECF 33-1 (collectively, the "Officer Motion"). They assert that all claims, except for plaintiffs' malicious prosecution claims, are time-barred, because plaintiffs "knew the operative facts underpinning their causes of action well within the three year period, but chose to wait to file their suit until eight years later." *Id*. ¶¶ 5-6. In addition, they argue that Count V (Supervisory Liability) and Count VII (Malicious Prosecution) fail to state a claim. *Id*. ¶¶ 7-9.

In a consolidated submission, plaintiffs oppose the BPD Motion and the Officer Motion. ECF 35. They assert that their § 1983 claims are timely because "they did not accrue until Plaintiffs' criminal proceedings fully resolved when their convictions were vacated in December 2017." *Id*. at 13. Further, they contend that they stated claims for malicious prosecution, failure to intervene, and supervisory liability. *Id*. at 23.

The BPD (ECF 40) and the Officer Defendants (ECF 42) have replied. In BPD's reply, the Department asserts that it is not subject to *Monell* liability. ECF 40 at 9. With leave of court (ECF 45), plaintiffs have filed a surreply. ECF 46.

---

[3] In the SAC, plaintiffs define Jenkins, Guinn, and Gladstone collectively as the "Officer Defendants" or "Officers." ECF 23 at 2. Willard, Knoerlein, Fries, and Palmere are not included in that designation. *Id.*

Jenkins joins the BPD Motion and the Officer Motion. Pursuant to Fed. R. Civ. P. 12(b)(6), he also moves to dismiss the SAC, asserting that plaintiffs' claims are time-barred. ECF 41. The motion is supported by a memorandum of law. ECF 41-1 (collectively, the "Jenkins Motion"). Plaintiffs oppose the Jenkins Motion. ECF 43.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6. For the reasons that follow, I shall grant in part and deny in part the BPD Motion (ECF 29); deny the Officer Motion (ECF 33); and deny the Jenkins Motion (ECF 41).

## I.      Factual Background[4]

## A.      The Police Officers

At all relevant times, Jenkins, Guinn, Gladstone, Willard, Knoerlein, Fries, and Palmere were employed by the BPD. ECF 23, ¶ 24.

In 2007, "the BPD formed a new elite, plainclothes unit known as the Violent Crime Impact Division ["VCID"] to focus on 'bad guys with guns.'" ECF 23, ¶ 56.[5] According to plaintiffs, the unit is also known as the Violent Crime Impact Section ("VCIS") and was previously called the Organized Crime Division. *Id.* ¶ 25. Also in 2007, the BPD formed the GTTF, "with the stated goal of tracking and curbing illegal gun sales and gun activity." *Id.* ¶ 157.

Gladstone "is a former member of the BPD." *Id.* ¶ 27. He joined the Department in 1992. *Id.* In 2008, he joined the VCID, and was a member of that unit at the relevant time. *Id.*

---

[4] Given the procedural posture of this case, I must assume the truth of all well-pleaded factual allegations in the Second Amended Complaint. *See E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011). I may also take judicial notice of matters of public record. *Philips v. Pitt County Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

[5] In the SAC, the VCID is referred to alternately as the Violent Crime**s** Impact Division and the Violent Crim**e** Impact Division. *See*, *e.g.*, ECF 23, ¶¶ 25, 56.

Jenkins joined the BPD on February 20, 2003. *Id.* ¶ 25. And, plaintiffs assert that Jenkins joined the VCID in June 2006. *Id.*[6] Jenkins was promoted to Sergeant on November 30, 2012, and in June 2016 he was "named supervisor" of the GTTF. *Id.*

Guinn "is a current member of the BPD." *Id.* ¶ 26. In April 2010, Guinn was a member of VCID. *Id.* And, he is a former member of the GTTF. *Id.*

Willard is a former member of the Department. *Id.* ¶ 28. He "joined the BPD in 1992." *Id.* In April 2010, Willard was "a Sergeant in VCID" and "directly supervised" Jenkins. *Id.*

Knoerlein "is a current member of the BPD." *Id.* ¶ 29. In April 2010, he "was a Sergeant in VCID and directly supervised" Gladstone and Jenkins. *Id.*

Fries is "a current member of the BPD." *Id.* ¶ 30. From at least 2004 to 2006, Fries "was part of a Special Enforcement Team" ("SET") and he "supervised" Jenkins. *Id.*[7] In April 2010, Fries "was a Lieutenant in VCID and directly supervised" Gladstone. *Id.*

Palmere was employed by the Department for more than twenty years before he retired in 2018. *Id.* ¶ 31. During his employment, he "held various supervisory roles within the BPD in which he oversaw plainclothes units." *Id.*; *see also* ¶ 134. From 2008 to 2010, Palmere "led VCID." *Id.* As the head of VCID, Palmere "was a supervisor responsible for Officers Jenkins, Guinn, and Gladstone[.]" *Id.* ¶ 140. And, in 2010 "he was promoted to Chief of the Criminal Investigations Division, into which VCID merged." *Id.* In 2011, Palmere "briefly served as Chief

---

[6] As noted, plaintiffs assert in ECF 23, ¶ 56, that the VCID was created in 2007. But, in ECF 23, ¶ 25, they state that Jenkins joined the VCID in 2006, which would have been prior to the formation of the VCID.

[7] Similar to so-called flex squad units, "SET members normally worked in plainclothes and patrolled the streets in unmarked vehicles." *Id.* ¶ 53. Although the flex squads were managed by each of the Department's nine district commanders, the SETs "were managed directly by the BPD's Chief of Patrol." *Id.*

of the Patrol Division." *Id*. In 2012, he returned "to his role as Chief of the Criminal Investigations Division." *Id*. From 2013 until Palmere retired in 2018, he "served as Deputy Commissioner overseeing the BPD's Patrol and Operations Bureaus, under which the plainclothes units fell." *Id*.

### 1. Gladstone and Jenkins

Gladstone "served as a mentor" to Jenkins, and the officers "began working with each other as early as 2008, frequently making arrests together in 2010." ECF 23, ¶ 78. Plaintiffs allege that the Department had actual or constructive knowledge of the history of "illegal actions" of Gladstone and Jenkins while they were employed by the BPD. *Id*. ¶ 72.

Plaintiffs assert, *id*. ¶ 73: "Gladstone was involved in the 2003 arrest of Mason Weaver, in which a federal judge held that the BPD officers involved had violated Mr. Weaver's constitutional rights." In addition, he was found to have committed misconduct between 2002 and 2004 while working in the Northwest District. *Id*. ¶ 74. And, "on multiple occasions prior to 2010, Officer Gladstone allowed his sources to keep drugs in exchange for information." *Id*. ¶ 75.

In May 2015, while Lieutenant Christopher O'Ree was working with Gladstone, O'Ree "pepper sprayed a man in the face from only a few feet way." *Id*. ¶ 76. Then, Gladstone "grabbed the man by his hair and pulled him to the ground, before running to chase other residents in the vicinity with pepper spray." *Id*. Thereafter, the victim filed a civil rights suit against the officers, and a jury found that Gladstone and O'Ree "had used excessive force and awarded $75,000" to the victim.

Similarly, plaintiffs claim that Jenkins "engaged in repeated misconduct as a police officer," *id*. ¶ 79, and he "was the subject of several . . . investigations" conducted by the BPD's Internal Affairs Division ("IAD"). *Id*. ¶ 95. Over the course of Jenkins' employment with the BPD, he "repeatedly crashed BPD-issued vehicles, damaging them and/or rendering them

inoperable." *Id.* ¶ 80. For example, on July 24, 2004, "Jenkins was involved in a car accident while on duty." *Id.* ¶ 81. And, "IAD subsequently conducted an investigation and disciplined Mr. Jenkins for an accident that it deemed 'preventable.'" *Id.* In addition, plaintiffs allege that "Jenkins modified or enhanced the department-issued vehicles in an effort to withstand frequent collisions – in contravention of BPD policy." *Id.* ¶ 82.

In 2005, Jenkins "struck a private citizen, Timothy O' Conner, in the face." *Id.* O'Conner "suffered a fracture of the bone near his eye." *Id.* Thereafter, O'Conner filed a lawsuit in connection with the incident. *Id.* ¶ 86. In September 2008, Baltimore City "agreed to settle the case . . . for $75,000." *Id.* ¶ 86.

In February 2008, Jenkins, as a VCID member, "fabricated an affidavit in support of a search warrant, writing that a confidential source had told him that a black male by the name of Mickey Oakley was distributing large amounts of cocaine and heroin in Baltimore and that a confidential source had been inside an apartment where the drugs were stored with Mr. Oakley." *Id.* ¶ 87. Jenkins and other officers "entered Mr. Oakley's apartment without a search warrant," a practice known within the BPD as a "sneak and peek." *Id.* ¶ 88. Later that day, Jenkins and Detective Daniel Hersl, an officer who later worked under Jenkins in the GTTF, "apprehended Mr. Oakley." *Id.* ¶ 89.

At a hearing in 2009, Jenkins "took the stand and lied when he stated that" another officer had told Jenkins "that he saw Mr. Oakley exit an apartment building holding a brown paper bag and get into a black SUV." *Id.* ¶ 90. Due to Jenkins's misconduct, the government "later agreed to Mr. Oakley's release from federal prison . . . ." *Id.* ¶ 91.

In an incident in November 2010, Jenkins and Gladstone, while working in the VCID, "arrested Jamal Walker during a car stop and then went to Mr. Walker's home, where they tried to

break in." *Id.* ¶ 92. But, Jovonne Walker, Mr. Walker's wife, "set off a silent burglary alarm during the break-in attempt, which brought police to the home." *Id.* According to plaintiffs, "Jenkins and Gladstone sent the police away so that they could conduct a search of the home themselves." *Id.* However, "once the inconsistencies in Jenkins' account came to light," the government dropped the case against Mr. Walker. *Id.*

Plaintiffs also assert that in May 2011, Jenkins "stole at least $1,800 from an individual's car after an attempted traffic stop and later authored a false incident report to conceal his illegal conduct." *Id.* ¶ 93.

In a 2014 case involving Jenkins and Gladstone, Assistant City State's Attorney Molly Webb notified defense counsel that video camera footage taken of a search of a vehicle "contradicted the sworn statement of probable cause submitted by the officers." *Id.* ¶ 167. In response to the video footage, "Webb dismissed the case and reported the inconsistency" to the IAD. *Id.* ¶ 168. After Webb reported the incident, "Jenkins threatened ASA Webb that she should 'stop talking about him.'" *Id.* ¶ 169. However, "no investigation was conducted and no disciplinary actions were taken against" Jenkins and Gladstone. *Id.* ¶ 170.

Although the BPD knew that "Officer Jenkins engaged in repeated acts of misconduct," *id.* ¶ 183, plaintiffs assert that "the BPD did not punish Officer Jenkins . . . ." *Id.* Instead, it "rewarded him by promoting him to lead" two of the plainclothes units. *Id.*

In a BPD newsletter of an unspecified date, Lieutenant O'Ree purportedly wrote of Jenkins, *id.* ¶ 189: "'I am extremely proud to showcase the work of Sergeant Wayne Jenkins and [his team] . . . Their relentless pursuit to make our streets safer by removing guns and arresting the right people for the right reasons has made our City safer. I couldn't be more proud of the strong work

of this team.'" O'Ree added: "'This team of dedicated detectives has a work ethic that is beyond reproach.'" *Id.*

## 2. Willard, Knoerlein, and Fries

Plaintiffs allege that Willard, Knoerlin, and Fries, who "held supervisory roles within the plainclothes units" in which Jenkins, Gladstone, and Guinn worked, were deliberately indifferent to the conduct of Jenkins, Gladstone, Guinn, and Jemell Rayam. *Id.* ¶¶ 102, 103, 123. According to plaintiffs, these supervisors took no steps "to report or remedy illegal conduct that each of them knew or should have known was occurring in the plainclothes units under their supervision," *id.* ¶ 124, and they "failed to adequately train, investigate, supervise, or discipline" the officers. *Id.* ¶ 127.

From 2004 to 2016, Fries supervised Jenkins as a part of the SET. *Id.* ¶ 105. Fries was Jenkins's supervisor in 2004, "when IAD sustained a finding against Officer Jenkins for a vehicular accident it deemed 'preventable.'" *Id.* ¶ 106. Fries was also Jenkins's supervisor in 2005, when Jenkins struck O'Conner in the face. *Id.* ¶ 107. Although Fries "had actual or constructive knowledge of Officer Jenkins' use of excessive force" against O'Conner, Fries did not take any "remedial or disciplinary action against Officer Jenkins." *Id.* Indeed, in June 2006, Fries "selected Officer Jenkins to join VCID," despite his "knowledge" of Jenkins's "prior misconduct." *Id.* ¶ 109.

Fries also served as "Gladstone's direct supervisor in VCID," beginning in 2008. *Id.* ¶ 110. Fries was Gladstone's supervisor when Gladstone, together with Jenkins, "arrested Mickey Oakley in 2008 and Jamal Walker in 2010." *Id.* ¶ 111.

Beginning in 2006, Knoerlin "supervised Officer Jenkins in VCID." *Id.* ¶ 112. Plaintiffs claim that Knoerlin "had actual or constructive knowledge of Officer Jenkins' history of

misconduct prior to joining VCID, including "the 2004 sustained IAD finding and the 2005 incident involving Timothy O'Conner." *Id*. ¶ 113.

Knoerlin also supervised Officer Gladstone in VCID beginning in 2008. *Id*. ¶ 114. Plaintiffs maintain that Knoerlin "had actual or constructive knowledge of Officer Gladstone's history of misconduct prior to joining VCID, including but not limited to an earlier sustained IAD finding and his practice of allowing individuals to keep drugs in exchange for information." *Id*. ¶ 115. Further, plaintiffs claim that Knoerlin "directly supervised" Jenkins and Gladstone in VCID "when they committed numerous acts of misconduct, including in connection with their arrests" of Oakley and Walker. *Id*. ¶ 116.

Willard also supervised Jenkins in VCID. *Id*. ¶ 117. According to plaintiffs, Willard "had actual or constructive knowledge of Officer Jenkins' history of misconduct prior to joining VCID, including but not limited to the 2004 sustained IAD finding and the 2005 incident involving" O'Conner. *Id*. ¶ 118.

In sum, plaintiffs allege that Willard, Knoerlein, and Fries "condon[ed] numerous instances of misconduct" and "actively encouraged plainclothes officers under their supervision, including Officers Jenkins and Gladstone, to violate the constitutional rights of Baltimore residents." *Id*. ¶ 130. Further, plaintiffs contend that the supervising officers "encouraged and incentivized the officers under their supervision to get as many guns off the street by whatever means necessary, legal or otherwise." *Id*. They add, *id.* ¶ 186, that the BPD "promoted" plainclothes officers "in large part based on their arrest statistics, without regard for the methods the plainclothes officers used to recover those guns and make those arrests." At a BPD ceremony in September 2011, the Department awarded three of seven "Bronze Medals" to Jenkins, Gladstone, and Knoerlein. *Id*. ¶ 188.

### 3. Palmere

Palmere "oversaw many of the BPD's plainclothes units throughout his tenure as a senior officer within the BPD[.]" *Id*. ¶ 134. According to plaintiffs, as a senior command-level officer, Palmere "had actual or constructive knowledge of the Officer Defendants' misconduct" but "did nothing to stop their practices." *Id*. ¶ 134; *see also id.* ¶¶ 140, 145.

In the mid-2000s as Commander of the Central District, "Palmere began supervising" plainclothes officers. *Id*. ¶ 136. In 2005 "Palmere served on the trial board for Officer Thomas E. Wilson, who had entered and searched a home without a warrant, later obtained a warrant, and then falsified police reports to state that he had received the warrant prior to the home invasion . . . ." *Id*. ¶ 137. Although "IAD recommended that Officer Wilson be fired," Palmere "voted for a reduced sentence[.]" *Id*.

From 2008 to 2010, as head of the VCID, "Palmere supervised plainclothes officers during a time of increased citizen complaints and widespread abuses." *Id*. ¶ 138. Plaintiffs allege that Palmere "supervised the VCIS officer who assaulted Jerriel Lyles, resulting in a $200,000 payout to Mr. Lyles." *Id*. Palmere also "had direct oversight responsibility for the three VCIS officers who were charged with kidnapping two Baltimore city teenagers and leaving one in Howard County in 2010[.]" *Id*. According to plaintiffs, Palmere also "assisted and coached" Rayam "in the cover-up of the fatal shooting of Mr. Cannady." *Id*. ¶ 139.

Plaintiffs assert, *id*. ¶ 144: "Palmere was a longstanding friend of and very close to Sergeant Thomas Allers, GTTF's officer-in-charge from July 2013 to June 2016." Palmere "had supervisory responsibility" for Allers. On December 4, 2017, Allers pleaded guilty to "RICO conspiracy charges" and was sentenced to 15 years in prison. *Id*; *see also United States v. Allers*, Case No. CCB-17-452, ECF 19.

In addition, plaintiffs assert that the "continued inaction of Mr. Palmere, over a substantial period of time, in the face of widespread and longstanding abuses committed by plainclothes officers under his supervision, including the Officer Defendants, demonstrates his deliberate indifference to that pattern of misconduct, including the misconduct" against Burley and Matthews. *Id*. ¶ 146. Further, plaintiffs allege that the charges against the GTTF officers "precipitated" the "abrupt retirement" of Palmere. *Id.* ¶ 53.

## B.       The Prosecution Of Plaintiffs

On April 28, 2010, Burley and Matthews "were planning to attend a sentencing hearing" in the Circuit Court for Baltimore City for an individual who was "recently convicted of murdering" Burley's cousin. *Id*. ¶ 212. While plaintiffs were sitting in Burley's vehicle, Jenkins and Guinn, "in an unmarked BPD vehicle, suddenly pulled in front of" Burley's vehicle. *Id*. ¶ 216. Officer Sean Suiter, in a second unmarked vehicle, "quickly pulled behind" Burley's vehicle, bumping it so that plaintiffs were "boxed-in and prevented from leaving the area." *Id*. ¶ 217.

Jenkins, Guinn, and Suiter, who were members of the VCID, "jumped out" of their vehicles, in "plainclothes" and with "masks," and with their "guns drawn." *Id*. ¶ 218. The officers did not display identification. *Id.* ¶ 219. Nor did they orally identify themselves as police officers." *Id*. According to plaintiffs, there was no reasonable suspicion of criminal activity to justify the seizure. *Id.* ¶ 216.

"[F]earing that they were about to be robbed or kidnapped by armed gunmen," Burley "maneuvered his car" and sought to flee in his vehicle, with Matthews in the passenger seat. *Id*. ¶ 221. Jenkins, Guinn, and Suiter "returned to their unmarked BPD vehicles, and a high-speed chase ensued." *Id*. ¶ 222. At no point did the officers "turn on police sirens or lights to indicate that they were, in fact, police officers." *Id*. During the course of the chase, Burley sped through

an intersection and struck a vehicle driven by Elbert Davis. *Id.* ¶ 223. Tragically, Mr. Davis died from injuries suffered in the collision. *Id.*

Following the collision, Burley and Matthews "fled on foot in an attempt to evade the Officers[.]" *Id.* ¶ 224. After they were apprehended, *id.*, the officers searched Burley's vehicle but "did not find any drugs or weapons." *Id.* ¶ 225. Jenkins instructed Guinn "to call another officer and ask him to bring the 'stuff' or 'shit,'" a reference "to a stash of illegal drugs to plant on innocent victims," *id.* ¶ 226, so as to justify the illegal conduct of the police officers. *Id.* ¶ 227. In addition to Jenkins, Guinn, and Suiter, Officers Gladstone and Willard "were also present on the scene." *Id.* ¶ 228.

According to plaintiffs, the officers "planted approximately 32 grams of heroin on the floor of" Burley's vehicle. *Id.* ¶ 228. Thereafter, Suiter "was instructed to search the car." *Id.* ¶ 229. During the search of Burley's vehicle, Suiter "signaled that he found something." *Id.* ¶ 230. The officers then arrested Burley and Matthews. *Id.* ¶ 231.

Later that day, Jenkins "authored a fabricated statement of probable cause . . . ." *Id.* ¶ 234. He claimed that "'32 individually wrapped pieces of plastic containing a tan powder substance each weighing approximately one gram (all of which was suspected high purity heroin)' was recovered from Mr. Burley's car." *Id.* Although Jenkins "knew that he had planted" the heroin, he "signed the statement affirmatively declaring that his statements were true under the penalties of perjury." *Id.* ¶ 235.

On February 10, 2011, Burley and Matthews were indicted in federal court in Case RDB-11-074, and charged with the following federal offenses: (1) conspiracy to possess with intent to distribute heroin and (2) possession with intent to distribute heroin. *Id.* ¶ 238. In addition, Burley was charged in State court with "vehicular manslaughter." *Id.* ¶ 239.

Mindful of the harsh sentences meted out in federal court, the use of statewide juries, and the difficulty in establishing police misconduct, *id.* ¶¶ 240-243, plaintiffs determined that they had "no real choice to make." *Id.* ¶ 241. Accordingly, on June 10, 2011, Burley and Matthews agreed to plead guilty to "possession with intent to distribute heroin." *Id.* ¶ 243; *see* Case RDB-11-074, ECF 54, ECF 55. And, Burley "agreed to plead guilty to the vehicular manslaughter charge in August 2011." ECF 23, ¶ 243. Matthews was sentenced to a period of 46 months' incarceration. *Id.* ¶ 245. Burley was sentenced to a term of imprisonment of 15 years for the federal drug offense, concurrent with a 10-year sentence imposed by the State for vehicular manslaughter. *Id.* ¶ 244.

On September 9, 2013, after Matthews served over two-and-a-half years in federal custody, he "began a three-year supervised release term." *Id.* ¶ 246. Burley "served six-and-a-half years in state prison" before he was "transferred to federal custody on February 3, 2017." *Id.* ¶ 247. He was "released later that year," after he was exonerated. *Id.*

As part of a federal investigation into the GTTF, discussed *infra*, "prosecutors interviewed Mr. Burley about his arrest." ECF 23, ¶ 250. At that point, Burley and Matthews "learn[ed] who had planted the heroin" in Burley's vehicle on April 28, 2010. *Id.* ¶ 251. Plaintiffs ascertained that "the purpose of the warrantless search and seizure" committed by the GTTF officers was "to rob [plaintiffs] of any drugs or money they may have possessed[.]" *Id.* ¶ 232. Moreover, plaintiffs aver that the officers "possessed the planted heroin because they had stolen it from other victims[.]" *Id.* ¶ 233. But, plaintiffs maintain that it was not until Burley's interview with federal prosecutors that they "had confirmation that the statement of probable cause prepared by" the officers "had been falsified." *Id.* ¶ 252.

Initially, in light of what transpired with the GTTF, the government moved to reduce Burley's sentence to time served. *Id.* ¶ 253. Judge Bennett granted that motion after a hearing on

August 31, 2017. *Id.* ¶ 254. Upon further investigation, however, the government "moved to vacate" the convictions of both Burley and Matthews. *Id.* ¶ 257; *see also Burley*, RDB-11-74, ECF 115. Following a hearing on December 18, 2017, Judge Bennett granted the government's motion, vacating plaintiffs' federal drug convictions. ECF 23, ¶ 258; *see also Burley*, RDB-11-74, ECF 118.

Moreover, in a joint motion, the State and Burley "moved to withdraw his guilty plea relating to the vehicular manslaughter conviction[.]" *Id.* ¶ 259. On April 9, 2018, the Circuit Court for Baltimore City granted that motion. *Id.*

### C. The GTTF

As noted, the GTTF was created by the BPD in 2007. ECF 23, ¶ 56. Plaintiffs allege that the GTTF engaged in "unconstitutional conduct," which was "permitted and condoned" by the BPD. *Id.* ¶ 203.

On February 23, 2017, a federal grand jury indicted seven members of the GTTF: Jenkins, along with detectives Momodu Gondo, Evodio Hendrix, Daniel Hersl, Jemell Rayan, Marcus Taylor, and Maurice Ward. *See United States v. Momodu Gondo, et al.*, CCB-17-106, ECF 1 (Indictment); *see* ECF 137 (Superseding Indictment). They were charged with RICO conspiracy and numerous RICO offenses. ECF 23, ¶ 158. Another GTTF officer, Thomas Allers, was separately charged with RICO offenses in Case CCB-17-452. And, on November 30, 3017, in Case CCB-17-0638, a grand jury returned a separate indictment against Jenkins in connection with his execution of the false statement of probable cause that led to plaintiffs' federal prosecution. *Id.* ¶ 255. In particular, Jenkins was charged with violations of 18 U.S.C. §§ 242 and 1519.[8]

---

[8] The investigation of rogue BPD officers is ongoing. An article in the September 11, 2019, edition of the BALTIMORE SUN reports that former BPD Detective Carmine Vignola was recently charged in federal court in connection with his conduct as a member of the GTTF.

According to the SAC, the RICO indictment revealed that the GTTF officers engaged, *inter alia*, in the following acts, ECF 23, ¶ 160:

- Conducting traffic stops of vehicles and stealing money, property, and narcotics from the vehicle occupants; and

- Preparing false and fraudulent official incident and arrest reports, reports of property seized from arrestees, and charging documents to conceal the fact that the defendants stole money, property, and narcotics from individuals.

All but two defendants entered pleas of guilty in the Rico case, CCB-17-106. *See id.*, ECF 156, 157, 195, 215, 257. Rayam pleaded guilty on October 10, 2017. *Id.* ¶ 161. *See also* CCB-17-106, ECF 196 (Rayam Plea Agreement). In Rayam's plea agreement, he admitted, *inter alia*, ECF 23, ¶ 161, that he

> [r]obbed civilians he detained and in some cases arrested and stole money and drugs from them. RAYAM did this beginning in at least 2009 or 2010 when he joined the GTTF. At times, RAYAM shared the proceeds with co-defendants Momodu GONDO ("GONDO"), Wayne Jenkins ("JENKINS"), Daniel Hersl ("HERSL"), Marcus Taylor ("TAYLOR"), Sergeant A and others, and on other occasions, he kept all the proceeds for himself . . . . RAYAM also sold, through associates of his, drugs that JENKINS gave him and split the proceeds of those sales. JENKINS obtained the drugs by robbing detainees and arrestees.

On January 5, 2018, Jenkins pleaded guilty "to racketeering conspiracy, racketeering, two counts of Hobbs Act Robbery, falsification of records in a federal investigation, and four counts of deprivation of rights under color of law." ECF 23, ¶ 99; *see also* CCB-17-106, ECF 254 (Jenkins Plea Agreement); CCB-17-0638, ECF 5 (Jenkins Plea Agreement). Jenkins acknowledged, *inter alia*, that he and other members of the BPD "authored false incident and arrest reports, engaged in warrantless stops and seizures without probable cause, made false arrests, created false charging documents, and planted drugs on defendants." ECF 23, ¶ 99. Also, Jenkins "expressly admitted that heroin had been planted" in Burley's vehicle on April 28, 2010. *Id.* ¶ 100.

Specifically, Jenkins admitted, *id.*:

- "[B]etween in or about April 28, 2010 and November 30, 2017, he knowingly concealed, covered up and falsified and made false entries in an official Statement of Probable Cause . . . reflecting his actions, and actions of his fellow Baltimore Police Department officers, in relation to the seizure of heroin from an automobile operated by U.B. [Mr. Burley] and in which B.M. [Mr. Matthews] was a passenger on April 28, 2010, with the intent to impede, obstruct and influence the investigation and proper administration" of that matter.

- "[W]hile acting under color of law, he willfully deprived" Mr. Burley and Mr. Matthews "of the right, secured and protected by the Constitution and laws of the United States, to be free from the deprivation of liberty without due process of law, which includes the right to be free from incarceration due to the fabrication of evidence by a law enforcement officer."

- He submitted a false Statement of Probable Cause in which he claimed that drugs had been recovered from Mr. Burley's car, even though he knew that the drugs had been planted.

- He failed to correct his false statement during the entire length of Mr. Burley's and Mr. Matthews' incarceration.

- "[W]hile acting under color of law," he willfully deprived Mr. Burley and Mr. Matthews of the constitutional right to "be free from incarceration due to a law enforcement officer's willful failure to disclose exculpatory evidence to a prosecutor."

- He "willfully violated his ongoing obligation to disclose to a prosecutor the fact that he had lied in a Statement of Probable Cause that he knew would be relied upon, and that was in fact relied upon" to detain Mr. Burley and Mr. Matthews.

Hersl and Taylor proceeded to trial before Judge Blake beginning in January 2018. *See* CCB-17-106, ECF 310– ECF 334. The jury found both defendants guilty of RICO conspiracy and RICO offenses. *Id.*, ECF 343.

According to plaintiffs, at the RICO trial, Gondo testified for the government and stated, ECF 23, ¶ 96:

Defendant Wayne Jenkins was very reckless, you know. I mean, he was just out of control, putting citizens at risk, you know, driving on the side of the street, going in people bumpers. I just never saw anything like this . . . . This dude is out of control. . . . It was crazy. Yeah. His -- his tactics in law enforcement, you know, he was -- you know what I mean? He was -- it was crazy. It was bad. It was bad.

Hendrix also testified at the RICO trial. He described Jenkins as "a 'golden boy' and 'prince' within the BPD who was 'untouchable' because he was looked after by higher-ups within the department." *Id*. ¶ 98.

In May 2017, then BPD Commissioner Kevin Davis "announced that he was effectively ending plainclothes policing in Baltimore, explaining that plainclothes officers were the subject of a disproportionate number of complaints and had adopted a 'cutting-corners mindset.'" *Id*. ¶ 173. Commissioner Davis also noted "that requiring officers to wear police uniforms would create a level of accountability that had been previously absent." *Id*. However, in 2018, former BPD Commissioner Darryl De Sousa "revived the plainclothes units." *Id*. ¶ 174.

### D. Pattern and Practice; Customs and Policies

At length, plaintiffs have set forth detailed allegations concerning "rampant misconduct" by officers of the BPD. ECF 23, ¶ 56. And, they claim that BPD's supervisors knew of and "condoned" the "pattern or practice" of misconduct. ECF 23, ¶¶ 33-34, 182.

According to plaintiffs, the "unconstitutional conduct at issue in this case" constituted a "'custom or usage' or pattern or practice of the BPD." *Id*. ¶ 190. They describe the conduct to include "illegally stopping, detaining, searching, and seizing persons; permitting the use of fabricated evidence to support unconstitutional stops and seizures; and suppressing exculpatory and/or impeachment evidence." *Id.*; *see also id.* ¶¶ 69, 70.

Plaintiffs allege that for many years the BPD has "deployed elite units comprised of plainclothes officers," including "flex squads," Special Enforcement Teams ('SETs')", and the VCID. *Id*. ¶ 36. The units were given "wide latitude to investigate and arrest persons suspected of dealing drugs and/or gun violations[.]" *Id*. Further, plaintiffs allege that plainclothes officers

were "known for driving unmarked vehicles towards groups of people, jumping out of their vehicles, and conducting aggressive searches of anyone in the vicinity." *Id.* ¶ 38.

According to plaintiffs, "the BPD's plainclothes officers and units have been a frequent and recurrent source of unconstitutional conduct" since at least the early 2000s. *Id.* ¶¶ 39, 181. Moreover, plaintiffs claim that the Department was "on notice, from at least 2003, of the potential for abuse associated with officers who had wide latitude to police in a manner similar to that of the flex squad officers." *Id.* ¶ 50. They add that, since at least the early 2000s, "the BPD had repeated notice" that "its plainclothes officers engaged in a widespread pattern of flagrant unconstitutional violations" through, *inter alia*, "convictions of its police officers, complaints and suits lodged against their police officers, public reporting, failed polygraph tests, and notifications from state prosecutors[.]" *Id.* ¶ 209.

Plaintiffs assert that although the BPD knew of "the recurrent misconduct by its plainclothes officers," the Department "failed to establish reasonable and necessary systems to train, supervise, investigate, and hold accountable" those officers. *Id.* ¶ 171; *see id.*, ¶ 195. Further, BPD supervisors knew "that plainclothes units were the source of a disproportionate share of complaints against the BPD for many years[.]" *Id.* ¶ 182. Yet, according to plaintiffs, the "BPD continued to permit plainclothes officers to roam the streets with high levels of discretion and little supervision" and "did not institute any meaningful oversight" of the plainclothes units, including flex squads, SETs, and the VCID. *Id.*

Plaintiffs support their allegations with several concrete instances of police misconduct. They also identify numerous individuals exonerated after wrongful conviction. *Id.* ¶ 70.

For example, plaintiffs note that on January 16, 2003, former Judge Andre M. Davis, then on the United States District Court, "rebuked several BPD officers for their conduct in arresting a

defendant named Mason A. Weaver." *Id.* ¶ 40.[9]  At the close of a two-day hearing, the court granted the defendant's motion to suppress "due to the unconstitutional conduct of the BPD officers." *Id.* ¶ 41.  According to the SAC, Judge Davis stated, *inter alia*, *id.*:

- "That the police affidavit used to secure the search warrant contained 'knowing lies.'"

- "'These officers had no justification to seize Mr. Weaver . . . handcuff him and transport him back to – I almost fell out of my chair when I heard that yesterday – transport him back from the shopping center to the apartments and, using the key they had seized from him, go into his apartment.'"

- "'Where are they learning this stuff? . . . Clearly, this was a roll of the constitutional dice on the part of these officers.'"

- "'I am here to protect everybody's constitutional rights.  Everybody's.  And I don't understand why the police don't understand that.'"

- "'They [the officers] are not making cases.  They're not building investigations.  And I say that with all respect to Detective [Keith] Gladstone [seated in court].  They are just making arrests.  They are just making seizures.'"

In 2004, "a BPD officer working as part of a flex squad was accused of dropping a teenage boy in rival gang territory in Southwest Baltimore, where he was assaulted." *Id.* ¶ 45.  On another occasion, in 2005, "two officers, William King and Antonio Murray, were charged and later received 100-year federal sentences for robbing drug dealers, drug trafficking, and gun violations, after terrorizing Baltimore citizens as plainclothes officers for over a decade." *Id.* ¶ 46.

In October and December of 2005, Officer Jemini Jones, "a member of the Southwest District's flex squad," was "accused of raping a woman while on duty on two separate occasions." *Id.* ¶ 47.  In investigating the December 2005 incident, "'Baltimore drug detectives found that flex squad officers had been stealing drugs and cell phones from people they had arrested, planting

---

[9]Judge Davis was subsequently elevated to the Fourth Circuit.  He has since left the federal bench to become the Baltimore City Solicitor.

evidence and making false arrests.'" *Id.* ¶ 48. As a result, the BPD "disbanded the Southwest District's flex squad" and "announced it would conduct an internal affairs investigation into 'every officer in those units.'" *Id.* ¶ 49.

In January 2006, the Baltimore Sun published an article, titled "Questions Raised for Years About City 'Flex Squad.'" *Id.* ¶¶ 42, 43. The article explained that the BPD "employed 'flex squads' in all its districts" and, "unlike normal officers, officers with the flex squads had enhanced freedom 'to chase down suspected criminals in neighborhoods dominated by drug dealing and violence.'" *Id.* ¶ 43. The article stated, *inter alia*: "Defense attorneys, prosecutors and community members say they have heard for years about allegations of misconduct that included planted drugs and troublesome practices about how suspects were treated and charged." *Id.* It also noted: "In a warrant police used to search the flex squad office last month, investigators noted that previous allegations against [certain officers] 'have been made as to the planting of controlled dangerous substances on citizens in an effort to knowingly make false arrests.'" *Id.* (alteration in original).

The Associated Press published an article in September 2006, titled "Baltimore police unit reassigned amid scandal." *Id.* ¶ 55. It noted, *inter alia*, that following a BPD investigation of the SET, "'[d]ozens of criminal cases have been thrown out because of misconduct allegations against [the] specialized unit, allegations that have led the department to reassign all seven of the unit's members to desk jobs.'" *Id.* (alteration in original).

When the VCID was formed in July 2007, *id.* ¶ 56, the BPD "transferred many of the same officers who had been part" of the "beleaguered," flex squads and SETs to the VCID. *Id.* Like the flex squads and SETs, the VCID "operated with little supervision" and "engaged in widespread abuses." *Id.* ¶ 57.

In March 2009, "video evidence confirmed that BPD Officer Michael W. Woodlon, a VCID member, had lied on charging documents to justify a drug arrest for three defendants." *Id*. ¶ 59. Woodlon then joined the Baltimore County Police Department in 2012, but allegedly "resigned" in August 2018 when "his ties" to the GTTF officers "came to light." *Id*.

Also in March 2009, BPD Officer Rayam, who later worked under Jenkins in the GTTF, "fatally shot Shawn Cannady while serving in the VCID. *Id*. ¶ 60. According to plaintiffs, "it was Officer Rayam's third shooting in a span of 20 months." *Id*. The City subsequently "settled a lawsuit brought by Mr. Cannady's family for $100,000." *Id*.

In another incident in June 2009, "Officer Rayam, while driving an unmarked vehicle with two other plainclothes officers, pulled over a driver for allegedly not wearing a seatbelt." *Id*. ¶ 61. During the stop, the officers "put the driver in flex cuffs and stole the $11,000 they found in the car." *Id*. Yet, "[a]round this time," Officer Rayam "was awarded the Citation of Valor & Silver Star for his work" in VCID. *Id*. ¶ 62.

In addition, Fabien Laronde, a VCID officer, "was the subject of numerous complaints" throughout his tenure with the BPD. *Id*. ¶ 63. Laronde was accused, *inter alia*, of "planting evidence and using excessive force in 2006 as well as of conducting an illegal strip search of a man in a shopping center parking lot in 2009." *Id*.

Further, the BPD "suspended" a VCID officer in 2010 "for pocketing money that had been planted on an undercover officer." *Id*. ¶ 64. Also in 2010, the BPD "disbanded a six-member plainclothes unit in the Northwest District after discovering a supervisor and one of the officers had been using a stolen license plate on an unmarked car." *Id*. ¶ 51. And, in 2011, Baltimore City "paid a $100,000 settlement after VCIS members used excessive force against a 65-year-old church deacon who was rolling a tobacco cigarette outside his own home." *Id*. ¶ 65.

Due to the "widespread" misconduct associated with the VCID, "the FBI initiated an investigation" in 2013. *Id*. ¶ 66. The FBI "determined that multiple unit members had falsified reports to further their cases." *Id*. As a result of the investigation, several officers were suspended and another officer "received six months of home detention." *Id*. In addition, a VCID officer pleaded guilty "to federal gun and drug charges and was sentenced to eight years." *Id*. On a wiretapped call, the officer had "discussed planting a gun in an unlicensed cab and then pulling over and arresting the cab driver on a gun violation." *Id*.

In December 2012, the BPD "'rebranded'" the VCID as the "'Special Enforcement Section' ('SES')," retaining many of the VCID officers. *Id*. ¶ 67. The BPD "selected" Jenkins "as an officer-in-charge of a plainclothes SES unit in October 2013," and he "continued to operate with . . . little supervision." *Id*. ¶ 68.

The Baltimore Sun published an article in September 2014, titled "Undue Force." *Id*. ¶ 58. The article noted, *inter alia*, that in 2009, "a plainclothes VCIS member beat up a Baltimore citizen, Jerriel Lyles, in an East Baltimore carryout restaurant," and "Mr. Lyles subsequently settled his excessive force case with the City for $200,000." *Id*. It stated, *id*.: "'Officers in [the VCID] were accused by prosecutors of lying on a search warrant and working to protect a drug dealer in order to make arrests.'"

Additionally, plaintiffs assert that prior to April 2010, the BPD "did not track" complaints against its officers, *id*. ¶ 195, and IAD detectives "lacked key training on how to investigate officers suspected of misconduct." *Id*. ¶ 197; *see also id*. ¶ 205. Plaintiffs maintain that the BPD's disciplinary system, including the IAD, was "deficient" in the following ways, *id*. ¶ 196:

- discouraged individuals from filing complaints;
- tolerated excessive and chronic delays in resolving disciplinary complaints;
- supervisors misclassified serious complaints as minor ones so that they could be resolved at the command level without IAD involvement;

24

- supervisors summarily closed complaints without investigation;
- failed to investigate complaints in a timely manner;
- failed to consider evidence that contradicted explanations provided by officers accused of misconduct;
- failed to probe beyond reports the accused officer already provided;
- provided officers with a detailed notice of the alleged misconduct at the outset of an investigation, compromising the investigation and creating the possibility that the complaining party could be targeted for retaliation or intimidation;
- used a trial board system beset by delays and deficiencies;
- failed to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;
- supervisors failed to identify deficiencies or questionable findings in investigations; and
- did not take steps to ensure that investigators did not have conflicts of interest visa-vis the officers they were investigating.

### E.  The BPD Consent Decree

Following the death of Freddie Gray in April 2015, former Baltimore Mayor Stephanie Rawlings-Blake "asked the United States Department of Justice, Civil Rights Division [('DOJ')], to conduct a pattern-or-practice investigation of BPD's policies." *Id*. ¶ 175.  DOJ issued an "investigative report" on August 10, 2016 ("DOJ Report").  *Id*. ¶ 176.  According to the SAC, the DOJ report included the following findings, *id*.:

- The Civil Rights Division "reviewed hundreds of thousands of pages of documents, including all relevant policies and training manuals used by the [BPD] since 2010; BPD's database of internal affairs files; a random sample of about 800 case files on non-deadly force incidents; files on all deadly force incidents since 2010" and other data;

- The BPD engaged in a "pattern or practice" of conduct that violates the United States Constitution and federal law, including stops, searches and arrests without the reasonable suspicion or probable cause required under the Fourth Amendment to the United States Constitution;

- The foregoing pattern or practice is rooted in BPD's deficient supervision and oversight of officer activity and resulted in part from BPD's zero tolerance enforcement strategy, dating back to the early 2000s;

- The BPD failed to take action against officers with a long history of misconduct that is well known to the department. For example, one officer currently employed by the BPD had received approximately 125 complaints from complainants within the department and from the community since 2010, and many of these complaints allege serious misconduct. However, the DOJ found that the BPD had sustained only one complaint against the officer for minor misconduct;

- In June 2006, the ACLU of Maryland sued the BPD regarding its illegal arrests of thousands of Baltimore residents. In 2010, that case settled with BPD agreeing to change its policies and procedures and submit to an independent auditor to evaluate its progress toward adopting stop and arrest practices consistent with the United States Constitution[.]

Further, the DOJ Report "highlighted the illegal conduct" of plainclothes units, noting that a "'disproportionate share of complaints' identified plainclothes officers as 'particularly aggressive and unrestrained in their practice of stopping individuals without cause and performing public, humiliating searches.'" *Id.* ¶ 177.

On January 12, 2017, the government filed suit in this District against the BPD. According to the SAC, the complaint alleged, *id.* ¶ 178:

- In the late 1990s, BPD adopted zero tolerance policing strategies that prioritized officers making large numbers of stops, searches, and arrests for misdemeanor offenses without ensuring robust oversight to hold officers accountable for misconduct and protect the constitutional rights of Baltimore City residents;

- Based on data from 2010 – 2015, BPD engaged in a pattern or practice of conduct that violated the United States Constitution and federal laws. Those violations included unconstitutional stops, searches, and arrests that run afoul of the rights guaranteed to Baltimore's citizens by the Fourth and Fourteenth Amendments to the United States Constitution; and

- BPD's violations of the Constitution and federal law are driven by BPD's systemic deficiencies in policies, training, supervision, and accountability structures. BPD has been aware of these structural challenges for many years but has not taken adequate steps to comply with the Constitution or federal law.

Additional facts are included, *infra*.

## II. Legal Standard

As noted, defendants have moved to dismiss plaintiffs' claims pursuant to Rule 12(b)(6). A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6). *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom. McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable Defined Benefit Pension Fund Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017). But, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted). The rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 423 (4th Cir. 2018); *Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy

sought. *A Soc'y Without a Name v. Comm'w of Va.*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quotation marks and citation omitted). But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 533 F.3d 334, 336 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 148 (4th Cir. 2014). However, because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464 (quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*).

Of relevance here, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, the adjudicative facts may not be subject to reasonable dispute, in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." And, courts may take judicial notice of publicly available

records, without converting a motion to dismiss to a motion for summary judgment. *See, e.g., Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015) ("Courts are permitted to consider facts and documents subject to judicial notice without converting the motion to dismiss into one for summary judgment."). A court may also take judicial notice of its own records. *Anderson v. Fed. Deposit Ins. Corp.*, 918 F.2d 1139, 1141 n.1 (4th Cir. 1990).

### III.    Discussion

#### A.    Section 1983 Generally

Plaintiffs lodge several claims pursuant to 42 U.S.C. § 1983. It provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 135 S. Ct. 1893 (2015). However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was

committed by a "person acting under the color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). The phrase "under color of state law" is an element that "is synonymous with the more familiar state-action requirement—and the analysis for each is identical." *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (citing *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 929 (1982)). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient." (Citations and internal quotation marks omitted)).

Section 1983 also requires a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). In other words, there is no respondeat superior liability under § 1983. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

## B.     Section 1985 Generally

In Count IV, plaintiffs also rely on 42 U.S.C. § 1985. Section 1985 pertains to conspiracy to violate constitutional rights, and is designed to protect citizens in the following instances:[10]

> (1) Preventing officer from performing duties
>
> If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;
>
> (2) Obstructing justice; intimidating party, witness, or juror

---

[10] Plaintiffs do not specify the particular provision of § 1985 on which they rely. It would seem, however, that they rely on § 1985(3).

If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

(3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

## C.    *Monell* Generally

Plaintiffs have also lodged a *Monell* claim under § 1983. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978). The Supreme Court determined in *Monell* that a municipality is subject to suit under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government, resulting in a violation of the plaintiff's rights. *Id.* at 690-91. As the *Monell*

Court said, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see also Love-Lane*, 355 F.3d at 782. But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 Fed. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained, *id.* at 1359 (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (citing *Monell*, 436 U.S. at 665-683). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691; *Canton*, 489 U.S. at 392; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty., v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

To impose liability on a municipality, a plaintiff must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation" of constitutional rights. *Jordan by Jordan v. Jackson,* 15 F.3d 333, 338 (4th Cir. 1994). "Locating a 'policy' ensures that a municipality is held liable only for

those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[l]iability arises only where the constitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (citing *Monell*, 436 U.S. at 694). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted); *see Moore v. Howard County Police Dep't*, No. CCB-10-1430, 2010 WL 4722043 at *2 (D. Md. Nov. 15, 2010).

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in

*Semple*; citations omitted).  But, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances."  *Id.*

Of relevance here, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'"  *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees."  *Spell*, 824 F.2d at 1387; *see Holloman*, 661 Fed. App'x at 799.  In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state."  *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d at 402, the Fourth Circuit reiterated that, to establish a *Monell* claim, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'"  (quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*).  Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must ... adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan*, 15 F.3d at 338.

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

Under the condonation theory of liability, "a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389). In such a case, however, a plaintiff must show "a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386-1391). Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct." *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391). But, only "'widespread or flagrant'" misconduct is sufficient. *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387). In contrast, "[s]poradic or isolated" misconduct is not. *Owens*, 767 F.3d at 403.

### D.     Statute of Limitations

With the exception of the claims for malicious prosecution in Counts II and VII, defendants move to dismiss plaintiffs' federal and State claims as time-barred. ECF 29-2 at 6; ECF 33-1, ¶¶ 5-6. The parties agree that plaintiffs' claims are subject to a three-year limitations period. However, they dispute the date on which the various claims accrued.

It is clear from the face of the Second Amended Complaint that "the stop, detention, search, and arrest of Plaintiffs occurred on April 28, 2010." ECF 29-2 at 6. Yet, "Plaintiffs did not file

suit until June 13, 2018, over seven years after these events occurred." *Id.* And, as to Willard, Knoerlein, and Fries, plaintiffs "did not file suit until December 21, 2018." ECF 33-1, ¶ 4. Thus, defendants maintain that plaintiffs' claims "are clearly time-barred." ECF 29-2 at 6.

Plaintiffs counter that their federal claims are timely because "they did not accrue until Plaintiffs' criminal proceedings fully resolved when their convictions were vacated in December 2017." ECF 35 at 13. As to the State law claims, plaintiffs argue that defendants "provide no analysis and thus have waived any argument as to timeliness." *Id.*

### 1.    Section 1983 Claims (Counts I – VI)

Section 1983 does not contain a statute of limitations. Thus, to determine whether a § 1983 claim was timely filed, courts look to the statute of limitations from the most analogous state-law cause of action. *Owens*, 767 F.3d at 388; *see also* 42 U.S.C. § 1988(a) ("[I]n all cases where [the laws of the United States] are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies ... the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil . . . cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause[.]").

A suit filed pursuant to 42 U.S.C. § 1983 constitutes a personal injury action. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989). Under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. Md. Code (2013 Repl. Vol., 2018 Supp.), § 5–101 of the Courts and Judicial Proceedings Article ("C.J.").

"Limitations statutes . . . are designed to (1) provide adequate time for diligent plaintiffs to file suit, (2) grant repose to defendants when plaintiffs have tarried for an unreasonable period of

time, and (3) serve society by promoting judicial economy." *Georgia-Pacific Corp. v. Benjamin*, 394 Md. 59, 85, 904 A.2d 511, 526 (2006); *Pierce v. Johns-Manville Sales Corp.*, 296 Md. 656, 665, 464 A.2d 1020, 1026 (1983). In Maryland, "[a]s a general rule, the party raising a statute of limitations defense has the burden of proving that the cause of action accrued prior to the statutory time limit for filing the suit." *Newell v. Richards*, 323 Md. 717, 725, 594 A.2d 1152, 1156 (1991).

Although the Maryland statute of limitations applies, the matter of when a cause of action has accrued under § 1983 is a federal question. *Nassim v. Md. House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995) (en banc) (citing *Cox v. Stanton*, 529 F.2d 47, 50 (4th Cir. 1975)); *see also McDonough v. Smith*, ___ U.S. ___, 139 S. Ct. 2149, 2155 (2019). "An accrual analysis begins with identifying 'the specific constitutional right' alleged to have been infringed." *McDonough*, 139 S. Ct. at 2155 (quoting *Manuel v. Joliet*, ___ U.S. ___, 137 S. Ct. 911, 920 (2017)).

The date of accrual occurs "when the plaintiff possesses sufficient facts about the harm done to him that reasonable inquiry will reveal his cause of action." *Nassim*, 64 F.3d at 955 (citing *United States v. Kubrick*, 444 U.S. 111, 122-24 (1979)). However, "the answer is not always so simple." *McDonough*, 139 S. Ct. at 2155. "Where, for example, a particular claim may not realistically be brought while a violation is ongoing, such a claim may accrue at a later date." *Id.*

Maryland law is largely consistent with federal law. Therefore, I shall look to both federal and Maryland cases concerning accrual.

As noted, under Maryland law, "[a] civil action shall be filed within three years from the date it accrues unless another provision of the Code provides" otherwise. C.J. § 5-101; *see Poole v. Coakley & Williams Const., Inc.*, 423 Md. 91, 131, 31 A.3d 212, 236 (2011). Ordinarily, "'the question of accrual in § 5-101 is left to judicial determination,' unless the determination rests on the resolution of disputed facts regarding discovery of the wrong." *Poole*, 423 Md. at 131, 31 A.3d

at 236 (citation omitted); *see Bank of New York v. Sheff*, 382 Md. 235, 244. 854 A.2d 1269, 1275 (2004) (stating that summary judgment may be appropriate if there is no dispute of material fact as to whether plaintiff was on inquiry notice more than three years before suit was file); *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 95, 756 A.2d 963, 973 (2000) (explaining that the determination of accrual "may be based solely on law, solely on fact, or on a combination of law and fact, and is reached after careful consideration of the purpose of the statute and the facts to which it is applied").

Nevertheless, "[r]ecognizing the unfairness inherent in charging a plaintiff with slumbering on his rights where it was not reasonably possible to have obtained notice of the nature and cause of an injury," the so-called discovery rule is used to determine the date of accrual. *See Sheff*, 382 Md. at 244, 854 A.2d at 1275; *Frederick Road Ltd. P'ship*, 360 Md. at 95, 756 A.2d at 973. "The discovery rule acts to balance principles of fairness and judicial economy in those situations in which a diligent plaintiff may be unaware of an injury or harm during the statutory period." *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 167, 857 A.2d 1095, 1104 (2004).

Under the discovery rule, "a plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010) (citing *Lumsden v. Design Tech Builders, Inc.,* 358 Md. 435, 749 A.2d 796, 801 (2000)), *aff'd*, 495 F. App'x 350 (4th Cir. 2012). Accrual cannot occur until the plaintiff has (or should have) "possession of the critical facts that he has been hurt and who has inflicted the injury." *United States v. Kubrick,* 444 U.S. 111, 122 (1979) (discussing discovery rule in the context of the Federal Tort Claims Act, which requires notice to the government "within two years after such claim accrues"); *see also Gould v. U.S. Dep't of Health & Human Servs.*, 905 F.2d 738, 742 (4th Cir. 1990) (enbanc) ("The clear import of *Kubrick*

is that a claim accrues . . . when the plaintiff knows or, in the exercise of due diligence, should have known both the existence and the cause of his injury."); *Gilbert v. United States*, 720 F.2d 372, 374 (4th Cir. 1983). Notably, "[t]his standard . . . does not require actual knowledge on the part of the plaintiff, but may be satisfied if the plaintiff is on 'inquiry notice.'" *Dual Inc.*, 383 Md. at 167-68, 857 A.2d at 1104 (citing *Am. Gen. Assurance Co. v. Pappano,* 374 Md. 339, 351, 822 A.2d 1212, 1219 (2003); *Doe v. Archdiocese of Wash.*, 114 Md. App. 169, 188-89, 689 A.2d 634, 644 (1997)).

A plaintiff is on inquiry notice when the plaintiff "possesses 'facts sufficient to cause a reasonable person to investigate further, and ... a diligent investigation would have revealed that the plaintiffs were victims of ... the alleged tort.'" *Dual Inc.*, 383 Md. at 168, 857 A.2d at 1104 (quoting *Pennwalt Corp. v. Nasios*, 314 Md. 433, 448–49, 550 A.2d 1155, 1159 (1988)) (alterations in original). Inquiry notice must be actual notice, either express or implied. *Poffenberger v. Risser*, 290 Md. 631, 637, 431 A.2d 677, 681 (1981). But, "[c]onstructive notice or knowledge will not suffice for inquiry notice." *Benjamin*, 394 Md. at 89, 904 A.2d at 529; *see Poffenberger*, 290 Md. at 637, 431 A.2d at 681.

Here, plaintiffs assert three underlying § 1983 claims: (1) a claim of fabrication of evidence, in violation of due process (Count I); (2) a due process claim based on the failure to disclose exculpatory material, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) (Count I); and (3) a claim of malicious prosecution (Count II).[11]

---

[11] Defendants argue that Count I is properly characterized as a "pure" fabrication of evidence claim, not a *Brady* violation. ECF 40 at 4. They contend that plaintiff's *Brady* claim fails as a matter of law because no evidence was withheld from plaintiffs. *Id*. at 2 (quoting *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) ("The alleged 'fabricated evidence' here is Wilmore's false claim that Washington possessed nonpublic knowledge about the crime. . . . What Washington challenges here is not the failure to disclose exculpatory evidence, but rather the creation of false evidence."); *see also Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir.

Defendants acknowledge that a malicious prosecution claim accrues upon termination of prosecution favorable to a plaintiff. ECF 40 at 2; *see also Owens*, 767 F.3d at 390 ("Under the common law, the limitations period for a plaintiff's malicious prosecution claim commences when the proceedings brought against him are resolved in his favor."). In this case, plaintiffs' convictions were vacated in December 2017. Thus, their malicious prosecution claim (Count II) was timely filed.

As to plaintiffs' due process/fabricated evidence claim, defendants contend that the claim accrued on April 28, 2010, when plaintiffs were unlawfully stopped, detained, and arrested. *Id*. They argue that on that date, "Plaintiffs had more than enough factual knowledge of their claims and injuries to bring this action within the applicable three year period of limitations. They knew that they did not possess the drugs, they knew that at least one of the officers had planted the drugs, and they knew that the case against them was fabricated." *Id*. at 4. Thus, they insist that "plaintiffs possessed all of the necessary information" to file suit and "simply failed to do so." *Id*.

Plaintiffs maintain that a fabrication of evidence claim is most analogous to the common law tort of malicious prosecution. ECF 35 at 16. Therefore, they argue that the three-year limitations period did not begin to run until their convictions were vacated in December 2017. *Id*.

The Supreme Court's recent decision in *McDonough*, 139 S. Ct. at 2155, is instructive.[12] There, a grand jury indicted McDonough on numerous counts under New York law. *Id*. at 2154. The case against McDonough proceeded to trial but ended in a mistrial. *Id*. The state retried McDonough, and the second trial ended on December 21, 2012, with an acquittal on all charges.

---

2003) (holding that false police report did not violate *Brady* because "[t]he problem was not that evidence useful to [the defendant] was being concealed; the problem was that the detectives were giving false evidence"). I address this argument, *infra*.

[12] *McDonough* was issued on June 20, 2019, after the parties briefed the pending motions.

*Id*. Nearly three years later, McDonough filed suit under 42 U.S.C. § 1983, claiming that Smith, who was the prosecutor, and other defendants violated his due process rights by fabricating evidence and using it against him before the grand jury and at both trials. *Id*. Based on this timeline, "McDonough's claim was timely only if the limitations period began running at acquittal." *Id*.

The district court dismissed McDonough's fabricated evidence claim as untimely. *McDonough v. Smith*, 15-cv-01505-MAD-DJS, 2016 WL 5717263, at *12 (N.D.N.Y. Sept. 30, 2016). The Second Circuit affirmed, finding that the limitations period began to run "when (1) McDonough learned that the evidence was false and was used against him during the criminal proceedings; and (2) he suffered a loss of liberty as a result of that evidence." *McDonough v. Smith*, 898 F.3d 259, 265 (2d Cir. 2018). In accordance with this standard, the court reasoned that McDonough's fabricated evidence claim accrued when he "was arrested and stood trial." *McDonough*, 139 S. Ct. at 2154.

The Supreme Court reversed. It concluded that the statute of limitations for McDonough's fabricated evidence claim began to run once "the criminal proceedings against him terminated in his favor," *i.e.*, "when he was acquitted at the end of his second trial." *Id*. at 2161.

The ruling of the Supreme Court was consistent with decisions of several circuits, concluding that a fabricated evidence claim begins to run when the criminal proceedings resolve in the defendant's favor. *See Floyd v. Attorney Gen*., 722 F. App'x 112, 114 (3d Cir. 2018); *Mills v. Barnard*, 869 F.3d 473, 484 (6th Cir. 2017); *Bradford v. Scherschligt*, 803 F.3d 382, 387-389

(9th Cir. 2015); *Mondragon v. Thompson*, 519 F.3d 1078, 1083 (10th Cir. 2008); *Castellano v. Fragozo*, 352 F.3d 939, 959-60 (5th Cir. 2003) (*en banc*).[13]

In light of the Supreme Court's ruling in *McDonough*, I conclude that the limitations period as to plaintiffs' fabricated evidence claim began to run when the criminal proceedings against them terminated in their favor, that is, when their convictions were vacated in December 2017. Therefore, plaintiffs' due process/fabricated evidence claim in Count I was timely filed.

Plaintiffs argue that their remaining § 1983 claims (Count III through Count VI) are also timely because they derive from their underlying claims in Counts I and II. *See, e.g., McCarty v. Gilchrist*, 646 F.3d 1281, 1289 (10th Cir. 2011) (applying the same accrual date of plaintiff's underlying malicious prosecution claim as to plaintiff's failure-to-train and failure-to-supervise claims); *Hoskins v. Knox Cty.*, 17084-DLB-HAI, 2018 WL 1352163, at *16 (E.D. Ky. Mar. 15, 2018) (finding that "logic and common sense command that both the supervisor-liability claim and the underlying § 1983 claim upon which it is based accrued at the same time."); *Alvarado v. Hudak*, 14-cv-9641, 2015 WL 9489912, at *2 (N.D. Ill. Dec. 30, 2015) (applying accrual date of underlying claims for unlawful search and seizure to supervisory liability claim); *Ellis v. Lewis*, 5:12-CT-3122-FL (E.D.N.C. Sept. 3, 2014) (finding that plaintiff's supervisory liability claim began to accrue on the same date as plaintiff's underlying Eighth Amendment claim).

At this juncture, I am unable to determine whether these claims were all timely filed. Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint." *Forst*, 4 F.3d at 250. To resolve a limitations issue at the motion to dismiss stage, "all facts necessary to the affirmative defense [must] 'clearly appear[ ] *on the face of the complaint*.'" *Goodman*, 494 F.3d at 464

---

[13] As plaintiffs put it, the Second Circuit's decision in *McDonough* is an outlier. ECF 35 at 17 n.3.

(quoting *Forst*, 4 F.3d at 250) (emphasis added in *Goodman*). On the basis of the SAC, I cannot say whether plaintiffs were on inquiry notice on the date of the illegal stop.

## 2. State Law Claims (Counts VII – XIII)

In a single sentence in their initial submissions, defendants contend that plaintiffs' State law claims, with the exception of Count VII for malicious prosecution, are time-barred under the three-year limitations period. ECF 29-2 at 2; ECF 33-1, ¶ 6. Defendants do not expand upon this contention in their replies. *See* ECF 40; ECF 42.

In opposition, plaintiffs argue that "[s]uch conclusory assertions cannot sustain Defendants' burden of proving an affirmative defense at this stage." ECF 35 at 23 (citing *Goodman*, 494 F.3d at 464). Accordingly, they urge the court to find that defendants have waived this contention. ECF 35 at 23 (citing *Kinder v. White*, 609 F. App'x 126, 132 (4th Cir. 2015) (noting that "fleeting mention of [an argument] in a single sentence . . . is not an argument—it's an observation" and finding such arguments waived)).

I decline to find that defendants waived the limitations defense. But, I do find that defendants' argument as to the expiration of limitations with respect to plaintiffs' State claims is insufficient at this juncture to establish the bar of limitations. *See, e.g., Kinder*, 609 F. App'x at 132 (observing that "[i]t is not the practice of this court to consider an argument that has not been developed in the body of a party's brief . . . ."); *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006) (finding a single "conclusory remark in brief" insufficient to constitute an argument); *Reynolds v. Wagner*, 128 F.3d 166, 178 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion . . . will be deemed waived.").

### E.    Sovereign Immunity

Count VII alleges *Monell* liability against BPD.  BPD contends that it is not subject to *Monell* liability, and that sovereign immunity bars plaintiffs' indemnification claims in Counts XII and XIII.  ECF 40 at 9-12.[14]

Plaintiffs counter that, to the extent BPD asserts the defense of sovereign immunity, it is entitled to sovereign immunity only as to State law claims, but not as to the § 1983 claims.  ECF 46 at 6-8.  I agree.

### 1.    Sovereign Immunity Generally

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another state, or by Citizens or subjects of any Foreign State."

Under the Eleventh Amendment, states generally enjoy immunity from suits brought in federal court by their own citizens.  *See Hans v. Louisiana*, 134 U.S. 1, 3 (1890); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting states may not be sued by private individuals in federal court.").  Therefore, absent consent or a valid congressional abrogation of sovereign immunity, the Eleventh Amendment bars a private individual from bringing suit against a state in federal court

---

[14] In its Motion, BPD asserted only that it "is protected by sovereign immunity as to the state law claims[.]" ECF 29-2 at 2.  In its reply, BPD argued that it is not subject to *Monell* liability. ECF 40 at 9.  Plaintiffs contend that the Court "should not consider the BPD's newly raised argument." ECF 46 at 2 (citing *United States v. Al-Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) ("It is well settled rule that contentions not raised in the argument section of the opening brief are abandoned.").

As noted, by marginal Order of June 3, 2019 (ECF 45), the Court granted plaintiffs' motion for leave to file a surreply concerning whether the BPD is subject to *Monell* liability.  Therefore, the Court will address the issue, as it has been fully briefed by the parties.

to recover damages, unless there is an exception to sovereign immunity. *See Coleman v. Court of Appeals of Md.*, 556 U.S. 30, 35 (2012) ("A foundational premise of the federal system is that States, as sovereigns, are immune from suits for damages, save as they elect to waive that defense."); *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011); *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54-55 (1996) ("For over a century we have reaffirmed that federal jurisdiction over suits against unconsenting States was not contemplated by the Constitution when establishing the judicial power of the United States.") (internal quotation marks and citation omitted); *Edelman v. Jordan*, 415 U.S. 651 (1974).[15]

The Eleventh Amendment did not create sovereign immunity, however. Rather, it preserved the sovereign immunity that the states enjoyed prior to the formation of the Union. *See Alden v. Maine*, 527 U.S. 706, 724 (1999); *see also Sossamon v. Texas*, 563 U.S. 277, 284 (2011). State sovereign immunity "accord[s] states the dignity that is consistent with their status as sovereign entities[.]" *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002).

The Fourth Circuit recently reiterated that the defense of sovereign immunity is a jurisdictional bar, stating that "'sovereign immunity deprives federal courts of jurisdiction to hear claims, and a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.'" *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2018) (quoting *Ackerson v. Bean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009)). Moreover, a defendant "bears the burden of demonstrating" sovereign immunity, because it is "akin to an affirmative defense." *Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 543 (4th Cir. 2014).

---

[15] State sovereign immunity "is an immunity from private suit; it does not . . . bar federal enforcement actions." *Passaro v. Va.*, ___ F.3d ___, 2019 WL 3849555, at *3 (4th Cir. Aug. 16, 2019) (citing *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 71 n.14 (1996)).

Of relevance here, state sovereign immunity not only bars suit against a state; it also bars suit against an instrumentality of a state, sometimes referred to as an "arm of the state," which includes state agencies. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101-02 (1984) ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *see also Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997); *Pense v. Maryland Dep't of Pub. Safety & Corr. Servs.*, 926 F.3d 97, 100 (4th Cir. 2019) *McCray v. Md. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014); *Bland v. Roberts*, 730 F.3d 368, 389 (4th Cir. 2013); *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005). The question here, addressed *infra*, is whether BPD is an arm of the State of Maryland for purposes of State sovereign immunity.

The Fourth Circuit has noted three exceptions to the Eleventh Amendment's prohibition of suits against a state or an arm of the state. In *Lee-Thomas v. Prince George's County Public Schools*, 666 F.3d 244 (4th Cir. 2012), the Court said, *id.* at 249 (internal quotations omitted):

> First, Congress may abrogate the States' Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority. *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) . . . . Second, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004) . . . . Third, a State remains free to waive its Eleventh Amendment immunity from suit in a federal court. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.,* 535 U.S. 613, 618 (2002).

Notably, sovereign immunity has not been congressionally abrogated for claims under § 1983. *See Quern v. Jordan*, 440 U.S. 332 (1979). In *Quern*, 440 U.S. at 345, the Supreme Court concluded that suits by individuals against a state for money damages under § 1983 are barred by the Eleventh Amendment. *Id.* ("[Section] 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States[.]").

A state may waive its Eleventh Amendment sovereign immunity and permit suit in federal court. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618 (2002); *see Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 249. But, the test to determine whether a state has waived its immunity from suit in federal court is a "stringent" one. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 240 (1985), *superseded on other grounds, as recognized in Lane v. Pena*, 518 U.S. 187, 198 (1996); *see Pense*, 939 F.3d at 101. Under *Atascadero*, 473 U.S. at 254, a court may find that a state has waived its Eleventh Amendment immunity "only where stated by the most express language or by such overwhelming implication from the text as will leave no room for any other reasonable construction." (Internal quotation marks and alteration omitted); *accord Pense*, 926 F.3d at 101; *Lee-Thomas*, 666 F.3d at 250-51.

And, under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not extend to a request for prospective injunctive relief to correct an ongoing violation of law. However, to avoid an Eleventh Amendment bar to suit on this basis, the complaint must be lodged against a state official, and it must "alleg[e] an ongoing violation of federal law and see[k] relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002).

"Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (quoting *Kentucky v. Graham*, 473 U.S. 159, 167, n. 14 (1985)); *see also Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 269 (1997) (recognizing exception to Eleventh Amendment immunity for certain suits seeking declaratory and injunctive relief against state officers in their individual capacities); *Bland*, 730 F.3d at 390 ("Because reinstatement is a form of prospective

relief, the refusal to provide that relief when it is requested can constitute an ongoing violation of federal law such that the *Ex parte Young* exception applies.").

## 2. The BPD

With respect to plaintiffs' *Monell* claim (Count VI), the BPD argues that it is not subject to suit because it is a State agency. ECF 40 at 9. And, as to plaintiffs' indemnification claims, Counts XII and Count XIII, the BPD contends that it "has sovereign immunity as to all state law claims, and therefore, the Court has no choice but to dismiss them. There are no exceptions." ECF 40 at 11-12 (internal citations omitted).

Plaintiffs acknowledge that the BPD is entitled to sovereign immunity as to State law claims. But, they maintain that immunity does not extend to the federal claims lodged pursuant to § 1983. ECF 46 at 6-8.

As indicated, State agencies enjoy immunity from suit brought in federal court. *See Hans*, 134 U.S. at 3; *see also Garrett*, 531 U.S. at 363; *Bd. of Educ. of Prince George's Cty. v. Town of Riverdale*, 320 Md. 384, 389, 578 A.2d 207, 210 (1990). However, sovereign immunity "does not immunize political subdivisions of the state, such as municipalities and counties, even though such entities might exercise a 'slice of state power.'" *Ram Ditta v. Md. Nat. Capital Park & Planning Comm'n*, 822 F.2d 456, 457 (4th Cir. 1987) (quoting *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401 (1979)). On the other hand, sovereign immunity applies when "'the governmental entity is so connected to the State that the legal action against the entity would . . . amount to the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties.'" *Lane v. Anderson*, 660 F. App'x 185, 195-96 (4th Cir. 2016) (quoting *Cash v. Granville Cty. Bd. of Educ.*, 242 F.3d 219, 224 (4th Cir. 2001)) (internal quotations omitted).

The question here is whether BPD is a State agency or a local one for purposes of § 1983. To determine whether an entity is sufficiently connected to a state for purposes of immunity, the Fourth Circuit has articulated a nonexclusive list of four factors to be considered: (1) whether the state will pay a judgment against the defendant entity; (2) "'whether the entity exercises a significant degree of autonomy from the state,'" (3) "'whether [the entity] is involved with local versus statewide concerns,'" and (4) "'how [the entity] is treated as a matter of state law.'" *Lane*, 660 F. App'x at 195 (alterations in original) (some alterations omitted) (quoting *Ram Ditta*, 822 F.2d at 457-58).

As indicated, BPD argues that it is not subject to liability with respect to plaintiffs' *Monell* and indemnification claims. To support its position, BPD relies on two recent decisions issued by this court. *See Whetstone v. Mayor & City Council of Balt.*, ELH-18-738, 2019 WL 1200555, at *12 (D. Md. Mar. 13, 2019); *McDougald v. Spinnato*, ELH-17-2898, 2019 WL 1226344, at *11 (D. Md. Mar. 15, 2019).

The plaintiff in *Whetstone* filed a civil rights suit under 42 U.S.C. § 1983 against several defendants, including BPD. 2019 WL 1200555, at *1. In particular, she asserted a *Monell* claim against BPD. *Id*. BPD moved to dismiss under Rule 12(b)(6), for failure to state a claim. *Id*. at *11. This court observed that the BPD is a State agency and thus immune to *Monell* actions. *Id*. at *12. Specifically, the court said: "In the first instance, the claim against the BPD is not viable under *Monell*, as the BPD has been a State agency, not a local agency, since 1867."

However, this statement was dicta; it was not outcome determinative. As the court explained, the plaintiff failed to plead sufficient allegations to support *Monell* liability against the BPD, as she did "not identify any specific ordinances or regulations" that constituted an unconstitutional policy. *Id*. at *11.

In *Spinnato*, 2019 WL 1200555, the plaintiff lodged several claims under 42 U.S.C. § 1983 against many defendants, including former BPD Commissioner Anthony W. Batts, individually and in his official capacity. *Id*. at *1. Batts moved to dismiss plaintiffs' claims, including a *Monell* claim asserted against him in his official capacity, pursuant to Rule 12(b)(6), for failure to state a claim. *Id*. at *2. As Batts was sued in his official capacity, the court regarded plaintiff's *Monell* claim as a suit against the BPD. *Id*. at *8. It said, *id*. at *12:

> Under Maryland law, the BPD has been a State agency, not a local agency, since 1867. *See Mayor & City Council of Baltimore v. Clark*, 404 Md. 12, 23, 944 A.2d 1122, 1128 (2008); *Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 669-70, 541 A.2d 1303, 1306-07 (1988). If the BPD is an arm of the State, it is not a municipality subject to suit under *Monell*. . . . Therefore, there is no basis for a *Monell* claim based on actions of the BPD.

However, as in *Whetstone*, the above statement was merely *dicta*; it was not dispositive of the motion. The court concluded that the plaintiff's factual allegations were insufficient to support a *Monell* claim. *Id*. at *12.

In *Jones v. Chapman*, ELH-14-2627, 2015 WL 4509871, at *10 (D. Md. July 24, 2015), a § 1983 death case involving various members of the BPD, the court said that sovereign immunity protects the BPD against State law claims but not against § 1983 claims. The court explained that "'the BPD is too interconnected with the government of the City so as to constitute a State agency'" and thus the BPD is subject to suit under § 1983. *Id*. at *10 (quoting *Chin v. City of Balt.*, 241 F. Supp. 2d 546, 548 (D. Md. 2003)); *see also Blades v. Woods*, 107 Md. App. 178, 182, 667 A.2d 917, 919 (1995).

The case of *Chin v. City of Baltimore*, 241 F. Supp. 2d 546 (D. Md. 2003), cited by the court in *Chapman*, is informative. The case arose from an encounter between plaintiff Michael Chin and BPD police officers. *Id.* at 547. Several BPD police officers, led by Officer Wilhelm, entered a store owned by Chin, with their weapons drawn. *Id.* The officers searched the premises

without a warrant and "displayed no indicia that they were affiliated with law enforcement." *Id.* They subsequently assaulted Chin and "then handcuffed him for an extended period of time." *Id.* The search did not produce any contraband and, as a result of the search, the store sustained significant property damage. *Id.* Thereafter, Chin filed suit against Officer Wilhelm, the BPD, and the City of Baltimore, pursuant to 42 U.S.C. § 1983, for federal civil rights violations and for State common law and constitutional torts. *Id.*

Judge Blake considered, *inter alia*, "whether the Baltimore Police Department is a state agency for Eleventh Amendment purposes" and therefore entitled to Eleventh Amendment immunity. *Id.* at 548. In connection with the plaintiffs' § 1983 claims, Judge Blake determined that the BPD is "too interconnected with the government of the City" so as to constitute a State agency. *Id.* Therefore, she concluded that it is a "person" subject to suit under § 1983. *Id.*

But, the ruling in *Chin* that Eleventh Amendment immunity did not shield the BPD from § 1983 liability had no bearing on plaintiff's State law claims. Significantly, the *Chin* Court explained, *id.* at 548-49:

> However, with respect to the state law causes of action, the result is different. State sovereign immunity "protects the State not only from damage actions for ordinary torts but also from such actions for State constitutional torts." *Cherkes*, 780 A.2d at 424.[ ] The Baltimore Police Department enjoys sovereign immunity from actions for damages based on state common law torts or state constitutional torts. *See id.* at 422; 436.[ ] The claims against the Baltimore Police Department based on state law will, therefore, be dismissed on sovereign immunity grounds.

In sum, as to the claims under Maryland law, the *Chin* Court considered the BPD an arm of the State. Therefore, based on State sovereign immunity, it dismissed the State law claims against it.

To my knowledge, the Fourth Circuit has not directly addressed this issue. In *Wiley v. Mayor and City Council of Baltimore*, 48 F.3d 773 (4th Cir. 1995), the Court assumed that in a

§ 1983 action, the BPD "may be held accountable . . . ." *Id.* at 776. However, numerous decisions in this District have said that the BPD is not entitled to Eleventh Amendment immunity in regard to a claim under § 1983. *See, e.g., Lucero v. Early*, GLR-13-1036, 2018 WL 4333745, at *6-9 (D. Md. Sept. 11, 2018); *Fish v. Mayor and City Council of Balt.*, CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Rockwell v. Mayor & City Council of Balt.*, RDB-13-3049, 2014 WL 949859, at *11 (D. Md. Mar. 11, 2014); *Humbert v. O'Malley*, WDQ-11-0440, 2011 WL 6019689 (D. Md. Nov. 29, 2011); *Munyiri v. Haduch*, 585 F. Supp. 2d 670, 676 (D. Md. 2008); *Chin*, 241 F. Supp. 2d 546; *Alderman v. Balt. City Police Dep't*, 952 F. Supp. 256 (1997).

Accordingly, plaintiffs' § 1983 claims may proceed against BPD. At this juncture, however, the issue of BPD's duty to indemnify is premature. *See Home Exterminating Co., Inc. v. Zurich-Am. Ins. Grp.*, 921 F. Supp. 318, 324 n.7 (D. Md. 1996) (finding that the "question of indemnification . . . would be premature" at the motion to dismiss stage).

### F.     Failure to State a Claim

#### 1.     *Brady* Claim (Count I)

As indicated, in Count I plaintiffs assert two due process claims against Jenkins, Gladstone, Guinn, and Willard: (1) fabrication of evidence and (2) failure to disclosure exculpatory evidence, as required by *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Defendants move to dismiss plaintiffs' *Brady* claim for failure to state a claim. ECF 29-2 at 10.

The SAC alleges that Jenkins, Gladstone, Guinn, and Willard deliberately failed to disclose to prosecutors that they planted heroin in Burley's vehicle and falsified reports in connection with the arrest of Burley and Matthews on April 28, 2010. ECF 23, ¶ 268. Plaintiffs assert that this failure "directly and proximately resulted in the unjust and wrongful incarceration" of Burley and

Matthews, "thereby denying them their constitutional rights to a fair trial, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Id.* ¶ 271.

Defendants contend that "the relevant theory in the instant case is purely one of *fabrication of evidence*[.]" ECF 40 at 2 (emphasis in original). They argue that the Court "should not permit Plaintiffs to recast their fabrication of evidence claim as a *Brady* claim." ECF 29-2 at 13. Further, they argue that "*Brady* does not apply because Plaintiffs possessed the exculpatory evidence." *Id.* at 10. In this regard, they observe that plaintiffs knew at the time of their arrest that the officers had planted heroin in Burley's vehicle and fabricated the probable cause statement. *Id.* at 7. In addition, defendants assert that "*Brady* principles do not apply in the context of guilty pleas." *Id.* at 11. Rather, it is a "trial right." *Id.* at 12 (citing *United States v. Moussaoui*, 591 F.3d 263, 285 (4th Cir. 2010) ("The *Brady* right . . . is a trial right.")).

Plaintiffs counter that "they did not know who planted the heroin and thus did not possess the exculpatory evidence," an allegation which "must be accepted as true at this stage of the proceedings." ECF 35 at 27. Plaintiffs also argue that defendants' "sweeping contention that *Brady* does not apply before trial conflicts with Fourth Circuit precedent and would eviscerate a fundamental due process protection for criminal defendants." *Id.* at 28.

In *Brady*, 373 U.S. at 87, the Supreme Court expressly held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See also United States v. Agurs*, 427 U.S. 97, 106-07 (1976); *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019); *United States v. Young*, 916 F.3d 368, 382 n.9 (4th Cir. Feb. 21, 2019); *United States v. Horton*, 693 F.3d 463, 470 (4th Cir. 2012). A *Brady* violation occurs when a defendant can show that the evidence at issue (1) was favorable to the defendant, (2)

material to the defense, and (3) the prosecution had the evidence but failed to disclose it. *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972); *Young*, 916 F.3d at 383; *United States v. Sarihifard*, 155 F.3d 301, 309 (4th Cir. 1998).

Evidence is "material" when there is a reasonable probability that, had the evidence been disclosed, the result of the proceedings would have been different. *See Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *United States v. Bagley*, 473 U.S. 667, 682 (1985); *United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015); *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013); *United States v. Kelly*, 35 F.3d 929, 936 (4th Cir. 1994). But, a *Brady* violation does not occur when the alleged exculpatory material is available to the accused from "a source where a reasonable defendant would have looked." *United States v. Wilson*, 901 F.2d 378, 380-81 (4th Cir. 1990). Moreover, mere speculation as to the materials is not enough. *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).

Notably, the "'reasonable probability' standard does not require a showing that a jury more likely than not would have returned a different verdict. Rather, the 'reasonable probability' standard is satisfied if 'the likelihood of a different result is great enough to undermine confidence in the outcome of the trial, or the suppression 'cast[s] serious doubt on the proceedings' integrity.'" *Gilliam*, 932 F.3d at 238 (quoting *Owens*, *supra*, 67 F.3d at 398) (internal citation omitted; alteration in *Gilliam*).

The Fourth Circuit recently explained: "Unlike prosecutors . . . police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith." *Gilliam*, 932 F.3d at 238; *see Owens*, 767 F.3d at 396 & n.6, 401. And, "to prove a due process violation, [plaintiffs] must prove both but-for causation and proximate causation -- in other words, that the alleged wrongful act(s) caused [their] loss of liberty and the loss of liberty was a reasonably

foreseeable result of the act." *Gilliam*, 932 F.3d at 238; *see Massey v. Ojaniit*, 759 F.3d 343, 354-56 (4th Cir. 2014); *Evans v. Chalmers*, 703 F.3d 636, 647-48 (4th Cir. 2012).

Defendants assert that *Brady* does not apply because plaintiffs were in possession of the exculpatory evidence. ECF 29-2 at 10. This argument is not persuasive. The SAC alleges that, at the time of their prosecution, plaintiffs did not know who planted the heroin in Burley's vehicle. ECF 23, ¶¶ 268-72.

Defendants also contend that "*Brady* principles do not apply in the context of guilty pleas." ECF 29-2 at 11. They rely on *United States v. Ruiz*, 536 U.S. 622, 625 (2002), and *Moussaoui*, 591 F.3d at 285-87.

In *Ruiz*, 536 U.S. at 633, the Supreme Court stated that "the Constitution does not require the government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." The *Ruiz* Court explained that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is *voluntary* . . . ." *Id*. at 629 (emphasis in original). It reasoned that impeachment information was not "critical information of which the defendant must always be aware prior to pleading guilty." *Id*. at 630.

However, the Supreme Court did not explicitly address whether the withholding of exculpatory evidence during the pretrial plea-bargaining process violated a defendant's constitutional rights. *Id*. at 630-33. Moreover, there is a well-defined circuit split on the question of whether the *Brady* right to exculpatory information extends to the guilty plea context. *See Moussaoui*, 591 F.3d at 286 (acknowledging circuit split); *see also Alvarez v. City of Brownsville*, 904 F.3d 382, 392-93 (5th Cir. 2018) (same).

The Fifth Circuit has consistently ruled that there is no constitutional right to *Brady* material prior to a guilty plea. *Alvarez*, 904 F.3d at 382-94; *United States v. Conroy*, 567 F.3d

174, 178-79 (5th Cir. 2009) (citing *Matthew v. Johnson*, 201 F.3d 353, 361-62 (5th Cir. 2000)). And, the First and Second Circuits have expressed doubts about a defendant's constitutional entitlement to exculpatory *Brady* material before entering a guilty plea. *United States v. Mathur*, 624 F.3d 498, 507 (1st Cir. 2010) (describing the extension of *Brady* to plea negotiations as "new ground," a "novel approach," and an "unprecedented expansion of *Brady*."); *Friedman v. Rehal*, 618 F.3d 142, 154 (2d Cir. 2010) (observing that "the Supreme Court has consistently treated exculpatory and impeachment evidence in the same way for the purpose of defining the obligation of a prosecutor to provide *Brady* material prior to trial, and the reasoning underlying *Ruiz* could support a similar ruling for a prosecutor's obligations prior to guilty plea") (internal citations omitted).

In contrast, the Seventh, Ninth, and Tenth Circuits have recognized a distinction between impeachment and exculpatory evidence in the guilty plea context, as noted by the Supreme Court in *Ruiz*. *See Smith v. Baldwin*, 510 F.3d 1127, 1148 (9th Cir. 2007) (en banc); *United States v. Ohiri*, 133 F. App'x 555, 562 (10th Cir. 2005) (unpublished) (distinguishing *Ruiz* on the basis, *inter alia*, that "the evidence withheld by the prosecution . . . is alleged to be exculpatory, and not just impeachment, evidence"); *McCann v. Mangialardi*, 337 F.3d 782, 787-88 (7th Cir. 2003) (suggesting, but not deciding due to lack of evidence, that a "*Brady*-type disclosure might be required" where "the government possesses evidence that would exonerate the defendant of any criminal wrongdoing but fails to disclose such evidence during plea negotiations or before the entry of the plea").

The Fourth Circuit has not directly addressed this issue. In *Moussaoui*, 591 F.3d at 285-87, it stated: "The *Brady* right . . . is a *trial* right. It requires a prosecutor to disclose evidence favorable to the defense if the evidence is material to either guilt or punishment . . . . When a

defendant pleads guilty, those concerns are almost completely eliminated because his guilt is admitted." After summarizing the circuit split as to whether the *Brady* right extends to the guilty plea context, however, the Fourth Circuit did not decide the issue. *Id*. at 286. And, I need not do so, because I am not persuaded that the claim is properly cast as a *Brady* violation.

As indicated, defendants argue that plaintiffs have mischaracterized their fabricated evidence claim as a *Brady* violation. In support of their position, defendants rely on *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005). In that case, Washington brought a § 1983 action against Wilmore and other police officers, alleging constitutional violations in connection with his conviction and death sentence for rape and murder. *Id*. at 275. Washington contended, *inter alia*, that Wilmore fabricated evidence and failed to disclose exculpatory evidence as required under *Brady*.

In particular, Washington claimed that Wilmore falsely stated in a police report that Washington had volunteered non-public knowledge of the crime, rather than merely responding to leading questions during an interrogation. *Id.* at 278. Further, Washington argued that Wilmore failed to disclose this false statement to prosecutors. *Id*. at 282. Upon review of the district court's summary judgment ruling, the Fourth Circuit identified the right at stake as a fabricated evidence claim, not a *Brady* claim. *Id*. The *Washington* Court concluded, *id*.: "What Washington challenges here is not the failure to disclose exculpatory evidence, but rather the creation of false evidence."

Plaintiffs counter that the Fourth Circuit's decision in *United States v. Fisher*, 711 F.3d 460 (4th Cir. 2013), issued three years after *Moussaoui*, "speaks most directly to the question at hand." ECF 35 at 28. But, as defendants point out, *Fisher* is not instructive on the question of whether *Brady* applies in the pretrial plea-bargaining context. ECF 40 at 7. Moreover, in my view, *Fisher* is more consistent with the defense position.

In *Fisher*, 711 F.3d at 466, a law enforcement officer investigating the case lied in a sworn search warrant affidavit that led to the recovery of inculpatory evidence forming the basis of the charge to which the defendant, Fisher, pleaded guilty. The officer later entered a plea of guilty to fraud and theft in connection with his official duties. *Id*. at 462, 466. Pursuant to 28 U.S.C. § 2255, Fisher moved to vacate his guilty plea, asserting that the officer's pre-plea misconduct rendered his plea involuntary under *Brady*, 397 U.S. at 755. *Fisher*, 711 F.3d at 464.

On these facts, the Fourth Circuit concluded: "Given the totality of the circumstances of this case—a law enforcement officer intentionally lying in an affidavit that formed the *sole* basis for searching the defendant's home where evidence forming the basis of the charge to which he pled guilty was found—Defendant's plea was involuntary and violated his due process rights." *Id*. at 469 (emphasis added). In finding egregious misconduct, the *Fisher* Court relied on the "highly uncommon" facts of the case, "in which gross police misconduct [went] to the heart of the prosecution's case." *Id*. at 466. Further, the Court reasoned that setting aside the plea "supported . . . the important interest of deterring police misconduct." *Id*. at 469. If a defendant cannot challenge "subsequently discovered police misconduct," the Court observed, "officers may be more likely to engage in such conduct." *Id*.

The *Fisher* Court stated that "this case centers not on a *Brady v. Maryland* failure to disclose but rather on something categorically different: affirmative misrepresentations." *Fisher*, 711 F.3d at 465 n.2. The same may be said here.

In my view, under *Washington v. Wilmore* and *United States v. Fisher*, the claim here is better understood as one of fabrication of evidence. To be sure, the fabricated evidence was not disclosed until after the guilty pleas, when the police corruption was uncovered. In any event, whether the claim is labeled as one under "*Brady*," or one based on fabrication of evidence, is

largely semantic. In the context of this case, the claims are duplicative, and there can be only one recovery. It is not helpful to clog and clutter the SAC with repetitive allegations of what would, either way, amount to a due process violation.

## 2. Failure to Intervene Claim (Count III)

Palmere moves to dismiss plaintiffs' failure to intervene claim in Count III. He argues that he was not "present when the Defendant Officers planted drugs, falsified reports or otherwise committed a tort against Plaintiffs." ECF 29-2 at 15. As such, he lacked specific knowledge of the wrongs alleged and "did not have the opportunity to prevent" them. ECF 40 at 11.

In the SAC, plaintiffs allege that Palmere "had supervisory responsibility for plainclothes units, was aware of constitutional violations by officers in those units (including the Officer Defendants), and failed to take reasonable steps to stop those violations." ECF 23, ¶ 31. Further, plaintiffs claim that Palmere, as head of VCID, "was a supervisor responsible for Officers Jenkins, Guinn, and Gladstone, and had actual or constructive knowledge of their misconduct, including the misconduct that led to the unlawful incarceration" of Burley and Matthews. *Id.* ¶ 140.

The Fourth Circuit has recognized a cause of action for failure to intervene, or "bystander liability," as "'premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them.'" *Stevenson v. City of Seat Pleasant*, 743 F.3d 411, 416-17 (4th Cir. 2014) (quoting *Randall v. Prince George's Cty.*, 302 F.3d 188, 203 (4th Cir. 2002)). "[S]uch a duty attaches when an officer observes or has reason to know that a 'constitutional violation [is being] committed' by other officers and possesses 'a realistic opportunity to intervene to prevent the harm from occurring.'" *Randall*, 302 F.3d at 203-04 (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). Indeed, "it is well-established that

an omission to act, when coupled with a duty to act, may provide a basis for liability" under § 1983.  *Randall*, 743 F.3d at 203.

The theory of bystander liability "permits relief against an officer who '(1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act.'"  *Brooks v. Johnson*, 924 F.3d 104, 110 (4th Cir. 2019) (quoting *Randall*, 743 F.3d at 203).  As to the first prong, the Fourth Circuit noted in *Randall*, 302 F.3d at 203 n.24: "[A] bystanding officer, by choosing not to intervene, functionally participates in the unconstitutional act of his fellow officer.  If the bystander lacks such specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible."

Palmere contends that plaintiffs fail to satisfy the first prong.  He maintains that under the theory of bystander liability, "an officer must be a 'bystander' to the wrongs alleged; in other words, the officer must be an accomplice."  ECF 40 at 11.  Palmere asserts, *id*.: "There is no allegation Palmere had specific knowledge that Defendant Officers planted drugs in Burley's vehicle or that they authored a false report concerning the incident."  Plaintiffs' allegation that he had "actual or constructive knowledge of . . . the misconduct that led to the unlawful incarceration" of Burley and Matthews is "insufficient and conclusory."  *Id*. at 11 n.8.  According to defendant, plaintiffs "must allege actual knowledge of the specific tort, not 'actual or constructive knowledge' of general misconduct that may have led to the violations of constitutional rights."  *Id*.

Defendants' arguments are sound.  Plaintiffs' allegations fail to show that Palmere was present at the relevant time and had "specific knowledge" of his subordinates' unlawful acts in this matter.  Plaintiffs' failure to intervene claim, as asserted against Palmere, is more appropriately analyzed under a theory of supervisory liability.  As discussed below, "supervisory liability arises from the obligation of a supervisory law officer to insure that his subordinates act within the law."

*Randall*, 302 F.3d at 203.  The Fourth Circuit in *Randall*, 302 F.3d at 203, distinguished the two theories:

> The concepts of bystander and supervisory liability are each premised on omissions, but there are significant differences between them. . . . [A]lthough the separate concepts of bystander and supervisory liability arise from a failure to act in the presence of duty, they are based on differing duties and obligations, and our analysis of them is separate and distinct.

Accordingly, plaintiffs' failure to intervene claim against Palmere (Count III) is subject to dismissal.

### 3.  Conspiracy

Jenkins, Guinn, Gladstone, and Willard were sued in Count IV under 42 U.S.C. §§ 1983 and 1985 for "Conspiracy to Deprive Constitutional Rights."  ECF 23, ¶¶ 284-90.  Plaintiffs do not specify a particular provision in § 1985 on which they rely.  But, it would appear that § 1985(3) is the only portion of the statute that would possibly have any relevance.  Curiously, no defendant moved to dismiss the claim under § 1985.

The viability of a conspiracy claim under § 1983 has not been raised or briefed, and therefore I will not address it.  But, it is patently clear that plaintiffs have not stated a claim under § 1985.

Under § 1985(3), quoted earlier, a litigant must allege that the defendant was motivated by a "class-based, invidiously discriminatory animus."  *See Simmons v. Poe*, 47 F.3d 1370, 1376-77 (4th Cir. 1995).  There are no such allegations in the SAC.  Accordingly, because the SAC does not state a § 1985 claim, and in the interest of managing this case, I will dismiss all § 1985 claims.

### 4.  Supervisory Liability (Count V)

Count V asserts a claim for supervisory liability against Willard, Knoerlein, Fries, and Palmere.

Defendants argue that plaintiffs "fail to state a claim because there is no allegation" that defendants were "personally involved in the deprivation of Plaintiffs' constitutional rights." ECF 29-2 at 15. They contend that under § 1983, "individuals are not vicariously liable and cannot be sued under a theory of *respondeat superior*." *Id*. (citing *Love-Lane*, 335 F.3d at 782). Therefore, defendants maintain that "there is no basis for direct liability" against them. ECF 29-2 at 15.

Plaintiffs counter that defendants "misunderstand" supervisory liability. ECF 35 at 25. They agree that "supervisors may not be held liable under a theory of *respondeat superior*." *Id*. at 26. But, they contend that Count V is asserted "under the distinct theory of supervisory liability as recognized by the Fourth Circuit." *Id*. (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) ("Liability in [the] context [of supervisory liability] is not premised on *respondeat superior*, . . . but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.")).

Indeed, a public official or agent "may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676; *see Monell*, 436 U.S. at 691; *Love-Lane*, 355 F.3d at 782 (finding no respondeat superior liability under § 1983); *Trulock*, 275 F.3d at 402 (finding no respondeat superior liability in a *Bivens* suit). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Fourth Circuit has stated: "A supervisor can only be held liable for the failings of a subordinate under certain narrow circumstances." *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013). As indicated, to state a claim for supervisory liability under § 1983, plaintiffs must

allege: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to the knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted); *see also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). In other words, the liability of supervisory officials "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan*, 737 F.2d at 372).

With respect to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 373-74); *see Wilkins*, 751 F.3d at 226. As to the second element, "a plaintiff [o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Randall,* 302 F.3d at 206 (alteration in *Randall* and internal quotations omitted). "Deliberate indifference, however, may be satisfied by showing [a] supervisor's continued inaction in the face of documented widespread abuses." *Id.* (alteration in *Randall* and internal quotations omitted); *see Wilkins*, 751 F.3d at 226-27. As to the third element, "'proof of causation may be direct . . . where the policy commands the injury of which

the plaintiff complains . . . or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions."' *Wilkins*, 751 F.3d at 226-227 (quoting *Shaw*, 13 F.3d at 799).

The case of *Lee v. Queen Anne's County Office of Sheriff,* RDB–13–672, 2014 WL 476233, at *8 (D. Md. Feb.5, 2014), is informative. In *Lee,* the plaintiff had allegedly driven through a stop sign. *Id.* at *1. He claimed that he was not driving the car nor did he drive through a stop sign. Nonetheless, a warrant was issued for his arrest. *Id.* Upon learning about the warrant, Lee surrendered to law enforcement and was "briefly incarcerated before being released on bond that same day." *Id.* He was convicted of fraud, failure to stop, and driving with a revoked license. *Id.* But, an investigation of the events surrounding the stop revealed dashboard camera video evidence suggesting that the deputy had testified falsely. Moreover, the prosecutor purportedly concluded that the camera footage revealed no probable cause for the traffic stop. *Id.* at *2. As a result, the "charges" were subsequently nol prossed. *Id.* at *2.

Lee subsequently filed suit against Queen Anne's County Office of the Sheriff. He alleged that the deputy's actions were "undertaken with malice and that he has suffered mental anguish, emotional pain and suffering, and financial loss as a result." *Id.* at *2. Further, Lee contended that the deputy "'acted with a wanton and reckless disregard for Plaintiff's civil rights by conducting an illegal traffic stop, causing an improper warrant to issue, [and] harassing Plaintiff and his family during a two-month period....'" *Id.* at *17 (quoting the amended complaint). And, pursuant to a theory of supervisory liability under § 1983, plaintiff sought to hold the sheriff of Queen Anne's County liable for the deputy's conduct. *Id.* at *8.

In Lee's amended complaint, he alleged that the sheriff "had constructive knowledge of his deputies' unconstitutional conduct" based on three incidents of prior conduct, *id.* at *9 (quoting the amended complaint):

a. On May 12, 2011, Queen Anne's County deputy John Dennis Hofmann pled guilty to second-degree assault after groping a woman inside his patrol car in August 2009. Deputy Hofmann is the brother of the Queen Anne's County Sheriff, Gary Hofmann. Hofmann remains employed by the Queen Anne's Office of the Sheriff[.]

b. In August 2007, the Queen Anne's County Office of the Sheriff suspended three deputies for misconduct that occurred during a traffic stop. The misconduct concerned violations of departmental policies and procedures having to do with vehicle searches. After the investigation, all three deputies were reinstated even though two deputies had been found to have violated policies and procedures.

c. On March 17, 2004, Queen Anne's County Deputy Sheriff Mark Barbre shot and paralyzed Andrew Pope, III during a traffic stop. Deputy Barbre had signaled for Pope to stop and pull over, but Pope continued to drive his vehicle until he reached his house, where he exited his vehicle and raised his hands in surrender. Deputy Barbre shot his firearm at Pope, striking him in the neck, paralyzing him.

The plaintiff insisted "that these allegations are sufficient to support his claim that [the sheriff] had constructive knowledge of his deputies' unconstitutional conduct" and acted with deliberate indifference. *Id.* Urging dismissal, the sheriff argued that plaintiff relied too heavily on conclusory statements and lacked adequate factual detail to state a claim for supervisory liability. *Id.* at *8.

In effect, the question before the court was whether the "Amended Complaint contain[ed] sufficient examples of past occurrences to state a valid claim and avoid dismissal at this early stage of the litigation." *Id.* at *9. The *Lee* Court found that the allegations "present[ed] a close case," but it ruled that plaintiff adequately pleaded a claim for § 1983 supervisory liability. *Id.*

The court noted that "the specific instances of misconduct adequately supplement that claim and demonstrate the requisite constructive knowledge and deliberate indifference." *Id.* In

particular, it said that "[t]he 2007 event pertaining to the traffic stop clearly raises potential Fourth Amendment issues" similar to the case at bar. *Id.* The court also noted that "[t]he 2009 and 2007 incidents, as alleged, also suggest that the Sheriff's Office-and Sheriff Hofmann in particular-have failed to properly supervise and discipline the deputies because the deputies allegedly remained a part of the Sheriff's Office despite their misconduct." *Id.* The court observed: "Above and beyond these incidents, [plaintiff's] claims involve repeated instances of harassment spanning a two month period." *Id.*

Here, the SAC sets out in abundant detail a protracted history of misconduct by members of the BPD who were under the supervision of these defendants.

For example, and as already recounted, plaintiffs allege that Fries was Officer Jenkins's supervisor in 2005, when "Jenkins struck Timothy O'Conner in the face," resulting in a settlement paid by Baltimore City. *Id.* ¶ 107. Jenkins and another officer claimed that "they had not seen who had harmed Mr. O'Conner as they were purportedly distracted by another altercation." *Id.* ¶ 85. However, "two witnesses testified that they saw an officer throw Mr. O'Conner to the ground and hold him down with a nightstick." *Id.* ¶ 85. According to the SAC, "Fries had actual or constructive knowledge of Officer Jenkins' use of excessive force against Timothy O'Conner," but "took no remedial or disciplinary action against Officer Jenkins." *Id.* ¶ 108.

The SAC also states that Fries supervised Jenkins "when IAD sustained a finding against Officer Jenkins for a vehicular accident it deemed 'preventable.'" *Id.* ¶ 106. In addition, Fries and Knoerlein directly supervised Officer Gladstone in VCID when Gladstone and Jenkins arrested Mickey Oakley in 2008 and Jamal Walker in 2010. *Id.* ¶¶ 111, 116.

Further, plaintiffs allege that Jenkins and other officers entered Oakley's apartment without a search warrant, a practice known as a "sneak and peak." *Id.* ¶ 88. That same day, Jenkins and

another GTTF officer "stopped and apprehended" Oakley. *Id*. ¶ 89. Plaintiffs claim that at a hearing in 2009, "Officer Jenkins took the stand and lied when he stated a fellow officer . . . had told him that he saw Mr. Oakley exit an apartment building holding a brown paper bag and get into a black SUV." *Id*. ¶ 90. Due to Jenkins's misconduct, prosecutors later agreed to release Oakley from prison. *Id*. ¶ 91.

The SAC also alleges that in November 2010, Jenkins and Gladstone "arrested Jamal Walker during a car stop and then went to Mr. Walker's home, where they tried to break in." *Id*. ¶ 92. During the attempted break-in, a silent alarm was set off, which brought additional officers to the home. *Id*. But, Jenkins and Gladstone "sent the police away so that they could conduct a search of the home themselves." *Id*. According to the SAC, "[p]rosecutors later dropped the case against Mr. Walker once the inconsistencies in Jenkins' account came to light." *Id*.

In addition, plaintiffs allege that Willard supervised Jenkins, both prior to and during the arrest of Burley and Matthews on April 28, 2010. *Id*. ¶ 117. According to plaintiffs, "Willard had actual or constructive knowledge of Officer Jenkins' history of misconduct prior to joining VCID," including "the 2004 sustained IAD finding and the 2005 incident involving Timothy O'Conner." *Id*. ¶ 118. Also, "Willard was present at the scene when drugs were planted in Mr. Burley's car[.]" *Id*. ¶ 119.

Willard, Knoerlein, and Fries also held "supervisory roles in VCID . . . when that unit's officers were committing widespread abuses, including the repeated illegal conduct of Jemell Rayam." *Id*. ¶ 123. In March 2009, Rayam "fatally shot Shawn Cannady while working as part of VCIS." *Id*. ¶ 60. It was Rayam's "third shooting in a span of 20 months." *Id*. And, the City "later settled a lawsuit brought by Mr. Cannady's family for $100,000." *Id*.

With respect to Palmere, the SAC alleges that he "had actual or constructive knowledge of the misconduct by officers in the plainclothes units" based on several incidents of misconduct. *Id.* at 24. Plaintiffs assert that Palmere "supervised the VCIS officer who assaulted Jerriel Lyles, resulting in a $200,000 payout to Mr. Lyles." *Id.* ¶ 138. Also, Palmere "had direct oversight responsibility for the three VCIS officers who were charged with kidnapping two Baltimore city teenagers and leaving on in Howard County in 2010[.]" *Id.* At the GTTF trial, former GTTF member Momodu Gondo testified that "Palmere assisted and coached" Rayam "in the cover-up of the fatal shooting of Mr. Cannady." *Id.* ¶ 139. Further, plaintiffs allege that Palmere "did not take any steps to report or remedy illegal conduct of the Officer Defendants or other plainclothes officers that he knew of or should have known of." *Id.* ¶ 145.

Taking the foregoing allegations as true, and drawing all inferences in plaintiffs' favor, as I must, the SAC amply states a claim of supervisory liability as to Willard, Knoerlein, Fries, and Palmere.

### 5.      Malicious Prosecution (Count VII)

In Count VII, plaintiffs lodge a malicious prosecution claim under State law against Jenkins, Guinn, Gladstone, and Willard. The SAC alleges that the officers accused Burley and Matthews "of criminal activity knowing those accusations were without probable cause, and they made statements to prosecutors with the intent of exerting influence and to institute and continue judicial proceedings." ECF 23, ¶ 306. Plaintiffs further aver that defendants "fabricated evidence and withheld exculpatory evidence that would have proven Plaintiffs' innocence." *Id.* ¶ 309.

Guinn, Gladstone, and Willard seek dismissal of the malicious prosecution claim. They assert that no defendants, except for Jenkins, "are alleged to have made false statements leading to the prosecution of Plaintiffs[.]" ECF 33-1, ¶ 7.

To state a claim for malicious prosecution under Maryland law, a plaintiff must allege that the defendant instituted or continued a criminal proceeding; the proceeding was resolved in favor of the accused; there was no probable cause for the proceeding; and the defendant acted with malice, or for the primary purpose other than that of bringing an offender to justice. *See*, *e.g.*, *Okwa v. Harper*, 360 Md. 161, 183, 757 A.2d 118, 130 (2000). Notably, "[w]here a party instigates, aides or assist [sic] in a criminal prosecution he/she may be liable even where he/she did not swear out a warrant." *Smithfield Packing Co., Inc. v. Evely*, 169 Md. App. 578, 193, 905 A.2d 845, 854 (2006). Conversely, a person is not liable for malicious prosecution "for relying upon the independent judgment of a prosecutor or attorney where the defendant has made a full disclosure of all material facts relative to the charges being made." *Id.* at 593-94, 905 A.2d at 854.

In *Southern Management Corp. v. Taha*, 378 Md. 461, 473, 836 A.2d 627, 633 (2003), the Maryland Court of Appeals said:

> A person is responsible for starting a criminal proceeding who . . . directs or requests a prosecution based on information which the person knows is false or withholds information which a reasonable person would realize might affect the decision to prosecute, . . . or gives inaccurate or incomplete information to those who prosecute.

But, "the plaintiff must establish that the defendant committed the tort with some improper purpose or motive. Mere negligence in instituting unjustified criminal proceedings against the plaintiff cannot satisfy the 'malice' element." *Montgomery Ward v. Wilson*, 339 Md. 701, 719, 664 A.2d 916, 925 (1995).

Here, plaintiffs adequately set forth the elements of a malicious prosecution claim. Defendants do not dispute the first three elements, *i.e.*, a criminal proceeding was instituted against plaintiffs, their convictions were vacated, and there was no probable cause for the proceeding. Defendants dispute only the final element, *i.e.*, whether they acted with malice. Defendants argue

that plaintiffs fail to state a claim against them, because only Jenkins is alleged to have fabricated the probable cause statement.

Defendants' arguments are unavailing. The SAC alleges that Guinn, Gladstone, and Willard "planted heroin inside" Burley's vehicle "from a stash of drugs that the Officers carried with them for the purpose of framing innocent persons." ECF 23, ¶ 4. Plaintiffs also state that the officers "intentionally withheld" their knowledge of the planted drugs from others and used this information to arrest Burley and Matthews. *Id*. ¶ 231. Further, federal prosecutors relied on the planted evidence to bring criminal charges against Burley and Matthews. *Id*. ¶ 6.

The foregoing allegations more than adequately support plaintiff's malicious prosecution claim against Guinn, Gladstone, and Willard. As indicated, "[w]here a party instigates, aides or assist [sic] in a criminal prosecution he/she may be liable even where he/she did not swear out a warrant." *Smithfield*, 169 Md. App. at 193, 905 A.2d at 854.

Accordingly, plaintiffs state a claim of malicious prosecution in Count VII.

## IV.     Conclusion

For the reasons stated above, I shall GRANT the BPD Motion (ECF 29) with respect to plaintiffs' failure to intervene claim (Count III) asserted against Palmere. I shall otherwise deny the BPD Motion. I shall also DENY both the Officer Motion (ECF 33) and the Jenkins Motion (ECF 41).

An Order follows, consistent with this Memorandum Opinion.


Date: September 12, 2019                        _____/s/_____

                                        Ellen L. Hollander
                                        United States District Judge